# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

LEE SCHMIDT; CRYSTAL ARRINGTON,

*Plaintiffs-Appellants*,

v.

CITY OF NORFOLK; MARK TALBOT, IN HIS OFFICIAL CAPACITY AS THE NORFOLK CHIEF OF POLICE,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Virginia, Norfolk Division
No. 2:24-cv-621
The Honorable Mark S. Davis

## BRIEF OF THE CATO INSTITUTE AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS

Matthew P. Cavedon
  *Counsel of Record*
Brent Skorup
Laura A. Bondank
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20001
(706) 309-2859
mcavedon@cato.org

Dated: April 20, 2026

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The Cato Institute is a nonprofit entity operating under § 501(c)(3) of the Internal Revenue Code. *Amicus* is not a subsidiary or affiliate of any publicly owned corporation and does not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to *amicus*'s participation.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.......................................... i

TABLE OF AUTHORITIES ............................................................................... iii

INTEREST OF *AMICUS CURIAE*......................................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..............................2

ARGUMENT .......................................................................................................6

    I.      NORFOLK'S ALPR NETWORK GIVES POLICE A DISCRETIONARY, SUSPICIONLESS SEARCH POWER. ..................6

    II.    THE DISTRICT COURT'S DECISION INVITES THE GOVERNMENT TO BUILD NETWORKS OF CONTINUOUS SURVEILLANCE. .................................................................................10

        A.    ALPRs...........................................................................................11

        B.    Drones .........................................................................................14

        C.    Security Cameras ........................................................................17

CONCLUSION...................................................................................................20

CERTIFICATE OF COMPLIANCE ..................................................................21

CERTIFICATE OF SERVICE ...........................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Buonocore v. Harris*, 65 F.3d 347 (4th Cir. 1995) ....................................................3

*Carpenter v. United States*, 585 U.S. 296 (2018) ................................. 4, 8, 9, 11, 19

*Kyllo v. United States*, 533 U.S. 27 (2001) ............................................................11

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
  2 F.4th 330 (4th Cir. 2021) .................................................................................8, 9

*Messerschmidt v. Millender*, 565 U.S. 535 (2012) .................................................9

*Riley v. California*, 573 U.S. 373 (2014) .................................................................7

*Silverman v. United States*, 365 U.S. 505 (1961) ..................................................11

*Stanford v. Texas*, 379 U.S. 476 (1965)................................................................6, 7

*Steagald v. United States*, 451 U.S. 204 (1981) .....................................................9

*United States v. Chadwick*, 433 U.S. 1 (1977) .......................................................6

*United States v. Knotts*, 460 U.S. 276 (1983) .........................................................3

*Wilkes v. Wood*, 98 Eng. Rep. 489 (1763) ..............................................................7

**Statutes & Legislative Materials**

Funding Act of 1790, Act of August 4, 1790, ch. 35, § 48, 1 Stat. 145 ..................3

**Other Authorities**

A.J. Vicens & Raphael Satter, *As 'No Kings' protests denounce Trump,
  surveillance worries emerge*, REUTERS (Oct. 19, 2025, 12:51 PM)....................17

Akela Lacy, *An NYPD Camera Points Directly into Their Bedroom. They're
  Suing the City Over it.*, THE INTERCEPT (Oct. 28, 2025, 5:00 AM)....................19

Beryl Lipton, *Drones as First Responder Programs Are Swarming Across
  the United States*, ELEC. FRONTIER FOUND. (June 27, 2024) ........................ 15, 18

*Cell Site Simulators*, NAT'L ASSOC. OF CRIM. DEF. LAWS. (Apr. 28, 2016)...........18

Chaim Gartenberg, *Social-distancing detecting 'pandemic drones' dumped
  over privacy concerns*, THE VERGE (Apr. 23, 2020, 10:51 AM).......................17

Cybele Mayes-Osterman & Josh Meyer, *Military parade is coming to DC
  soon. Officials gave a preview of what to expect*, USA TODAY
  (June 10, 2025, 8:13 AM).................................................................................17

Dave Maass & Rindala Alajaji, *How Cops Are Using Flock Safety's ALPR Network to Surveil Protesters and Activists*, ELEC. FRONTIER FOUND. (Nov. 20, 2025) ...................................................................................12

Dave Maass, *Data Driven 2: California Dragnet—New Data Set Shows Scale of Vehicle Surveillance in the Golden State*, ELEC. FRONTIER FOUND. (Apr. 22, 2021) ............................................................ 2, 12

