No. 26-1227

IN THE

# United States Court of Appeals

FOR THE FOURTH CIRCUIT

LEE SCHMIDT, *et al.,*

*Plaintiffs-Appellants*,

v.

CITY OF NORFOLK, *et al.,*

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**BRIEF OF THE POLICING PROJECT
AT NEW YORK UNIVERSITY SCHOOL OF LAW
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS**

Megan Tankel
Yang Li
BAKER BOTTS L.L.P.
700 K Street, N.W.
Washington, D.C. 20001-5692
(202) 639-7700
megan.tankel@bakerbotts.com
alex.li@bakerbotts.com

*Counsel for Amicus Curiae
The Policing Project at New York
University School of Law*

**CORPORATE DISCLOSURE STATEMENT**

*Amicus curiae* is a non-profit center at New York University School of Law. It has no parent company and no publicly held corporation owns 10 percent or more of its stock.

**TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF AUTHORITIES.................................................................................... iv

INTEREST OF THE *AMICUS* ............................................................................1

SUMMARY OF THE ARGUMENT .......................................................................2

ARGUMENT ...........................................................................................................3

    I.      Introduction .................................................................................3

    II.    Background .................................................................................4

    III.   The Capabilities of Indiscriminate Surveillance Systems Are What Make Them Unconstitutionally Invasive .............................................5

        A.    The Beautiful Struggle Court Relied on All the Capabilities of the AIR Program in Finding That a Search Occurred, Even Though the Program Was Limited. ...........................................5

        B.    The District Court Overlooked the Flock System's Capabilities ...................................................................................9

    IV.   Growing Integration and Automation of Surveillance Technologies Exacerbates Their Invasiveness .......................................................10

        A.    Integration of Technologies Is What Made the AIR Program in *Beautiful Struggle* Invasive....................................................11

        B.    This Court Properly Concluded That the Integration of Surveillance Tools Is Central to Determining Whether a System Enables Deductions from the Whole of One's Movements......13

        C.    The District Court Misapplied *Carpenter* and *Beautiful Struggle* by Isolating the Flock Cameras from the Broader Surveillance System They Operate in..........................................................15

        D.    Because the Norfolk Flock System Automates Much of the Data Analysis, It May Be More Invasive than the AIR Program. ...................................................................................17

    V.    Conclusion.................................................................................20

CERTIFICATE OF COMPLIANCE ................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Carpenter v. United States*,
585 U.S. 296 (U.S. 2018) ................................................8, 9, 10, 15, 16, 17, 18, 20

*Commonwealth v. McCarthy*,
484 Mass. 493, 142 N.E.3d 1090 (2020) ......................................................... 18

*Kyllo v. United States*,
533 U.S. 27 (2001) ................................................................................... 16, 20

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
456 F. Supp. 3d 699 (D. Md. 2020) .................................................................. 14

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
2 F.4th 330 (4th Cir. 2021) (en banc) ....1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16,
17, 19, 20

*United States v. Chatrie*,
136 F.4th 100 (4th Cir. 2025) (Berner, J., concurring) .........................................5

*United States v. Jones*,
565 U.S. 400. 415-16 (2012) ........................................................................10, 18

**OTHER AUTHORITIES**

U.S. Const. amend. IV ...............................................1, 2, 3, 4, 5, 12, 13, 14, 15, 17, 20

Fed. R. App. P. 29(a)(2) ...............................................................................2

Fed. R. App. P. 29(a)(4)(E) ...........................................................................2

POLICING PROJECT, CIVIL RIGHTS & CIVIL LIBERTIES AUDIT OF BALTIMORE'S
AERIAL INVESTIGATION RESEARCH (AIR) PROGRAM (Nov. 2020),
https://perma.cc/6R3L-Y93P
.............................................................. 4, 6, 7, 11, 12, 18

## INTEREST OF THE *AMICUS*

The Policing Project at New York University School of Law partners with communities and police to promote public safety through transparency, equity, and democratic engagement.[1] The interpretation of the Fourth Amendment by courts is of particular concern to the Policing Project because of the impact those interpretations have on public safety and individual rights.

