**No. 26-1227**

IN THE

# United States Court of Appeals
# for the Fourth Circuit

LEE SCHMIDT; CRYSTAL ARRINGTON,

*Plaintiffs-Appellants,*

v.

CITY OF NORFOLK; MARK TALBOT, IN HIS OFFICIAL CAPACITY AS NORFOLK CHIEF OF POLICE,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Virginia at Norfolk

## BRIEF OF THE NEW CIVIL LIBERTIES ALLIANCE
## AS *AMICUS CURIAE* IN SUPPORT OF
## PLAINTIFFS-APPELLANTS AND REVERSAL

John J. Vecchione
Andreia Trifoi
Mark S. Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
(202) 869-5210
John.Vecchione@ncla.legal
*Counsel for* amicus curiae
*New Civil Liberties Alliance*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _26-1227_     Caption: _Lee Schmidt v. City of Norfolk_

Pursuant to FRAP 26.1 and Local Rule 26.1,

New Civil Liberties Alliance
(name of party/amicus)

who is _____Amicus Curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

12/01/2019 SCC     - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ John J. Vecchione          Date: 4/20/2026

Counsel for: New Civil Liberties Alliance

- 2 -

| Print to PDF for Filing |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................ii

INTEREST OF *AMICUS CURIAE* ........................................................1

INTRODUCTION AND SUMMARY ......................................................3

ARGUMENT ........................................................................................6

   I. INDIVIDUALS HAVE A REASONABLE EXPECTATION OF PRIVACY IN THEIR ALPR LOCATION HISTORY OVER TIME .................................................6

      A. Aggregated, Long-Term ALPR Location Data Is Capable of Revealing the "Privacies of Life" ...............................................10

      B. ALPRs Are an Advanced Surveillance Technology that Captures Detailed Location Information Previously Impossible to Obtain .................................................................................13

   II. ALPR SCHEMES LIKE THE CITY OF NORFOLK'S EFFECTUATE A "TOO PERMEATING POLICE SURVEILLANCE" THAT THE FOURTH AMENDMENT WAS DESIGNED TO IMPEDE ...........................................16

      A. The Utility of ALPRs for Policing Cannot Outweigh the Fourth Amendment's Constraints on Their Use .....................................20

      B. Legislatively Established Limits Cannot Cure the Constitutional Defects in the Sweeping, Long-Term Monitoring of Public Movements Through ALPRs .....................23

CONCLUSION ....................................................................................24

CERTIFICATE OF COMPLIANCE.......................................................26

CERTIFICATE OF SERVICE...............................................................27

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Canosa v. City of Coral Gables,*
359 So. 3d 719 (Fla. Dist. Ct. App. 2023)................................................3

*Carpenter v. United States,*
585 U.S. 296 (2018) ...................................4, 5, 6, 7, 8, 9, 10, 13, 16, 17

*City of Los Angeles v. Patel,*
576 U.S. 409 (2015) ...............................................................................23

*Katz v. United States,*
389 U.S. 347 (1967) ...............................................................................16

*Kyllo v. United States,*
533 U.S. 27 (2001) .................................................................................12

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't,*
2 F.4th 330 (4th Cir. 2021).......................6, 8, 10, 11, 12, 13, 14, 19, 24

*Maryland v. King,*
569 U.S. 435 (2013) ..........................................................................21, 22

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
60 F.4th 956 (5th Cir. 2023)..................................................................18

*Schemel v. City of Marco Island,*
No. 2:22-cv-79-KCD-DNF, 2025 WL 2958798
(M.D. Fla. Oct. 17, 2025) ........................................................................2

*Schmidt v. City of Norfolk,*
No. 2:24CV621, 2026 WL 207513
(E.D. Va. Jan. 27, 2026) ........................................ 5, 6, 9, 11, 14, 19, 23

*Sidor v. Thornell,*
No. CV-25-08141-PCT-DWL, 2025 WL 3282976
(D. Ariz. Oct. 24, 2025)..........................................................................21