Dhruv Mehrotra & Jesse Marx, *The Age of the Drone Police is Here*, WIRED (June 5, 2024, 6:00 AM) .............................................................16

Dhruv Mehrotra & Joey Scott, *Here Are the Secret Locations of ShotSpotter Gunfire Sensors*, WIRED (Feb. 22, 2024, 8:18 PM) ..............................18

*Does Flock Share Data With ICE?*, FLOCK (Jan. 6, 2026) ............................. 12, 13

Ese Olumhense, *Axon's Ethics Board Resigned Over Taser-Armed Drones. Then the Company Bought a Military Drone Maker*, WIRED (Sept. 8, 2023, 1:46 PM) .......................................................................15

GEORGE ORWELL, 1984 (1949) ...........................................................................19

Hannah Fry, *Government drones used in 'runaway spying operation' to peek into backyards in Sonoma County, lawsuit says*, L.A. TIMES (June 6, 2025, 6:06 PM) ....................................................................17

Helen Webley-Brown et al., *ShotSpotter and the Misfires of Gunshot Detection Technology*, SURVEILLANCE TECH. OVERSIGHT PROJECT (July 14, 2022) ...............................................................................18

Jake Offenhartz, *New York police will use drones to monitor backyard parties this weekend, spurring privacy concerns*, ASSOC. PRESS (Aug. 31, 2023, 7:53 PM) .......................................................................17

James Otis, *Speech Against Writs of Assistance*, TEACHING AM. HIST. (Feb. 24, 1761) ...............................................................................7

Jason Koebler & Joseph Cox, *ICE Taps into Nationwide AI-Enabled Camera Network, Data Shows*, 404 MEDIA (May 27, 2025, 9:36 AM) ....... 13, 14

Jason Koebler, *Police Are Searching Thousands of Flock Cameras for ICE*, 404 MEDIA (April 6, 2026, 9:53 AM) .................................................14

Jason Koebler, *Police Used Flock to Give a Man a Traffic Ticket*, 404 MEDIA (Mar. 26, 2026, 11:04 AM) ..............................................12

Jay Stanley, *Eye-in-the-Sky Policing Needs Strict Limits* ACLU (July 27, 2023) ..................................................................... 15, 16

Jessica Dwyer-Moss, *The Sky Police: Drones and the Fourth Amendment*, 81 ALB. L. REV. 1047 (2017–2018) ................................................................ 14, 15

Matt Powers, *Michigan Supreme Court Creates Giant Loophole for Warrantless Surveillance*, INST. FOR JUST. (May 6, 2024) ................................17

Michael Silberman, *Streetlights as Spyware*, TECH POL'Y PRESS (Aug. 30, 2023) ....................................................................................................18

*NJ Town Resorts to Talking Drones to Enforce Social Distancing*, WNBC (Apr. 9, 2020, 11:08 AM) .....................................................................................17

Patrick Sisson, *Welcome to Chula Vista, where police drones respond to 911 calls*, MIT TECH. REV. (Feb. 27, 2023) ...............................................................18

RADLEY BALKO, RISE OF THE WARRIOR COP: THE MILITARIZATION OF AMERICA'S POLICE FORCES (2013) ....................................................................6

Spencer Soicher & Marilyn Moore, *Denver dumps Flock, awards location tracking camera contract to Axon*, 9NEWS (last updated Feb. 24, 2026, 3:50 PM) ......................................................................................................................13

*Street Level Surveillance: Automatic License Plate Readers*, ELEC. FRONTIER FOUND. (updated Oct. 1, 2023) ........................................... 2, 11

*Street Level Surveillance: Surveillance Camera Networks*, ELEC. FRONTIER FOUND. (updated Oct. 1, 2023) ................................................................18

Thomas K. Clancy, *The Framers' Intent: John Adams, His Era, and the Fourth Amendment*, 86 IND. L.J. 979 (2011) ........................................................7

Tina Moore, *NYPD used drones for arrests in pro-Palestine protests in NYC*, N.Y. POST (Oct. 28, 2023, 11:45 AM) ......................................................17

**Constitutional Provisions**

U.S. CONST. amend. IV ...........................................................................................6, 7

## INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Project on Criminal Justice was founded in 1999, and focuses on the scope of substantive criminal liability, the proper and effective role of police in their communities, the protection of constitutional and statutory safeguards for criminal suspects and defendants, citizen participation in the criminal justice system, and accountability for law enforcement officers.