The Policing Project has unique knowledge of the facts underlying this Court's decision in *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021) (en banc), which the District Court sought to apply in this case. Underlying that dispute was the Baltimore Police Department's Aerial Investigation Research ("AIR") Program, an investigative effort that combined aerial surveillance planes, ground surveillance technologies—including automated license plate readers and public cameras—and human analysts to track individuals and vehicles of interest. In 2020, at the invitation of the Baltimore Police Department, the Policing Project conducted an independent civil rights and civil liberties audit of the AIR Program, during which it was given extraordinary access to AIR's operations. That experience gives the Policing Project a detailed, firsthand understanding of the operation and capabilities of the very surveillance system that

---

[1] The Policing Project is affiliated with New York University School of Law, but this brief does not purport to represent the School's official views.

the District Court sought to distinguish when applying *Beautiful Struggle* to this case.

Pursuant to Fed. R. App. P. 29(a)(4)(E), counsel for *amicus* states that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and that no person, other than the *amicus curiae*, its members, or its counsel made a monetary contribution to its preparation or submission. All Parties consent to filing of this brief. Fed. R. App. P. 29(a)(2).

## SUMMARY OF THE ARGUMENT

The District Court distinguished Norfolk's Flock System of cameras and automated license plate readers from Baltimore's Aerial Investigation Research ("AIR") Program—the surveillance system at issue in this Court's decision in *Beautiful Struggle*—and concluded that the Flock System did not constitute a Fourth Amendment search. That conclusion rested on a misapprehension of both what made the AIR Program invasive and what this Court's decision in *Beautiful Struggle* requires.

*Amicus* writes to correct two errors in the District Court's analysis. First, the District Court focused on the actual uses of Norfolk's Flock System rather than its capabilities. But this Court's holding in *Beautiful Struggle* rested on the capabilities of the AIR Program—what it could do, not merely what it had done.

2

Second, the District Court examined the Flock cameras in isolation, ignoring the broader surveillance ecosystem in which they operate. This atomistic approach is inconsistent with this Court's contextualized reasoning in *Beautiful Struggle* as well as the technological reality of modern surveillance systems: individual surveillance tools, when integrated into a unified system with automated analytic tools, are far more invasive than any individual component. The Court should hold that Norfolk's warrantless Flock surveillance constituted a search.

## ARGUMENT

### I. Introduction

Surveillance technology is advancing at a pace that threatens to outstrip the Fourth Amendment's protections. In the few years since this Court's decision in *Beautiful Struggle*, automated and "intelligent" surveillance systems are being deployed rapidly, and policing agencies have woven these tools into integrated networks of cameras, license plate readers, and other surveillance tools, all driven by artificial intelligence—operating around the clock, at negligible marginal cost, and without the knowledge or consent of the millions of people whose movements they record. The question this case presents—whether one such system constitutes a Fourth Amendment search—may well shape the boundary between public safety and constitutional liberty for a generation.

**II.    Background**

In May 2020, the Baltimore Police Department ("BPD") launched a pilot of the AIR Program, an investigative and surveillance program that combined aerial surveillance planes, ground surveillance technologies, and human analysis. The Memorandum of Understanding between the Baltimore Police Department and its vendor commissioned the Policing Project to conduct a civil rights and civil liberties audit of AIR. *Beautiful Struggle*, 2 F.4th at 335; *see* Professional Service Agreement Between Baltimore Police Department and Persistent Surveillance Systems, LLC at 27–28 (Mar. 17, 2020), https://perma.cc/G986-24D7 [hereinafter "MOU"]. Following the audit, the Policing Project issued a public report. *See* POLICING PROJECT, CIVIL RIGHTS & CIVIL LIBERTIES AUDIT OF BALTIMORE'S AERIAL INVESTIGATION RESEARCH (AIR) PROGRAM (Nov. 2020), https://perma.cc/6R3L-Y93P [hereinafter "Audit Report"].

The constitutionality of the AIR Program was the subject of this Court's opinion in *Beautiful Struggle*. Sitting *en banc*, the Court held that accessing data from the AIR Program constituted a search, and its warrantless operation violated the Fourth Amendment. 2 F.4th at 333.

In holding that Norfolk's Flock System does not constitute a search under the Fourth Amendment, the District Court distinguished this case from *Beautiful Struggle* and distinguished the Flock System from Baltimore's AIR Program. Given

the Policing Project's unique insight into the latter, it submits this amicus brief because an accurate understanding of the AIR Program demonstrates that the District Court's analysis was flawed.