*United States v. Cuevas-Sanchez,*
821 F.2d 248 (5th Cir. 1987) ..................................................................23

ii

*United States v. Gregory,*
  128 F.4th 1228 (11th Cir. 2025) ................................................... 14, 15

*United States v. Jones,*
  565 U.S. 400 (2012) ........................................................... 7, 13, 15, 22

*United States v. Knotts,*
  460 U.S. 276 (1983) ................................................................. 7, 17, 19

*United States v. Smith,*
  110 F.4th 817 (5th Cir. 2024) ........................................... 13, 18, 19, 22

*United States v. Sturdivant,*
  786 F. Supp. 3d 1098 (N.D. Ohio 2025) .............................................. 19

*United States v. Tuggle,*
  4 F.4th 505 (7th Cir. 2021) ................................................................. 4

*Virginia v. Moore,*
  553 U.S. 164 (2008) ......................................................................... 24

## Other Authorities

Letter From John Adams to William Tudor (Mar. 29, 1817), *reprinted*
  *in* 10 *The Works of John Adams, Second President of the United*
  *States: with a Life of the Author*
  (Charles Francis Adams ed., 1856) ..................................................... 18

Orin S. Kerr,
  The Digital Fourth Amendment: Privacy and Policing in Our Online
  World (2025) ...................................................................................... 8

Philip Hamburger,
  *Is Administrative Law Unlawful?* (2014) ........................................... 18

## INTEREST OF *AMICUS CURIAE*[1]

The New Civil Liberties Alliance ("NCLA") is a nonpartisan, nonprofit civil-rights organization and public-interest law firm devoted to defending constitutional freedoms from the administrative state's depredations. Professor Philip Hamburger founded NCLA to challenge multiple constitutional defects in the modern administrative state through original litigation, *amicus curiae* briefs, and other advocacy.

The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself, such as the rights to a jury trial, to due process of law, and to be free from unreasonable searches and seizures. These selfsame civil rights are also very contemporary— and in dire need of renewed vindication—precisely because Congress, executive branch officials, administrative agencies, and even some courts have neglected them for so long.

NCLA aims to defend civil liberties—primarily by asserting constitutional constraints against the modern administrative state.

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus* or its counsel made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

1

Although Americans still enjoy the shell of their Republic, a very different sort of government has developed within it—a type that the Constitution was designed to prevent. This unconstitutional state within the Constitution's United States is the focus of NCLA's concern.

Federal and state governments' increasing efforts to surveil the American public through automated information-collection technologies causes particular concern for NCLA. All too often, executive officers seize upon technological innovation to carry out unprecedented and dangerous intrusions into Americans' private lives. NCLA seeks to ensure that executive officers are prohibited from exploiting the character of constantly modernizing surveillance technology to evade the clear constraints the Fourth Amendment places on them.

NCLA was founded to restore constitutional limits on administrative power and to protect the civil liberties of all Americans, including the right to be free from unreasonable searches and seizures. NCLA has defended this right by challenging warrantless surveillance through automatic license plate readers (ALPRs), including in *Schemel v. City of Marco Island*, No. 2:22-cv-79-KCD-DNF, 2025 WL 2958798 (M.D. Fla. Oct. 17, 2025) (pending appeal in the 11th Cir.), and *Canosa*

2

*v. City of Coral Gables*, 359 So. 3d 719 (Fla. Dist. Ct. App. 2023), *aff'g* No. 2018-033927-CA-01 (Fla. Cir. Ct. Oct. 15, 2019).  NCLA believes that the long-term, suspicionless tracking of individuals' daily movements through ALPRs flouts the very purpose of the Fourth Amendment: to secure the people in their persons and property against arbitrary government intrusion.  The City of Norfolk's expansive deployment of this technology is not a targeted investigative tool, but a suspicionless dragnet that subjects every resident to continuous monitoring, contravening the Fourth Amendment's command that searches be particularized and justified.