Cato's interest in this case arises from its mission to support the rights that the Constitution guarantees to all citizens. *Amicus* has a particular interest in this case as it concerns the continuing vitality of the Fourth Amendment and meaningful restraints on the exercise of government power.

---

[1] Fed. R. App. P. 29 Statement: No counsel for either party authored this brief in whole or in part. No one other than *amicus* and its members made monetary contributions to its preparation or submission. All parties have consented to the filing of this brief.

**INTRODUCTION AND SUMMARY OF THE ARGUMENT**

The City of Norfolk currently operates nearly 200 automatic license plate readers (ALPRs) in 75 "clusters" scattered throughout the city. ALPRs "are high-speed, computer-controlled camera systems" that capture all license plate numbers, along with the location, date, and time. *Street Level Surveillance: Automatic License Plate Readers*, ELEC. FRONTIER FOUND. (updated Oct. 1, 2023) [hereinafter *ALPRs*].[2] These systems are increasingly sophisticated. Norfolk has deployed advanced ALPRs from the technology company Flock that use artificial intelligence to record the make, type, color, and distinctive features of a vehicle (like bumper stickers) to create a trackable "Vehicle Fingerprint." App. Br. 5. They "can reveal the direction and speed a person traveled through triangulation" and, with enough time, "a vehicle's historical travel." *ALPRs*, *supra*. Using "a few keystrokes," officers can generate a comprehensive map of a person's movements throughout a city over a set period, "with few safeguards and little oversight." Dave Maass, *Data Driven 2: California Dragnet—New Data Set Shows Scale of Vehicle Surveillance in the Golden State*, ELEC. FRONTIER FOUND. (Apr. 22, 2021).[3] The ALPRs installed by the City of Norfolk automatically record every vehicle that passes by and archive that information for 21 days. *See* App. Br. 45.

---

[2] Available at https://tinyurl.com/3s9b79dj.

[3] Available at https://tinyurl.com/35b56y9s.

The Appellants—Lee Schmidt and Crystal Arrington—are Norfolk residents whose cars are captured by the city's ALPRs, sometimes several times per day. *Id.* at 41. They sued, alleging that the City's warrantless collection of their movements throughout the city—and retention of those records for future review and inspection—violates the Fourth Amendment. *See* Op. at 30–31. The district court dismissed their complaint, holding that the ALPRs do not violate the Fourth Amendment because they do not track "the whole" of their movements. *Id.* at 43.

Although the City's ALPRs are stationary and do not persistently track people the way a cell phone or a drone can, the public nature of a roadway is not a blank check for government surveillance. The Supreme Court once held that a person has no expectation of privacy in "movements from one place to another," *United States v. Knotts*, 460 U.S. 276, 281 (1983), but it has since refined that analysis.[4] As technology has advanced, the Court has recognized that even data collected in public spaces can offer an intimate window into a person's life—revealing where they travel, how often, and for how long—and that "more sophisticated surveillance of

---

[4] The Founders drew no strict line between searches of public and private places. For example, the First Congress required federal customs officials to obtain warrants not only to search homes for concealed goods, but also before searching commercial buildings, stores, and any "other place." Funding Act of 1790, Act of August 4, 1790, ch. 35, § 48, 1 Stat. 145 (codifying a warrant requirement before searching any "dwelling-house, store, building or other place"); *see also Buonocore v. Harris*, 65 F.3d 347, 355 (4th Cir. 1995) (noting that the First Congress was the same that adopted the Fourth Amendment).

the sort envisioned in *Knotts*" can violate the Fourth Amendment. *Carpenter v. United States*, 585 U.S. 296, 305–07 (2018) (citation omitted). Norfolk's ALPR network qualifies as such a system.

We write to highlight two points. First, the Fourth Amendment was designed to eliminate indiscriminate searches and the threat of "general warrants" that allowed British officials to rummage through Americans' homes and papers. Today's technology poses an analogous threat: with no probable cause, government officials can now collect and store intimate details of a person's life—including financial information[5] and location information—for perusal at the click of a button. Without judicial oversight, tools like ALPRs give police the discretionary power to engage in the suspicionless searches that the Framers sought to prohibit.