### III. The Capabilities of Indiscriminate Surveillance Systems Are What Make Them Unconstitutionally Invasive

In assessing whether a surveillance system constitutes a search under the Fourth Amendment, courts must consider "what [the] technology had the capacity to reveal, not what it actually revealed in the search at issue." *United States v. Chatrie*, 136 F.4th 100, 150 (4th Cir. 2025) (Berner, J., concurring). That is precisely what this Court did in *Beautiful Struggle*. As the Policing Project audit made clear, Baltimore's AIR Program was limited in several respects. The *Beautiful Struggle* Court nonetheless assessed the AIR Program's full *capabilities* and concluded that a search had occurred. The District Court erred by focusing on actual documented uses of the Flock System rather than its technological capabilities, and on the quantity of the raw data collected rather than what that data had the capacity to reveal.

#### A. The *Beautiful Struggle* Court Relied on All the Capabilities of the AIR Program in Finding That a Search Occurred, Even Though the Program Was Limited.

As the Policing Project audit demonstrated, the AIR Program was limited in significant respects. Because the surveillance cameras were set to capture wide areas, images were low definition, with cars and individuals appearing as "blurred

dots or blobs." *Beautiful Struggle*, F.4th at 334; Audit Report at 12. Analysts could occasionally discern a vehicle's color but could not read license plates. Audit Report at 12. Identifying individuals from the air was impossible; indeed, distinguishing a person from a bush was difficult. *Id*. The Program captured only uncovered outdoor areas during daylight hours—the surveillance planes were prohibited from flying at night. *Id*. at 11. While the Program collected aerial imagery across most of the City of Baltimore, it did not automatically track individuals. *Id*. at 12–13. Doing so required a specific request and was extraordinarily labor-intensive: "at least 2 hours of analyst time to track an individual through 1 hour of AIR imagery." *Id*.

In fact, the *Beautiful Struggle* Court evaluated the AIR Program on an incomplete record that *overstated* the limitations of the program. The Policing Project audit found that the AIR Program operated well beyond the bounds of its Memorandum of Understanding—which the *Beautiful Struggle* Court relied heavily upon for its understanding of how AIR functioned. Although the Policing Project submitted an amicus brief to correct the record, the *Beautiful Struggle* Court expressly declined to consider the audit because it was not part of the record. 2 F.4th at 343 n.9. Thus, when the Court held that an unreasonable search had occurred, it was relying on an incomplete record reflecting a *more restrained* AIR Program than what actually existed.

The most striking example of the AIR Program operating beyond its bounds involved a loophole the Policing Project identified called "Supplemental Requests." Audit Report at 15–16. The MOU limited tracking to vehicles and individuals moving *to and from crime scenes* for identification purposes. The Supplemental Request procedure, however, permitted far broader surveillance. *Id*. In one investigation, AIR analysts monitored the home of a suspect's mother over two days, tracking every individual who came and went. *Id*. In other instances, analysts tracked individuals across multiple days. *Id*. These Supplemental Request procedures were absent from the record and thus not part of the *Beautiful Struggle* Court's decision. 2 F.4th at 343 n.9.

Despite the limitations of the AIR Program—both real and as reflected in the court record—the *Beautiful Struggle* Court relied on the *capabilities* of the program in finding that a search occurred. The Court did so in two important ways: 1) it evaluated the full technological capabilities of the system, rather than its actual documented uses; and 2) it considered what the data collected had the capability to reveal rather than simply the raw data in isolation.

As to technological capabilities, the Court deduced that, despite no specific instances in the record, multi-day tracking was a capability of the program: "police will at least sometimes be able to re-identify the same target over consecutive days." *Id*. at 343. "[T]he record alone supports . . . this understanding of the program's

capabilities." *Id*. at 343 n.9. And even though the AIR Program only created "tracks" for select individuals upon requests, the Court put immense emphasis on the fact that the program, by collecting footage of the whole City of Baltimore, had the *capability* to "'track[] every movement' of every person outside in Baltimore," and was thus comparable to "'attaching an ankle monitor' to every person in the city." *Id*. at 341 (cleaned up).