## INTRODUCTION AND SUMMARY

This case asks whether the Constitution places any constraints on a municipal government's effort to impose a vast network of surveillance technology to watch and record the movements and whereabouts of that city's inhabitants and visitors.  More specifically, does the daily, automatic, and suspicionless tracking of individuals each time they drive through the City of Norfolk, combined with the potentially indefinite retention of that data in a searchable database, comport with the Fourth Amendment's guarantee against unreasonable searches and seizures?

3

Under the Supreme Court's decision in *Carpenter v. United States*, 585 U.S. 296 (2018), it does not.

While the application of the Fourth Amendment is necessarily fact-specific, courts confronting novel surveillance technologies cannot evade *Carpenter*'s guiding analytical framework and central command: that the government violates a reasonable expectation of privacy when it uses advanced technology to assemble a comprehensive record of a person's physical movements, thereby revealing the "privacies of life"—information previously unobtainable without that advanced technology. *See Carpenter*, 585 U.S. at 311. In the years after *Carpenter*, however, lower courts have all too frequently cabined the seminal decision to its specific facts, regarding it as a limited departure from settled Fourth Amendment doctrine rather than new controlling precedent. *See, e.g.*, *United States v. Tuggle*, 4 F.4th 505, 525 (7th Cir. 2021) ("Until the Supreme Court or Congress instructs otherwise, we will read *Carpenter* as limited to the unique features of the historical [cell-site location information] at issue there, as distinct from the real-time video footage here.").

4

The district court did just that in this case. Disregarding *Carpenter*'s analytical framework, it concluded that Norfolk's ALPR program does not contravene a reasonable expectation of privacy in the "whole of [one's] physical movements." *Schmidt v. City of Norfolk*, No. 2:24CV621, 2026 WL 207513, at *18 (E.D. Va. Jan. 27, 2026). That conclusion cannot be squared with the record or with precedent. Norfolk's network of 176 ALPR cameras captures and retains enough information to enable the city to reconstruct its residents' daily movements, habits, and patterns, which is precisely the kind of deeply revealing information that allows deductions as to "privacies of life." *See Carpenter*, 585 U.S. at 311. And because this information is beyond the government's reach absent ALPR technology, each of the factors identified in *Carpenter* is readily satisfied.

Pervasive, long-term surveillance of individuals through ALPRs represents precisely the type of "too permeating police surveillance" the Fourth Amendment was designed to impede. *See id.* at 305 (quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)). The fact that ALPRs may serve legitimate law enforcement interests cannot outweigh the constraints the Fourth Amendment places on such surveillance.

5

Similarly, a state's statutorily imposed guardrails cannot render otherwise unconstitutional ALPR use constitutional by virtue of its citizens' "direct[] involve[ment]" in the "debate." *Schmidt*, 2026 WL 207513, at *16.

In line with both *Carpenter* and this Court's prior decision in *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021), the Fourth Amendment prohibits the City of Norfolk from collecting and retaining its residents' location data for a potentially unlimited period of time without a warrant, suspicion, or probable cause. The district court's denial of Plaintiffs-Appellants' motion for summary judgment should thus be reversed, and the decision should be remanded with instructions that the district court apply *Carpenter*'s analytical framework to Norfolk's ALPR scheme.

## ARGUMENT

### I. INDIVIDUALS HAVE A REASONABLE EXPECTATION OF PRIVACY IN THEIR ALPR LOCATION HISTORY OVER TIME

*Carpenter* held that individuals have a "reasonable expectation of privacy in the whole of [their] physical movements." 585 U.S. at 313. *Carpenter* expounded the principle that "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere." *Id.*

6

at 310.  As lower courts have recognized, the Fourth Amendment does not protect a single viewing of a person nor affect what is publicly visible. *See United States v. Knotts*, 460 U.S. 276, 281-82 (1983).  But the sum of an individual's public movements can provide "an intimate window into [that] person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'"  *Carpenter*, 585 U.S. at 311 (citing *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring)).  That is why the government's use of technology to monitor public movements more pervasively can trigger the warrant requirement even if an officer could have, conceivably, conducted the same search in a single instance.