Second, the district court's rule—accepting all government tracking short of the very most exhaustive kind—would invite the warrantless deployment of many technologies to surveil the public. Modern surveillance tools such as ALPRs, military-grade drones, financial "audit trails," and other technologies and sensors let the government monitor millions of people with ease, tracking movements, detecting faces, recording digital conversations—then storing everything for later review. Left

---

[5] *See*, *e.g.*, Jennifer Schulp, *The SEC Is Starting a Massive Database of Every Stock Trade*, REASON (Feb. 7, 2023), http://tinyurl.com/56vhex57.

unchecked, such tools would render the Fourth Amendment's warrant requirement a dead letter.

This Court should reverse the decision below and foreclose a surveillance apparatus that silently records the daily movements of every Norfolk resident who ventures onto a public street.

**ARGUMENT**

## I. NORFOLK'S ALPR NETWORK GIVES POLICE A DISCRETIONARY, SUSPICIONLESS SEARCH POWER.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." U.S. CONST. amend. IV. These protections "grew in large measure out of the colonists' experience with the writs of assistance and their memories of the general warrants formerly in use in England." *United States v. Chadwick*, 433 U.S. 1, 7–8 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991). General warrants conferred broad authority upon the King's agents to conduct widespread searches of anyone, anytime, regardless of whether they were suspected of a crime. *See Stanford v. Texas*, 379 U.S. 476, 481 (1965).

The writ of assistance was arguably the most reviled form of general warrant, and it aided the British in combating colonial resistance to taxation by giving officers broad power to search any person or place at whim, *see id.*—including conferring "the power to enter private homes [to] search for smuggled or untaxed goods." RADLEY BALKO, RISE OF THE WARRIOR COP: THE MILITARIZATION OF AMERICA'S POLICE FORCES 8 (2013). James Otis, a Massachusetts lawyer whose advocacy against general warrants inspired revolutionaries like John Adams, described these writs as "the worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English law

book" precisely because "they place[d] the liberty of every man in the hands of every petty officer." James Otis, *Speech Against Writs of Assistance*, TEACHING AM. HIST. (Feb. 24, 1761).[6] It was this unchecked "discretionary power" to decide who, what, and when to search that the Founding Generation found "totally subversive of . . . liberty." *Wilkes v. Wood*, 98 Eng. Rep. 489, 499 (1763).

Abuses stemming from general warrants were so "[v]ivid in the memory" of the Framers, *Stanford*, 379 U.S. at 481, that they "were united in seeking objective criteria to measure the propriety of government actions." Thomas K. Clancy, *The Framers' Intent: John Adams, His Era, and the Fourth Amendment*, 86 IND. L.J. 979, 980 (2011). The language they settled upon for the Fourth Amendment is "precise and clear" and "reflect[s] the determination" that Americans should be secure "from intrusion and seizure by officers acting under the unbridled authority of a general warrant." *Stanford*, 379 U.S. at 481. The Fourth Amendment's Warrant Clause thus permits a search only pursuant to a warrant particularly describing the place to be searched and the persons or things to be seized, and supported by probable cause. *See* U.S. CONST. amend. IV. In ratifying the Amendment, the Framers deliberately denied officials the discretion to engage in broad, suspicionless fishing expeditions. *See Riley v. California*, 573 U.S. 373, 403 (2014) (explaining

---

[6] Available at https://tinyurl.com/252z5j3h.

that the Fourth Amendment was a "response to the reviled 'general warrants'" that gave officers "unrestrained" power to "search for evidence of criminal activity").

In *Carpenter v. United States*, the Supreme Court applied this Founding Era prohibition on discretionary search power to new technology, holding that the warrantless collection and analysis of cell-site location information (CSLI) violated the Fourth Amendment. The Court's concern was not only how much CSLI reveals about a person's movements, but also that its warrantless collection swept up the entire population—unconstrained by individualized suspicion or any prior judicial determination of whom to target. *Carpenter*, 585 U.S. at 312. CSLI gave the government permanent and retrievable records about *everyone*—"not just those belonging to persons who might happen to come under investigation"—such that police "need not even know in advance whether they want to follow a particular individual, or when." *Id.* Not only the "deeply revealing nature of CSLI," but also "its depth, breadth, and comprehensive reach, and the inescapable and automatic nature of its collection" rendered its dragnet collection an unconstitutional search. *Id.* at 320.