The *Beautiful Struggle* Court's focus on tracking capabilities rather than documented instances of tracking is consistent with *Carpenter v. United States*. There, the Supreme Court held that it was the government's *acquisition* of wireless carrier cell-site records that constituted a search, not solely the use of that data in a particular case or to track a suspect. *See Carpenter v. United States*, 585 U.S. 296, 316 (U.S. 2018). Critically, the Court focused its analysis on the "127 days of location data [the Government] *received*" and what it "*could . . .* deduce" from that trove—"a detailed log of Carpenter's movements"—rather than just the subset of data ultimately used at trial to create a map placing Carpenter "near four of the charged robberies." *Id.* at 303, 312 (emphasis added).

The *Beautiful Struggle* Court applied the same reasoning to the data itself by "consider[ing] not only the raw data, but what that data can reveal." *Id*. at 344 (citing *Carpenter v. United States*, 585 U.S. 296, 311 (2018)). It acknowledged that the collected photographs depicted individuals and vehicles as blurry blobs and that

tracking was ostensibly limited to movements to and from crime scenes. *Beautiful Struggle*, 2 F.4th at 334. Yet it looked beyond the raw data in isolation, concluding that when paired with "the context of specific investigations," "publicly available information[,] and, even more valuably, their own data systems," the data was capable of revealing far more intrusive details. *Id*. at 344. On that basis, the Court held that the AIR Program enables police to make deductions "from the whole of individuals' movements." *Id*. at 333. Focusing on deductions rather than raw data is compelled by *Carpenter*, in which the Supreme Court found that a search occurred because "the Government could, *in combination with other information,* deduce a detailed log of Carpenter's movements." *Carpenter*, 585 U.S. at 312 (emphasis added).

**B. The District Court Overlooked the Flock System's Capabilities**

Here, the District Court overlooked the Flock System's technical capabilities when it concluded that, because the Flock System's photos of the specific Plaintiffs were "never accessed or analyzed," they "reveal[] *nothing* about a person's movements from one place to another" and "do[] not reveal 'the whole' of that person's movements." JA34 (emphasis in original). This is at odds with *Beautiful Struggle*, in which the Court, in finding that a search occurred, relied upon the *collection* of footage of the whole City of Baltimore, and the *capability* of the AIR Program to "'track[] every movement' of every person outside in Baltimore," despite

9

the fact that tracks were not actually created for every person outside in Baltimore. *Beautiful Struggle*, 2 F.4th at 341. The breadth of the data collection of the AIR Program and the tracking capabilities that resulted from that collection were an integral part of the decision.

Likewise, the District Court focused on the gaps in the raw data and significantly downplayed the deductions that can be made from the data, noting that the Flock cameras can only "locat[e] a vehicle for the brief time that it is in one of 75 designated areas." JA38. However, the District Court neglected that when paired with other information available to police, the data has the capacity to reveal habitual routes across virtually the entire city. *See* App. Br. at 17–18. Most surveillance technologies have "gaps in their coverage." *Beautiful Struggle*, 2 F.4th at 342 ("The datasets in *Jones* and *Carpenter* had gaps in their coverage, too."). Baltimore's AIR Program certainly did. Yet when the system enables deductions "from the whole of individuals' movements," a search has occurred. *Id*. at 343.

## IV. Growing Integration and Automation of Surveillance Technologies Exacerbates Their Invasiveness

Modern police departments do not deploy surveillance technologies in isolation. Across the country, law enforcement agencies increasingly integrate multiple data sources—automated license plate readers, video surveillance networks, gunshot detection systems, drone surveillance, third-party analytics platforms, and data purchased from commercial brokers—into unified systems that

are far more powerful than any single tool. Automated analytic tools further deepen this integration, enabling police to extract far more from the data they collect than any single tool could reveal on its own. It was precisely this kind of integration that made the AIR Program invasive; that this Court recognized as constitutionally significant in *Beautiful Struggle*; and that the District Court failed to account for in this case.

### A. Integration of Technologies Is What Made the AIR Program in *Beautiful Struggle* Invasive.

Viewed in isolation, the AIR Program's low-resolution aerial photographs may appear relatively innocuous. *See Beautiful Struggle*, 2 F.4th at 362 (Wilkinson, J., dissenting) (emphasizing that individuals captured in the aerial photographs appear as nothing more than "pixelated dots with no distinguishing features"). But the constitutional harm did not arise from the pixelated aerial photographs on their own; rather, it arose from their integration with other surveillance tools—an integration that transformed anonymous dots into identified individuals whose movements could be tracked over time.