*Carpenter* concluded that using cell-site location information ("CSLI") to track a criminal defendant's movements over a seven-day period constituted a Fourth Amendment "search," even though the movement occurred in public view, because similar comprehensive tracking by individual police officers watching public roads is not possible.  *Id*. at 312-13.  But *Carpenter* did not merely create a rule against the warrantless access of CSLI or its technological equivalent.  Instead, it "solidified the line between short-term tracking of public

7

movements—akin to what law enforcement could do '[p]rior to the digital age'—and prolonged tracking that can reveal intimate details through habits and patterns." *See Beautiful Struggle*, 2 F.4th at 341 (quoting *Carpenter*, 585 U.S. at 310). "The latter form of surveillance invades the reasonable expectation of privacy that individuals have in the whole of their movements," and is therefore a search. *Id.*

The "guideposts" the Supreme Court followed in reaching its decision that the government's warrantless access of CSLI violates the Fourth Amendment must likewise guide the analysis of Norfolk's use of ALPRs, which represent precisely the type of prolonged tracking the Supreme Court rejected in *Carpenter*. Those guideposts instruct that whether the government has violated one's reasonable expectation of privacy in the whole of their physical movements turns on: (1) whether the government used a digital technology to obtain information that would have historically been impossible to obtain without that technology, and (2) whether that information tends to reveal the "privacies of life." *Carpenter*, 585 U.S. at 311-13; *see also* Orin S. Kerr, *The Digital Fourth Amendment: Privacy and Policing in Our Online World* 155 (2025) (Explaining that *Carpenter* works at a high level of

8

generality and asks whether "police traditionally have easy access to detailed location tracking records" and whether "they have that access today.").

The long-term collection and retention of ALPR location data gives the government access to information that, prior to the digital age, was categorically beyond its reach. When aggregated, that data enables the government to draw extraordinarily detailed and precise pictures of individuals' daily habits, associations, and patterns. Aggregated ALPR data is therefore capable of revealing the "privacies of life." *Carpenter*, 585 U.S. at 311-13. The City of Norfolk's 176 ALPR cameras record the location of each passing motorist constantly and with extraordinary accuracy. *See Schmidt*, 2026 WL 207513, at *3-4. And while Virginia law theoretically limits the retention of this information to 21 days, nothing prevents "the long-term retention of ALPR data that is downloaded from the … system." *Id.* at *4. The Court must conclude that Norfolk's use of ALPRs constitutes a Fourth Amendment search because, per *Carpenter*, the city's long-term collection and retention of its residents' location information through ALPRs intrudes on the

9

expectation of privacy individuals have in the "whole of their physical movements." *Carpenter*, 585 U.S. at 310.

### A. Aggregated, Long-Term ALPR Location Data Is Capable of Revealing the "Privacies of Life"

Starting with the "privacies of life" prong, *Carpenter* made clear that whether the government's particular use of a digital surveillance tool tends to reveal the privacies of life is fact-intensive and requires an assessment of both the quantity *and* quality of the information collected. The *Carpenter* Court assessed factors including the scope, duration, invasiveness, precision, and length of time gathered information is kept. *Carpenter*, 585 U.S. at 320 (explaining that CSLI is entitled to Fourth Amendment protection in light of its "deeply revealing nature" and its "depth, breadth, and comprehensive reach"). Each of these factors informed the Court's analysis as to whether the location data at issue could allow law enforcement to draw certain inferences about Carpenter himself. *Id.*

It is precisely the *capability* of collected data to enable "deductions from the whole of individuals' movements" that is constitutionally suspect because it is those deductions that reveal the "privacies of life." *Beautiful Struggle*, 2 F.4th at 345. Although the AIR surveillance

10

program in *Beautiful Struggle* could only record movements occurring entirely in public spaces, this Court nonetheless held that the program amounted to a Fourth Amendment search. *Id.* at 334. Moreover, the surveillance program at issue in that case could not capture clear images of individuals—people and cars were "individually visible, but only as blurred dots or blobs." *Id.* But this was irrelevant:

> The "analysis (*i.e.*, the making of inferences)" involved in the AIR program may be more labor intensive than deducing location history from CSLI, or details about the inside of a home from its thermal image, or the fact of a beeper's presence inside a home from its activation. Nevertheless, because AIR data is what enables deductions from the whole of individuals' movements, the Fourth Amendment bars BPD from warrantless access to engage in that labor-intensive process.