The prohibition on suspicionless, discretionary record collection is equally reflected by this Court's decision in *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021). There, this Court analogized Baltimore's aerial surveillance program to "a 21st century general search" because

it gave police the power "to collect all movements, both innocent and suspected, without any burden to 'articulate an adequate reason to search for specific items related to specific crimes.'" *Id.* at 348 (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 560 (2012) (Sotomayor, J., dissenting)). It wasn't only the amount of information gathered that resembled a general search, but the government's asserted power to surveil anyone and accumulate information about their lives. *Id.* at 346–47. *Cf. Steagald v. United States*, 451 U.S. 204, 220 (1981) (explaining that the "central objectionable feature" of general warrants "was that they provided no judicial check on the determination of the executing officials that the evidence available justified an intrusion into any particular home").

The district court distinguished this case from *Leaders of a Beautiful Struggle* and *Carpenter* based on the differences "between the quantity and quality of the data collected" by ALPRs. Op. at 37. But in doing so, it misapprehended a crucial point: "General warrants and writs of assistance were noxious not because they allowed the government to acquire evidence in criminal investigations, but because of the *means* by which they permitted the government to acquire that evidence." *See Carpenter*, 585 U.S. at 369–70 (Alito, J., dissenting). These cases did not turn on the quantity of evidence collected: general warrants are impermissible even before a single scrap of paper is seized and read. Courts must consider *how* the government seeks to accrue information, not just *how much* it ultimately gathers.

9

Like the data collection methods in *Carpenter* and *Leaders of a Beautiful Struggle*, Norfolk's ALPR system gives the government precisely the kind of general search authority that the Framers condemned. Every vehicle that passes by an ALPR is tagged, recorded, identified, and logged. Records pertaining to people like Schmidt and Arrington are then warehoused in databases that permit officers to query and track any vehicle. The only limit on the collection and storage of this information is a 21-day retention period—and even that modest constraint can yield to officer discretion, since officials can download data for persistent use. *See* Op. at 10.

Norfolk's ALPR system implicates the same general search concerns that motivated the Fourth Amendment. It gives police broad discretion to collect and retain detailed records of where people travel, when, and for how often—and to deploy these cameras where they like and do as they please with the information gathered. This is not targeted law enforcement. It is the equivalent of a digital general warrant letting police continually monitor every person who travels the city's streets. That is precisely the discretionary, suspicionless power the Fourth Amendment forbids.

## II. THE DISTRICT COURT'S DECISION INVITES THE GOVERNMENT TO BUILD NETWORKS OF CONTINUOUS SURVEILLANCE.

Courts are "obligated . . . to ensure that the 'progress of science' does not erode Fourth Amendment protections," especially freedom "from unreasonable

governmental intrusion." *Carpenter*, 585 U.S. at 320 (internal citations omitted); *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Law enforcement agencies are already testing and using surveillance systems that enable comprehensive and continuous tracking of citizens, especially when combined. The district court's decision—accepting all government tracking short of the very most exhaustive kind—encourages this dangerous trend by eroding constitutional protections against public monitoring. *See* Op. at 43; *Kyllo*, 533 U.S. at 34.

### A. ALPRs

ALPRs collect data at staggering rate—some collect data on "thousands of plates per minute." *ALPRs*, *supra*. When a city deploys ALPRs, locals can do little to avoid them. *Id.* As a result, most of the data collected involves the movements of ordinary, law-abiding citizens. This case demonstrates as much. Although Schmidt and Arrington have not broken any laws, their vehicles were photographed by ALPR cameras at least 526 and 849 times over a period of less than five months. App. Br. 15–16.

ALPRs are often pitched to police and their communities "as tools for solving serious crimes, finding stolen vehicles, and locating missing people." Jason Koebler, *Police Used Flock to Give a Man a Traffic Ticket*, 404 MEDIA (Mar. 26, 2026, 11:04

AM).[7] But these systems routinely migrate toward mundane enforcement—for instance, ticketing a motorcyclist for using a cell phone while riding. *Id.*

ALPRs can also be deployed for political surveillance. Over a period of 10 months, "more than 50 federal, state, and local agencies ran hundreds of searches through Flock's national network of surveillance data in connection with protest activity." Dave Maass & Rindala Alajaji, *How Cops Are Using Flock Safety's ALPR Network to Surveil Protesters and Activists*, ELEC. FRONTIER FOUND. (Nov. 20, 2025).[8] While some of these protest-related searches might have been tied to an actual crime, "in most cases officers did not articulate a criminal offense when running the search." *Id.* Rather, they queried information to learn who attended events, regardless of their involvement in any criminal activity. *Id.*