The Policing Project, after auditing the AIR Program, concluded that the Program could only be properly evaluated as an integrated system: "AIR is not just an aerial mapping technology, as many seem to conceive of it: rather, AIR is an *integrated* program of aerial overflights, ground-level surveillance devices, and [AIR vendor] analysts." Audit Report at 1 (emphasis in original).

That integration was the AIR Program's core feature by design. From its inception, the AIR Program was intended to combine aerial photographs with a suite of other surveillance tools, including Baltimore's ground-based cameras, license plate readers, acoustic gunshot detection system, and computer-aided dispatch system. *See* MOU at 20. The Policing Project found that "[i]ntegrating these technologies makes it possible for BPD and [its vendor] to identify the actual people being tracked, and to track their movements over time." Audit Report at 14. For example, "one of the greatest values to AIR is that it can indicate precisely when an individual or vehicle being tracked passed a ground-level license plate reader or camera, so that the integrated system can capture images, confirming who was at that location and at what time." *Id*. at 2.

Following its extensive audit of the AIR Program, the Policing Project expressly warned against the technical and legal error of evaluating a surveillance technology in isolation when assessing its Fourth Amendment implications: "it is a mistake to think of AIR as anything other than an integrated system of data collection and surveillance." *Id.* The AIR Program's invasiveness was rooted precisely in the capabilities enabled by the integration of different surveillance tools. The Policing Project observed in 2020 that "[e]xisting Fourth Amendment law tends to focus on specific pieces and uses of technology rather than seeing them as an integrated whole. Whatever the precedents say about pieces of technology standing alone, it is

impossible to consider the risk AIR poses to personal privacy and security without looking at what it actually is—an integrated system for collecting vast amounts of data on individuals and using it to track their movements using both aerial and ground-based technology." *Id*. at 22. This is exactly the principle this Court recognized in *Beautiful Struggle*.

### B. This Court Properly Concluded That the Integration of Surveillance Tools Is Central to Determining Whether a System Enables Deductions from the Whole of One's Movements.

This Court's *en banc* decision in *Beautiful Struggle* recognized the constitutional significance of the technological integration of individual surveillance tools that collectively "enables police to deduce from the whole of individuals' movements." *Beautiful Struggle*, 2 F.4th at 333. The Court held that accessing the AIR Program's data constituted a Fourth Amendment search even though the AIR Program's aerial images themselves only depicted "people and cars . . . as blurred dots or blobs." *Id*. at 334. In reaching this conclusion, the Court reasoned that when evaluating the Fourth Amendment implications of an integrated surveillance system like the AIR Program, courts must consider, in addition to the raw data itself, what the data can reveal when analyzed in context. *Id*. at 344. It is "the context of specific investigations [that] narrows the pool of possible identities. Police can cross-reference against publicly available information and, even more valuably, their own data systems." *Id*. And all the available information, when analyzed together, "will

often be enough for law enforcement to deduce the people behind the pixels." *Id.* at 343.

Critically, this Court pointed to the "integration of police information systems": the AIR Program was designed to integrate BPD's existing surveillance tools—"like its CitiWatch camera network, license plate readers, and gunshot detectors"—into the vendor's proprietary software, thereby "mak[ing] all the systems work together." *Id.* at 344 (alteration in original). This integration resulted in a more capable and intrusive system that surpassed the apparent limitations of the aerial images as a single surveillance technology. Even though the aerial images on their own did not have sufficient resolution to identify any individual, *id.* at 334, "BPD can deduce an individual's identity from AIR data," *id.* at 344; and even though the aerial images were collected only during daytime hours, *id.* at 334, police could nonetheless track objects over consecutive days. "For example, if the tracking of a car is interrupted, license plate readers could help relocate it in the AIR data over the following days." *Id.*

This Court also rejected any attempt to dismiss integration as irrelevant. The lower court in *Beautiful Struggle* had reasoned that the plaintiffs were merely "lump[ing] together discrete surveillance activities as one Fourth Amendment 'search.'" *Id.* (quoting *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 456 F. Supp. 3d 699, 716 (D. Md. 2020)). But this Court held that approach was

exactly backwards: "[r]egarding AIR data as just 'one more investigative tool' does exactly what the Supreme Court has admonished against; it allows inference to insulate a search." *Beautiful Struggle*, 2 F.4th at 345. "[B]ecause AIR data is what enables deductions from the whole of individuals' movements, the Fourth Amendment bars BPD from warrantless access" to the AIR data. *Id.*

The critical integration of surveillance tools is what drove the Court's analysis in *Beautiful Struggle*. The District Court failed to recognize this principle and repeated the very analytical error that this Court corrected in *Beautiful Struggle*.