*Id.* at 345 (citations omitted).

The record shows that Norfolk's ALPRs generate enough data for it to deduce many of its residents' daily movements over multiple weeks. *See* App. Br. at 17-21. The fact that Norfolk may need to use other investigative tools or employ further "police techniques" to allow it to make those deductions does not place its ALPR network beyond the reach of the Fourth Amendment. *Schmidt*, 2026 WL 207513, at *16. Even prior to *Carpenter*, the Supreme Court squarely recognized that inference does not insulate a search. In *Kyllo v. United States*, the Court held that law

11

enforcement's use of a thermal-imaging device to scan a house for potential drug-related activity *could potentially* reveal "what hour each night the lady of the house takes her daily sauna and bath," and thus the use of such a device constituted a Fourth Amendment search. 533 U.S. 27, 38 (2001). And as *Beautiful Struggle* makes clear, surveillance need not capture the actual entirety of a person's movements to infringe upon a reasonable expectation of privacy; it is enough if it "enables deductions about 'what a person does repeatedly, what he does not do, and what he does ensemble,' which 'reveal[s] more about a person than does any individual trip viewed in isolation.'" *Beautiful Struggle*, 2 F.4th at 342 (quoting *United States v. Maynard*, 615 F.3d 544, 562-63 (D.C. Cir. 2010)). That the information captured by Norfolk's ALPR cameras can reveal its residents' movements only upon further analysis does not remove it from Fourth Amendment scrutiny. *Kyllo*, 533 U.S. at 36 (explaining that the Fourth Amendment does not only protect an "8-by-10 Kodak glossy that needs no analysis.").

The *Carpenter* inquiry focuses on whether collected location data, taken as a whole, could open an "intimate window" into an individual's life and does not necessitate a retroactive examination based on the

12

actual results of a particular search. *See United States v. Smith*, 110 F.4th 817, 832, 834 n. 8 (5th Cir. 2024) (explaining that, under *Carpenter*, the question is whether the data "has the *capability* of revealing intimate, private details about a person's life, thus conferring a 'reasonable expectation of privacy.'" (emphasis added) (citation omitted)). Because the location data collected by Norfolk's ALPR network is capable of allowing the government to deduce information about its residents' daily habits and patterns, it easily satisfies the first *Carpenter* prong.

### B. ALPRs Are an Advanced Surveillance Technology that Captures Detailed Location Information Previously Impossible to Obtain

In *Beautiful Struggle*, this Court recognized that *Carpenter* requires courts to consider whether a surveillance technology "transcends mere augmentation of ordinary police capabilities" by allowing police to "travel back in time to observe a target's movements, forwards and backwards." 2 F.4th at 341, 345 (cleaned up). "In the past, attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection." *Carpenter*, 585 U.S. at 312; see also *Jones*, 565 U.S. at 415-16 (Sotomayor, J., concurring). With long-term tracking through ALPRs, that is no longer the case.

13

The district court's comparison of Norfolk's ALPRs to stationary security cameras or "watchtowers" is misguided. *See Schmidt*, 2026 WL 207513, at *15, *16 n.19 (stating that "defendants' fixed ALPR cameras, like security cameras, are best described as captur[ing] images of locations, not individuals.") (cleaned up). This case does not challenge the fixed-location surveillance of one particular target, but rather the prolonged tracking of individuals' movements across Norfolk. *Cf. Beautiful Struggle*, 2 F.4th at 345-46 ("[E]ven though … pole cameras can sometimes reveal intimate information like the AIR program does, that does not mean the AIR program's citywide prolonged surveillance campaign must be permissible as well.").