Still more troublingly, the voluminous information stockpiled in ALPR databases is often shared "with hundreds of agencies around the country." Maass, *supra*. Although Flock states it "does not work with U.S. Immigration and Customs Enforcement (ICE) or any other sub-agency of the Department of Homeland Security," *Does Flock Share Data With ICE?*, FLOCK (Jan. 6, 2026),[9] that assurance offers little protection in practice. In fact, while Flock CEO Garrett Langley insisted

---

[7] Available at https://tinyurl.com/3uane28n.

[8] Available at https://tinyurl.com/3djd33p5.

[9] Available at https://tinyurl.com/4w97pckj.

that Flock has no federal contracts, public records requests revealed that Flock had given Border Patrol access to tracking data through a "previously undisclosed pilot program." Spencer Soicher & Marilyn Moore, *Denver dumps Flock, awards location tracking camera contract to Axon*, 9NEWS (last updated Feb. 24, 2026, 3:50 PM).[10] This pilot program gave DHS direct access to data from Flock customers that didn't want their data shared with federal law enforcement. *See id.*

ICE and other federal agencies can also access Flock databases through the help of local police and state agencies. Jason Koebler & Joseph Cox, *ICE Taps into Nationwide AI-Enabled Camera Network, Data Shows*, 404 MEDIA (May 27, 2025, 9:36 AM).[11] Because local agencies own the data they collect and routinely share it with federal partners, ICE and other federal agencies can readily access records stored in Flock's systems. *See Does Flock Share Data With ICE?*, *supra*. Throughout the country, local police departments are helping ICE by "performing lookups in Flock's AI-powered [ALPR] system for 'immigration' related searches." Koebler & Cox, *supra*. As a result, there have been "more than 4,000 nation and statewide lookups by local and state police done either at the behest of the federal government or as an 'informal' favor to federal law enforcement." *Id.* These searches give ICE access to records "across a nation and statewide network of law

---

[10] Available at https://tinyurl.com/32yvxcvf.

[11] Available at https://tinyurl.com/mwz7r2b2.

enforcement agencies," including from states like Illinois that "specifically ban[] the use of ALPR data for immigration enforcement." *Id.*

The recruitment of state and local agencies into federal surveillance efforts extends well beyond local police. Florida's Fish and Wildlife Conservation Commission (FWC), for example, has performed "dozens of license plate lookups for Flock cameras" on behalf of ICE, even though its Flock systems are primarily in place for "conservation, protecting endangered species, and investigating boating and maritime issues." Jason Koebler, *Police Are Searching Thousands of Flock Cameras for ICE*, 404 MEDIA (April 6, 2026, 9:53 AM).[12] FWC compounds this concern: "thousands of agencies around the country" share their ALPR data with it, further expanding the pool of records accessible to federal authorities. *Id.* Because officials "almost never get a warrant to perform a Flock search," there is little to no oversight, allowing ICE "side-door access" to vast quantities of information that it lacks formal access to. Koebler & Cox, *supra*.

## B. Drones

"Drones have made surveillance cheaper, easier, and more effective." Jessica Dwyer-Moss, *The Sky Police: Drones and the Fourth Amendment*, 81 ALB. L. REV. 1047, 1049 (2017–2018). Varying in size from "business jets [to] small enough to fit into the palm of someone's hand," they can be "virtually undetectable." *Id.* at

---

[12] Available at https://tinyurl.com/fjbux4rm.

1048. They can carry cameras, thermal imaging sensors, microphones, license plate readers, facial recognition software, and cell-site simulators. Beryl Lipton, *Drones as First Responder Programs Are Swarming Across the United States*, ELEC. FRONTIER FOUND. (June 27, 2024).[13] Most troublingly, they can and do "observe individuals in previously private and constitutionally protected spaces, like their backyards, roofs, and even through home windows." *Id.*

More than 1,400 police departments now use drones, a number that is growing as cities continue to adopt "drone as first responder" programs. Jay Stanley, *Eye-in-the-Sky Policing Needs Strict Limits*, ACLU 1 (July 27, 2023).[14] These programs deploy drones in response to 911 calls and other service requests, and they can help officers assess a situation before arriving at the scene. Lipton, *supra*. However, they also enable around-the-clock warrantless—often, suspicionless—surveillance.