**C. The District Court Misapplied *Carpenter* and *Beautiful Struggle* by Isolating the Flock Cameras from the Broader Surveillance System They Operate in.**

The District Court concluded that Norfolk's Flock System did not constitute a Fourth Amendment search in part because it believed the Flock cameras alone do not "capture 'the whole' of individuals' movements or even an analogue of 'the whole.'" JA50. The Court reasoned that "the more police work necessary to 'fill in the gaps' to build a path of travel . . . the less the rudimentary 'tracking' technology under review can be said to be 'capturing' or creating a record of all, or virtually all, of a person's movements." JA48. This analysis misapprehends the test established in *Carpenter* and applied in *Beautiful Struggle*.

In *Carpenter*, the Supreme Court encountered a similar argument that the collection of cell-site location information should be permitted because the

information was imprecise and could only place an individual in an area of up to four square miles. *Carpenter*, 585 U.S. at 313. There, the Supreme Court expressly "rejected the proposition that 'inference insulates a search'" when "the Government could, in combination with other information, deduce a detailed log of Carpenter's movements." *Id*. (quoting *Kyllo v. United States*, 533 U.S. 27, 36 (2001)). This Court also explained that the relevant question is not whether a single technology captures the literal whole of someone's movements; rather, it is whether the technology "enable[s] deductions from the whole of individuals' movements." *Beautiful Struggle*, 2 F.4th at 345.

The District Court's approach isolated the Flock cameras from the broader surveillance ecosystem in which they operate. Norfolk's Flock cameras do not operate in a vacuum. The Norfolk Police Department ("NPD") operates a suite of surveillance tools—thousands of city-owned and private video cameras, and state- and city-owned traffic cameras—all centralized in a Real Time Crime Center that "provide[s] real time information to officers who are responding to calls for service and . . . evidence of crimes that have occurred to investigators investigating crimes." JA887. NPD has deliberately placed video cameras in "roughly" the same areas as the Flock Cameras so that "the live view camera[s] and the Flock Camera[s] compliment[] each other." JA893, JA895. Norfolk Chief of Police Mark Talbot candidly described the result: "It would be difficult to drive anywhere of any distance

without running into a camera somewhere." NorfolkTV, Norfolk City Council Work Session, at 21:21–43 (YouTube, May 23, 2023), https://perma.cc/DH52-QFHX, *quoted in* JA75, JA83, JA87.

The District Court's approach also isolated the Flock cameras from Flock's own built-in analytics—features such as Real-Time Routing and Vehicle Journey Maps that are designed to synthesize raw data into actionable intelligence. Norfolk's Flock cameras generate precise, time-stamped data points. JA438; *e.g.*, JA452. When combined with officers' knowledge, thousands of video cameras, and the myriad police and public intelligence sources routinely used in investigations, these data points enable police to glean insights from the whole of individuals' movements—the same concern identified in *Beautiful Struggle*. NPD officers already do this: one officer testified that he reconstructed a suspect's route using Flock data and disproved the suspect's stated alibi. JA261–65.

The District Court's reasoning is precisely the kind of atomistic analysis that *Carpenter* and *Beautiful Struggle* rejected. By focusing solely on what the Flock cameras themselves "capture" at 75 locations, *e.g.*, JA36, the District Court improperly insulated the Flock System from Fourth Amendment scrutiny.

### D. Because the Norfolk Flock System Automates Much of the Data Analysis, It May Be More Invasive than the AIR Program.