In *United States v. Gregory*, a sister circuit held that the use of a pole camera to observe a criminal suspect's home non-stop for ten months did not violate his right to privacy. *See* 128 F.4th 1228, 1235 (11th Cir. 2025). The *Gregory* court distinguished *Carpenter* on the basis that "[p]ole cameras are distinct both in terms of the information they mine and the degree of intrusion necessary to do so." *Id.* at 1242. In reaching its conclusion, the Eleventh Circuit explained that "the Fourth Amendment does not punish law enforcement for using technology to

14

more efficiently conduct their investigations." *Id.* at 1243 (quoting *United States v. Houston*, 813 F.3d 282, 288 (6th Cir. 2016)). In other words, because law enforcement could be stationed round-the-clock to observe a criminal suspect's home in person, the "fact that they instead used a camera to conduct the surveillance does not make the surveillance unconstitutional." *Id.* (citations omitted).

Thus, under *Carpenter*, a factor courts should consider in deciding whether a surveillance technology encroaches upon an individual's expectation of privacy in the whole of their physical movements is: would law enforcement officials be able to effectuate this degree and type of surveillance and discern the same information without the use of that technology? The answer in this case is clearly no. Traditional surveillance tools could not possibly allow an officer to record potentially thousands of passing license plates each minute and populate that information into an easily searchable, massive database within seconds. *See* App. Br. at 4-6. While a police officer needs to sleep, eat, and take breaks, an automated, robotic camera does not. *See Jones*, 565 U.S. at 415-16 (Sotomayor, J., concurring) (explaining that this character of modern surveillance technology—its relatively low cost and ability to

15

proceed surreptitiously—"evades the ordinary checks that constrain abusive law enforcement practices: 'limited police resources and community hostility.'") (quoting *Illinois v. Lidster*, 540 U.S. 419, 426 (2004)).

Because Norfolk's ALPR scheme is capable of revealing the "privacies of life" through the long-term aggregation of location data—and because such information would have been beyond the government's reach prior to the digital age—it infringes on the expectation of privacy in the "whole of [one's] physical movements" and constitutes a search within the meaning of the Fourth Amendment. *See Carpenter*, 585 U.S. at 313. And because Norfolk operates its ALPR scheme without a warrant, it conducts unreasonable searches prohibited by the Fourth Amendment. *See Katz v. United States*, 389 U.S. 347, 360-61 (1967) (Harlan, J., concurring).

## II. ALPR SCHEMES LIKE THE CITY OF NORFOLK'S EFFECTUATE A "TOO PERMEATING POLICE SURVEILLANCE" THAT THE FOURTH AMENDMENT WAS DESIGNED TO IMPEDE

Whether an individual's expectation of privacy is entitled to Fourth Amendment protection is anchored in historical understandings "of what was deemed an unreasonable search and seizure" at the Founding.

16

*Carpenter*, 585 U.S. at 305 (citation omitted). Even "[a]s technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes," the Supreme Court "has sought to assure [] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Id.* (citing *Kyllo*, 533 U.S. at 34). After all, "a central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'" *Id.* (citation omitted).

In *Knotts*, the Supreme Court imposed guardrails on warrantless public surveillance by rejecting "dragnet type law enforcement practices." *Knotts*, 460 U.S. at 283-284. The Supreme Court and lower courts have continued to admonish against the government's attempts to carry out widespread warrantless and suspicionless surveillance schemes. The *Carpenter* Court recognized that one of the dangers of CSLI is that it "runs against everyone." *Carpenter*, 585 U.S. at 312. "Unlike with the GPS device in *Jones*, police need not even know in advance whether they want to follow a particular individual, or when." *Id.* And the Fifth Circuit has noted that the 24-hour warrantless tracking of charter-boats by the government can raise serious Fourth Amendment concerns, "given the Supreme Court's instruction that members of the public have a

17

'reasonable expectation of privacy in the whole of their movements.'" *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 970 (5th Cir. 2023).

Such surveillance schemes resemble the "reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Smith*, 110 F.4th at 836 (citing *Riley v. California*, 573 U.S. 373, 403 (2014)). The Founders' broad rejection of general warrants is what, by many accounts, first sparked the American Revolution. *See* Philip Hamburger, *Is Administrative Law Unlawful?* 186 (2014); *see also* Letter From John Adams to William Tudor (Mar. 29, 1817), *reprinted in* 10 *The Works of John Adams, Second President of the United States: with a Life of the Author* (Charles Francis Adams ed., 1856) (explaining that James Otis's argument against writs of assistance in *Paxton's Case* "was the first scene of the first act of opposition to the arbitrary claims of Great Britain.").