Consider what happened to Daniel Posada in Chula Vista, California—the city with the nation's first and longest-running drone-as-first-responder program. After Daniel and his girlfriend had an argument at a bus stop, a bystander called 911 and a drone was deployed from a police station to investigate. Dhruv Mehrotra & Jesse

---

[13] Available at https://tinyurl.com/2wp67bz7. At least one company has started developing Taser-equipped drones. Ese Olumhense, *Axon's Ethics Board Resigned Over Taser-Armed Drones. Then the Company Bought a Military Drone Maker*, WIRED (Sept. 8, 2023, 1:46 PM), https://tinyurl.com/mkcwbauv.

[14] Available at https://tinyurl.com/yc37jpmd.

Marx, *The Age of the Drone Police is Here*, WIRED (June 5, 2024, 6:00 AM).[15] On its way to Daniel, the drone "cross[ed] the airspace of 23 blocks, potentially exposing thousands of Chula Vista residents to the gaze of law enforcement." *Id.* The drone spied Daniel as he was riding his bike down the street, and "[w]ithin seconds, a police car pulled up alongside him, and an officer was soon rummaging through his pockets"—even though no crime had occurred. *Id.*

Since Daniel's city began its drone-as-first-responder program in 2018, drones have "criss-cross[ed] the skies . . . nearly 20,000 times." *Id.* They have amassed hundreds of hours of video footage of the city's residents, routinely flying "over backyards and above public pools, high schools, hospitals, churches, mosques, immigration law firms, and even the city's Planned Parenthood facility." *Id.* While Chula Vista maintains that it does not use drones for routine surveillance, records from the city show that it is not uncommon for drones to be deployed in response to minor complaints such as "reports of 'loud music', a 'water leak,' and someone 'bouncing a ball against a garage.'" Stanley, *Eye-in-the-Sky Policing*, *supra*, at 2.

---

[15] Available at https://tinyurl.com/d9jve3db.

Further, not all cities have limited their use of drones to emergency response. They have been used to surveil public events[16] and protests,[17] search for zoning and code violations,[18] enforce pandemic-era social distancing,[19] and even monitor Labor Day weekend backyard parties.[20]

## C. Security Cameras

Today's security cameras bear little resemblance to those of decades past. Many are "capable of 360-degree video, infrared vision, or the ability to pan, tilt, and zoom," and they "can be equipped with real-time face recognition or license

---

[16] Cybele Mayes-Osterman & Josh Meyer, *Military parade is coming to DC soon. Officials gave a preview of what to expect*, USA TODAY (June 10, 2025, 8:13 AM), https://tinyurl.com/3e4xu6vu (using drones to surveil crowds at a parade).

[17] Tina Moore, *NYPD used drones for arrests in pro-Palestine protests in NYC*, N.Y. POST (Oct. 28, 2023, 11:45 AM), https://tinyurl.com/4j459k5n; A.J. Vicens & Raphael Satter, *As 'No Kings' protests denounce Trump, surveillance worries emerge*, REUTERS (Oct. 19, 2025, 12:51 PM), https://tinyurl.com/2yy97r9t (discussing concerns about the government using drones to surveil protesters).

[18] Hannah Fry, *Government drones used in 'runaway spying operation' to peek into backyards in Sonoma County, lawsuit says*, L.A. TIMES (June 6, 2025, 6:06 PM), https://tinyurl.com/2bjfuwz4 (discussing alleged use of drones to search for code violations); Matt Powers, *Michigan Supreme Court Creates Giant Loophole for Warrantless Surveillance*, INST. FOR JUST. (May 6, 2024), https://tinyurl.com/42knayye (same).

[19] *NJ Town Resorts to Talking Drones to Enforce Social Distancing*, WNBC (Apr. 9, 2020, 11:08 AM), https://tinyurl.com/mr3rmsk7; Chaim Gartenberg, *Social-distancing detecting 'pandemic drones' dumped over privacy concerns*, THE VERGE (Apr. 23, 2020, 10:51 AM), https://tinyurl.com/yaev57d9.