A central concern running through the Supreme Court's Fourth Amendment jurisprudence on surveillance technology is the degree to which new tools

circumvent the practical constraints that historically limited police surveillance. *See also Commonwealth v. McCarthy*, 484 Mass. 493, 506, 142 N.E.3d 1090 (2020) (expressing similar concern that automated license plate readers "circumvent traditional constraints on police surveillance power by being cheap . . . and surreptitious"). In *Carpenter*, the Supreme Court stressed that cell phone tracking had become "remarkably easy, cheap, and efficient" and could be accomplished "[w]ith just the click of a button" at "practically no expense"—a dramatic departure from the resource-intensive methods of traditional investigation. *Carpenter*, 585 U.S. at 311. In *United States v. Jones*, Justice Sotomayor sounded the same alarm because GPS monitoring "evades the ordinary checks that constrain abusive law enforcement practices" precisely because it is "cheap in comparison to conventional surveillance techniques and, by design, proceeds surreptitiously." 565 U.S. 400, 415–16 (2012) (Sotomayor, J., concurring).

In 2020, the AIR Program still required substantial human labor to produce any actionable intelligence. *See* Audit Report at 15–16. An AIR Program vendor employed "approximately 25–30 trackers and analysts" who tracked individuals or vehicles "from image to image, second to second" by "zooming in on a location on an aerial surveillance image and clicking their mouse cursor over the subject they hope to track." The process of creating "tracks" was laborious and "in some cases,

analysts simply [were] . . . unable to create uninterrupted tracks of the movements of a person or vehicle." *See id*. at 13.

Norfolk's Flock System eliminates this labor requirement. Flock cameras automatically photograph every passing car, use artificial intelligence to read the license plates, and store the data in a searchable database—all around the clock. The Flock System automatically generates precise, time-and-location-stamped records that can be queried with just the click of a button. *See* JA8, JA437–438. The data is instantly accessible to over two hundred authorized users who have conducted more than 230,000 searches. JA1144, JA1164. Unlike the AIR Program, there is no need for human analysts to painstakingly construct tracks from ambiguous aerial images; the Flock System can automatically reconstruct a vehicle's route without any human analysis at all. The Flock System's "Real-Time Routing" feature helps determine a possible vehicle path of travel," JA141, and Flock's "Vehicle Journey Map" feature lets users map out the times and locations of captures to visualize a vehicle's path, *see* JA243–244. This automated capability distinguishes the Flock System from the AIR Program in *Beautiful Struggle*—which this Court itself described as "labor-intensive," *Beautiful Struggle*, 2 F.4th at 334—and makes the Flock System *more* constitutionally concerning, not less.[2]

---

[2] Even if Norfolk has not currently purchased all of Flock's advanced analytic features—such as "Convoy Analysis" and "Real Time Routing"—these features are

For all of these reasons, the Norfolk Flock System—operating within a broader surveillance ecosystem of video cameras and with automated built-in analytics—should be at least as concerning as the AIR Program that this Court found sufficient to constitute a Fourth Amendment search in *Beautiful Struggle*, and in critical respects more so, because it automates much of what AIR required teams of human analysts to perform. The District Court's atomistic approach, isolating the Flock cameras from the system's built-in analytic capabilities and the broader surveillance infrastructure, is inconsistent with this Court's holding in *Beautiful Struggle* and the Supreme Court's reasoning in *Carpenter*. Norfolk's Flock System "transcend[s] mere augmentation of ordinary police capabilities." *Beautiful Struggle*, 2 F.4th at 345. Its warrantless operation constitutes a Fourth Amendment search.

## V.     Conclusion

The District Court erred by overlooking the capabilities of the Flock System and isolating the Flock cameras from the larger, automated surveillance system. This Court should find that the Norfolk Flock System's data collection constitutes a search under the Fourth Amendment.

---

only "pay walled" and Norfolk could purchase these features at any time without necessarily consulting the public. *See* JA885–886, JA432–433; *see also Carpenter*, 585 U.S. at 312 (the rule the Court adopts "must take account of more sophisticated systems that are already in use or in development" (quoting *Kyllo v. United States*, 533 U.S. 27, 36 (2001))).

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because it contains 4,592 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Megan Tankel

Megan Tankel
Yang Li
BAKER BOTTS L.L.P.
700 K Street, N.W.
Washington, D.C. 20001-5692
(202) 639-7700
megan.tankel@bakerbotts.com
alex.li@bakerbotts.com

# CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2026, I electronically filed the foregoing brief with the Clerk of Court using the CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served with the foregoing by the Court's CMM/ECF system.

/s/ Megan Tankel