ALPR networks that collect location data of each motorist indiscriminately and without individualized suspicion are a far cry from a "discrete operation surveilling individual targets," *Beautiful Struggle*,

18

2 F.4th at 345. Norfolk's use of ALPRs to pervasively monitor its residents' movements, and its ability to retain records of these movements for a potentially unlimited amount of time,[2] instead resembles a "dragnet type law enforcement" practice against which courts have routinely cautioned. *See Knotts*, 460 U.S. at 281, 283-84 (recognizing that "twenty-four-hour surveillance of any citizen of this country['s]" public movements presents an entirely different constitutional question than limited GPS tracking of one individual); *see also United States v. Sturdivant*, 786 F. Supp. 3d 1098, 1114 (N.D. Ohio 2025) (warning that advanced ALPR systems that operate retroactively may present "dragnet type law enforcement practices" amounting to a Fourth Amendment search). And like general warrants, Norfolk's ALPRs "'work in reverse' from traditional search warrants," because, rather than "authorizing surveillance of a known suspect," they "conduct sweeping searches of" each vehicle that passes through Norfolk. *Smith*, 110 F.4th at 822.

---

[2] *See Schmidt*, 2026 WL 207513, at *4 (explaining that the statutory retention period "does not prevent the long-term retention of ALPR data that is downloaded from the Flock system.").

19

The historical understandings of the Fourth Amendment, and its rejection of dragnet surveillance schemes, must guide this Court's analysis of Norfolk's ALPRs, irrespective of their law enforcement utility or any legislatively imposed guardrails on their use.

### A. The Utility of ALPRs for Policing Cannot Outweigh the Fourth Amendment's Constraints on Their Use

Proponents of ALPRs frequently emphasize their value as crime-fighting tools and warn of the potential consequences if state, local, and municipal governments are unable to use this technology to facilitate law enforcement investigations. *See, e.g.*, Amicus Curiae *Virginia Assoc. of Chiefs of Police* Br. in Support of Defs.' Mot. for Summ. J. at 4 (highlighting the "significant value of LPR camera technology and how law enforcement uses the tool to protect the safety of Virginians."). ALPRs can certainly aid criminal investigations and help locate fleeing suspects, missing persons, and stolen vehicles, among other things. *See id.* at 4-8. But there is a critical difference between the long-term warrantless, suspicionless, and probable cause-deficient surveillance of each innocent motorist in a city via ALPRs and cases involving the limited, short-term "use[] of ALPR where the reasonable articulable suspicion to use the ALPR was a given," or where "police had reason to

20

believe that a particular vehicle was involved in a specific crime." *Sidor v. Thornell*, No. CV-25-08141-PCT-DWL, 2025 WL 3282976, at *10 (D. Ariz. Oct. 24, 2025).

Moreover, the Fourth Amendment imposes constraints on the use of ALPRs to continuously track the movements of everyone in a city regardless of policy judgments concerning the utility of ALPRs as a crime-fighting tool. In his dissent in *Maryland v. King*, Justice Scalia criticized the majority's upholding of the suspicionless collection of an arrestee's DNA. *See Maryland v. King*, 569 U.S. 435, 466-82 (2013) (Scalia, J., dissenting). He explained that the Fourth Amendment was specifically drafted in response to the warnings of certain Anti-Federalists "that the new Federal Constitution would expose the citizenry to searches and seizures 'in the most arbitrary manner, without any evidence or reason.'" *Id.* at 467 (citing 3 Debates on the Federal Constitution 588 (J. Elliot 2d ed. 1854)). Armed with this historical understanding, Justice Scalia aptly recognized that "[s]earching every lawfully stopped car [] might turn up information about unsolved crimes the driver had committed, but no one would say that such a search was aimed at 'identifying' him, and no court would hold such a search lawful."