[20] Jake Offenhartz, *New York police will use drones to monitor backyard parties this weekend, spurring privacy concerns*, ASSOC. PRESS (Aug. 31, 2023, 7:53 PM), https://tinyurl.com/bdf9k25z.

plate recognition software." *Street Level Surveillance: Surveillance Camera Networks*, ELEC. FRONTIER FOUND. (updated Oct. 1, 2023).[21] They can be linked with ALPRs, smart streetlights,[22] gunshot detection systems,[23] cell-site simulators,[24] and drones, all of which "dramatically expand surveillance capabilities." Patrick Sisson, *Welcome to Chula Vista, where police drones respond to 911 calls*, MIT TECH. REV. (Feb. 27, 2023);[25] *see also* Lipton, *supra*.

Nowhere is surveillance technology more prevalent than in New York City. The NYPD relies on an extensive system of video surveillance to "track and profile millions of New Yorkers each day." Akela Lacy, *An NYPD Camera Points Directly into Their Bedroom. They're Suing the City Over it.*, THE INTERCEPT (Oct. 28, 2025,

---

[21] Available at https://tinyurl.com/3za9mtbu.

[22] Michael Silberman, *Streetlights as Spyware*, TECH POL'Y PRESS (Aug. 30, 2023), https://tinyurl.com/4a8twrrn (discussing privacy concerns surrounding use of smart streetlights, which allow police to "quietly layer invisible surveillance technologies . . . once [the streetlights are] in place").

[23] Helen Webley-Brown, et al., *ShotSpotter and the Misfires of Gunshot Detection Technology*, SURVEILLANCE TECH. OVERSIGHT PROJECT (July 14, 2022), https://tinyurl.com/455bffuk. *See also* Dhruv Mehrotra & Joey Scott, *Here Are the Secret Locations of ShotSpotter Gunfire Sensors*, WIRED (Feb. 22, 2024, 8:18 PM), https://tinyurl.com/msdbuk7s.

[24] *Cell Site Simulators*, NAT'L ASSOC. OF CRIM. DEF. LAWS. (Apr. 28, 2016), https://tinyurl.com/4vx26fdz ("Cell Site Simulators, also known as IMSI catchers or Stingrays, mimic cell towers and trick phones within their radius into communicating with them instead, during which they are able to collect information about the device.").

[25] Available at https://tinyurl.com/454ndn84.

5:00 AM).[26] These tens of thousands of cameras all feed into one centralized network: the Domain Awareness System. *Id.* This system "collects the identity, location, banking details, vehicle information, social media activity, and friend groups of all who live in or enter the city. It combines these entries with civil and criminal records and converts them into digital profiles, reconstructing, in effect, the private lives of millions." *Id.*

\* \* \*

Under the district court's rule, even pervasive monitoring of an entire city's residents by ALPRs, drones, and cameras would be constitutional so long as the surveillance was not continuous and did not reveal "the whole" of residents' movements. *See* Op. at 48. The Constitution does not consign Americans to a digital Panopticon—one in which the government may be watching at any moment, even if not every moment. *Cf.* GEORGE ORWELL, 1984 at 3 (1949) ("There was of course no way of knowing whether you were being watched at any given moment. How often, or on what system, the Thought Police plugged in on any individual wire was guesswork."). The district court failed "to place obstacles in the way of a too permeating police surveillance" and its decision should be reversed. *Carpenter*, 585 U.S. at 305 (internal quotations omitted).

---

[26] Available at https://tinyurl.com/4wzzx7zn.

**CONCLUSION**

For these reasons and those given by the Appellants, this Court should reverse the district court's order and remand for further proceedings.

Respectfully submitted,

*/s/ Matthew P. Cavedon*

Matthew P. Cavedon
 *Counsel of Record*
Brent Skorup
Laura A. Bondank
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20001
(706) 309-2859
mcavedon@cato.org

*Counsel for the Cato Institute*

Dated: April 20, 2026

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32 and 4th Circuit Rule 32(g)(1), I certify that:

1. This brief complies with the type-volume limitation of 4th Circuit Rule 29(b)(4) because it contains 4,168 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

<table>
<tr><td></td><td>/s/ <em>Matthew P. Cavedon</em></td></tr>
<tr><td>Dated:  April 20, 2026</td><td><em>Counsel for Amicus Curiae</em></td></tr>
</table>

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2026, I electronically filed the foregoing with the Clerk of Court, who will enter it into the CM/ECF system, which will send a notification of such filing to the appropriate counsel.


Dated:  April 20, 2026

/s/ *Matthew P. Cavedon*
*Counsel for Amicus Curiae*