21

*Id.* at 470. Similarly here, the idea that tracking every innocent motorist's movements through ALPRs may aid in law enforcement investigations and potentially uncover evidence of criminal activity cannot outweigh the fact that the Fourth Amendment was expressly designed to prohibit such pervasive, suspicionless surveillance of ordinary citizens en masse.

A conclusion that Norfolk's long-term collection and retention of Appellants' ALPR location data effectuates a search within the meaning of the Fourth Amendment may "hamper legitimate law enforcement interests. But hamstringing the government is the whole point of our Constitution." *Smith*, 110 F.4th at 841 (Ho, J., concurring). Hence, the Fourth Amendment's guardrails must apply with equal force regardless of whatever public interests ALPRs might serve through warrantless, suspicionless tracking. *See Jones*, 565 U.S. at 416 (Sotomayor J., concurring) (warning that giving the government "unrestrained power to assemble data that reveal private aspects of identity" as to anyone whom it, "in its unfettered discretion, chooses to track" may "alter the relationship between citizen and government in a way that is inimical to democratic society.") (quotations omitted); *see also United States v.*

22

*Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987) (recognizing that long-term and "indiscriminate … surveillance [even in areas of plain view] raises the spectre of the Orwellian state.").

## B. Legislatively Established Limits Cannot Cure the Constitutional Defects in the Sweeping, Long-Term Monitoring of Public Movements Through ALPRs

In a similar vein, the Court should reject the misguided notion that legislative limits on ALPR use in Virginia enables Norfolk's ALPR program to accord with the constraints of the Fourth Amendment because it "offers at least some indication that the use of ALPR systems within these parameters promotes public safety without transgressing the public's reasonable expectation of privacy." *Schmidt*, 2026 WL 207513, at *16. Surveillance that otherwise violates the Fourth Amendment cannot be rendered constitutional by virtue of being enacted by a legislative body. To the contrary, in *City of Los Angeles v. Patel*, 576 U.S. 409, 428 (2015), the Supreme Court had no trouble striking down a warrantless inspection regulation under the Fourth Amendment even though it was enacted by a city government. Nor did its public enactment by city leadership prevent Baltimore's aerial surveillance program from

23

being held to violate the Fourth Amendment. *Beautiful Struggle*, 2 F.4th at 347.

Constitutional rights exist to protect citizens from unlawful legislative power, too. The Fourth Amendment's protection against unreasonable searches would be eviscerated if surveillance policies enacted by elected officials were *ipso facto* constitutional. *See Virginia v. Moore*, 553 U.S. 164, 168 (2008) (explaining that the Fourth Amendment is not "a redundant guarantee of whatever limits on search and seizure legislatures might have enacted."). The long-term collection and retention of innocent motorists' movements through ALPRs represent the very sort of "too permeating" police surveillance the Fourth Amendment was specifically designed to impede. This Court must police the boundaries of the Fourth Amendment vigilantly and ensure that it is the Constitution that guides its analysis of Norfolk's ALPRs—and not any legislatively imposed guardrails on its use.

## CONCLUSION

For the foregoing reasons and those provided by Plaintiffs-Appellants, this Court should reverse the district court's denial of

24

Plaintiffs-Appellants' motion for summary judgment and remand the case for further proceedings.

Dated: April 20, 2026

Respectfully submitted,

/s/ *John J. Vecchione*
John J. Vecchione
    *Counsel of Record*
Andreia Trifoi
Mark S. Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
Telephone: 202-869-5210
John.Vecchione@ncla.legal

*Counsel for* amicus curiae
*New Civil Liberties Alliance*

25

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of the Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 4,594 words. This brief also complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure because it was prepared using Microsoft Word in Century Schoolbook, 14-point font, a proportionally spaced typeface.

Dated: April 20, 2026

/s/ *John J. Vecchione*
John J. Vecchione

26

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2026, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system, which sent notification of such filing to all counsel of record.

Dated: April 20, 2026

/s/ *John J. Vecchione*
John J. Vecchione