No. 26-1227

IN THE

# United States Court of Appeals for the Fourth Circuit

---

LEE SCHMIDT, *et al.*,

*Plaintiffs-Appellants,*

v.

CITY OF NORFOLK, *et al.*,

*Defendants-Appellees.*

---

**On Appeal from the United States District Court
For the Eastern District of Virginia**

---

**BRIEF OF THE COMMONWEALTH OF VIRGINIA AS *AMICUS
CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES**

---

JAY JONES
  *Attorney General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-1252 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

 June 18, 2026

TILLMAN J. BRECKENRIDGE
  *Solicitor General*

DANIEL J. HONOLD
  *Deputy Solicitor General*

*Counsel for Amicus Curiae*

- i -

# TABLE OF CONTENTS

Table of Authorities.................................................................ii

Introduction and Interest of *Amicus Curiae*...............................1

Background..........................................................................2

Argument..............................................................................6

    I.    Norfolk's photographing of license plates and exteriors of cars driving on public roads does not amount to a Fourth Amendment search. ....................................6

Conclusion ..........................................................................14

Statement ...........................................................................15

Certificate of Compliance......................................................16

# TABLE OF AUTHORITIES

**Cases**

*Carpenter v. United States,*
  585 U.S. 296 (2018) ....................................................................... passim

*Katz v. United States,*
  389 U.S. 347 (1967) .................................................................................7

*Leaders of a Beautiful Struggle v. Baltimore Police Department,*
  2 F.4th 330 (4th Cir. 2021)............................................................ 10, 11

*Olabisiomotosho v. City of Houston,*
  185 F.3d 521, 529 (5th Cir. 1999) ..........................................................9

*Rinaldi v. Sylvester,*
  No. 7:24-cv-272, 2025 WL 2682691 (S.D.N.Y. Sept. 19, 2025)............ 12

*Scholl v. Illinois State Police,*
  776 F. Supp. 3d 701 (N.D. Ill. 2025) ................................... 6, 10, 11, 12

*Traft v. Commonwealth,*
  539 S.W.3d 647 (Ky. 2018) .....................................................................9

*United States v. Ellison,*
  462 F.3d 557 ..........................................................................................8

*United States v. George,*
  971 F.2d 1113 (4th Cir. 1992) ................................................................8

*United States v. Jones,*
  565 U.S. 400 (2012) ....................................................................7, 11, 13

*United States v. Knotts,*
  460 U.S. 276 (1983) ....................................................................8, 11, 12

**Statutes**

Va. Code § 2.2-5517 ................................................................... passim

Va. Code § 46.2-1013 ..............................................................................8

Va. Code § 46.2-711 ................................................................................8

Va. Code § 46.2-715 ................................................................................8

Va. Code § 46.2-716 ................................................................................8

**Other Authorities**

City of Norfolk, "Streets & Bridges,"
  *available at* https://www.norfolk.gov/1655/Streets-Bridges...................2

## INTRODUCTION AND INTEREST OF *AMICUS CURIAE*

The Commonwealth of Virginia promotes public safety though the vigorous enforcement of its laws consistent with the United States Constitution. The City of Norfolk's system of fewer than 200 automatic license-plate readers, placed in 75 clusters across more than 2,000 miles of public roadway, does not cross any Fourth Amendment line.

Moreover, Virginia has enacted Virginia Code § 2.2-5517, a comprehensive set of requirements and prohibitions for the use of these systems in the Commonwealth. The law places guardrails that address concerns about data retention and sharing, and it underscores that these systems do not violate any reasonable expectation of privacy.

As the district court recognized, Norfolk's use of an automatic license-plate reader system is not the type of "dragnet" practice that triggers Fourth Amendment protections, nor can it be under Virginia law. For those reasons, the district court's restrained decision can be affirmed on the grounds relied on by the court, and this Court need not take the invitations of *amici* for either side seeking broad endorsement or vilification of a law enforcement tool in this appeal of a narrow, fact-bound decision.

- 1 -

**BACKGROUND**

Norfolk has a population of approximately 240,000, JA987, and manages over 2,000 miles of public roads across its 66 square miles, JA10.[1] In 2023, Norfolk contracted with a company called Flock Safety to install a series of cameras in fixed places near its public roadways. JA384. These stationary cameras, variously called automatic license-plate readers, ALPRs, or LPRs, "are typically mounted on the top of poles and installed next to public roadways, where they photograph external vehicle characteristics that are visible to the naked eye." JA7 (citations and internal quotation marks omitted). Norfolk's cameras endeavor to photograph each car that drives past one of the cameras, and Flock's technology "uses artificial intelligence to read the license plate," with "very high accuracy." JA7. The cameras also capture "the make, type, color, and other distinctive features (like roof racks and bumper stickers)," of the passing cars. JA7. These cameras do not capture location information anywhere other than the public roadways near which they are placed. JA7.

---

[1] *See also* City of Norfolk, "Streets & Bridges," *available at* https://www.norfolk.gov/1655/Streets-Bridges.

The cameras upload the images they capture to a database that can only be accessed by authorized users—here, officers of the Norfolk Police Department. JA8. The images are automatically deleted after 21 days (previously 30) by default, but users can download specific data and thereby retain them for longer periods. JA10.

The district court found that the camera system works in essentially two steps: "First, vehicles are photographed at various locations around the City of Norfolk and the images are automatically uploaded to an encrypted database." JA15. "Second, when a[] [Norfolk Police Department] investigation calls for it, the ALPR database is queried by an authorized user seeking to discover any 'hits' tied to a license plate or vehicle of interest." JA15.

Flock cameras allow for data sharing with other authorized users. JA10. But Virginia law, effective as of July 2025, significantly restricts data sharing specifically and the use of these systems generally. *See* Va. Code § 2.2-5517. For example, users may not query these data except for limited law-enforcement purposes, such as criminal investigations supported by reasonable suspicion and searches for missing people. Va. Code § 2.2-5517(D). The law also curtails the circumstances in which

- 3 -

users can share the data they access. *See id.* Another provision, set to take effect in July 2026, requires contracts with vendors, including Flock, to specify compliance with many of the law's guardrails, which include limits on data dissemination, requirements for data purging within 21 days, and compliance with information-security standards. Va. Code § 2.2-5517(C).

By the time of summary judgment, Norfolk employed 176 cameras in 75 clusters and received data from 43 additional cameras owned by third parties who voluntarily produced the data. JA9–10 & n.6. Norfolk generally placed the cameras "at busy intersections, in commercial areas, and near freeway onramps and offramps, as well as major points of ingress to and egress from Norfolk." JA9 (internal quotation marks omitted). Norfolk "selected the locations of the clusters after considering areas with high rates of violent crime and high-priority calls for service," and the location of the third-party cameras. JA9 (internal quotation marks omitted). In short, the district court found that "the 75 Flock camera clusters . . . monitor a very small percentage of Norfolk's public roadways." JA10.

- 4 -

As for "step one" of the district court's framework, the plaintiffs, two Norfolk residents, had their cars photographed "approximately 475 and 325 times, respectively, during a four-and-a-half month period in early 2025," with an average distance between captures of "3.5 and 2.5 miles, respectively," and an average time interval of 45–50 minutes. JA10–11. For comparison, the police in *Carpenter v. United States* "obtained 12,898 location points cataloging Carpenter's movements [over approximately 127 days]—an average of 101 data points per day." 585 U.S. 296, 302 (2018). As for "step two," the plaintiffs did not allege that anybody had queried their license plates in the database outside the context of their lawsuit. JA20.

Despite the small percentage of road coverage and relative infrequency of individual vehicle capture, Norfolk "has successfully used its Flock camera system to locate stolen cars, missing persons, and vehicles seen leaving the scene of violent crimes." JA9. The Flock system allows users to request real-time notifications for specific vehicles "to help locate a stolen vehicle or missing person." JA8.

Norfolk is one of many cities and towns across the country to use automatic license-plate readers. *See* JA76 (complaint alleging that 5,000

- 5 -

communities use Flock cameras). Naturally, these communities vary in terms of their size, population, and number and placement of cameras. *See, e.g.*, *Scholl v. Illinois State Police*, 776 F. Supp. 3d 701, 707 (N.D. Ill. 2025) ("To date, the Illinois State Police has installed 344 cameras in Cook County, 78 in St. Clair County, and 44 across 17 other counties.") (footnote omitted).

## ARGUMENT

**I.    Norfolk's photographing of license plates and exteriors of cars driving on public roads does not amount to a Fourth Amendment search.**

The Fourth Amendment protects the people against unreasonable searches and seizures. *Carpenter*, 585 U.S. at 303. Whether government action constitutes a "search" historically turned on concepts of "common-law trespass," for example when the government "physically intrud[es] on a constitutionally protected area." *United States v. Jones*, 565 U.S. 400, 405, 406 n.3 (2012). But the Supreme Court has "expanded [its] conception of the [Fourth] Amendment to protect certain expectations of privacy." *Carpenter*, 585 U.S. at 304 (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)). Under the *Katz* framework, courts ask 1) whether the individual has a subjective expectation of privacy and 2) whether

society recognizes that expectation of privacy as reasonable. 389 U.S. at 361. The Commonwealth takes no position on whether these plaintiffs established a subjective expectation of privacy and instead focuses on the reasonableness of any such expectation.

The Supreme Court has set out two overlapping principles for reasonable expectations of privacy in travelers' locations and movements in public. On one hand, information that "a person knowingly exposes to the public" is "not a subject of Fourth Amendment protection." *United States v. Ellison*, 462 F.3d 557, 561 (6th Cir. 2006 (quoting *Katz*, 389 U.S. at 351). In that vein, "[a] car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view." *United States v. Knotts*, 460 U.S. 276, 281 (1983) (citation omitted). Accordingly, motorists have "no reasonable expectation of privacy in [their] movements from one place to another." *Id.* at 278.

Moreover, "one does not have a reasonable expectation of privacy in the visible exterior parts of an automobile that travels the public roads and highways." *United States v. George*, 971 F.2d 1113, 1120 (4th Cir. 1992). Similarly, motorists have no reasonable expectation of privacy in

- 7 -

license-plate numbers. *See, e.g., Ellison*, 462 F.3d at 561; *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 529 (5th Cir. 1999); *Traft v. Commonwealth*, 539 S.W.3d 647, 649–51 (Ky. 2018). Indeed, Virginia law thoroughly mandates and regulates the display of license plates. *See* Va. Code §§ 46.2-711(F), -715, -716(A), -1013.

On the other hand, "individuals have a reasonable expectation of privacy in the whole of their physical movements," *Carpenter*, 585 U.S. at 310 (citations omitted), at least over a long enough time period, *see id.* Accessing many days of "revealing," near-constant historical cell-site-location data entailed a such a "depth, breadth, and comprehensive reach" of surveillance that it intruded on one's reasonable expectation of privacy. *Id.* at 320. So did long-term, constant daytime aerial surveillance with a granularity that enabled tracking the movement "of every person outside in Baltimore." *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330, 333, 341 (4th Cir. 2021) (en banc). That program's capabilities "open[ed] an intimate window," capable of revealing a person's "associations and activities." *Id.*

Applying those principles here, the plaintiffs do not have a reasonable expectation of privacy. Norfolk's camera system does not

- 8 -

capture the whole of anyone's movements. The cameras—fewer than 200 grouped in 75 clusters covering a small fraction of Norfolk's 2,200 miles of public roads—cannot reasonably be said to capture the whole of anybody's movements, much less those of these plaintiffs.

The district court's reasoning in *Scholl* is persuasive. The court held that Illinois' "ALPR program lacks the same 'depth, breadth, and comprehensive reach' as the surveillance at issue in *Carpenter, Jones*, and *Leaders of a Beautiful Struggle.*" *Scholl*, 776 F. Supp. 3d at 719 (quoting *Carpenter*, 585 U.S. at 320). It noted that "the ALPR program only tracks cars," which "individuals regularly leave," while people "compulsively carry cell phones with them all the time." *Id.* (quoting *Carptenter*, 585 U.S. at 312).

The Illinois program's surveillance was "also significantly less comprehensive than in *Jones.*" *Scholl*, 776 F. Supp. 3d at 719. This was so because, while "[a] GPS tracking device follows a car wherever it goes . . . . the ALPR system records a vehicle's location only when it passes one of a limited (though expanding) number of ALPRs, each of which is installed near the roadside of an expressway." *Id.* at 719–20. Accordingly, the program was "more akin to the beeper in *Knotts*, which 'amounted

principally to the following of an automobile on public streets and highways,' or to the stationary pole cameras" that the Seventh Circuit had approved in prior cases. *Id.* at 720 (citations omitted).

For similar reasons, "[t]he utility of ALPRs for revealing an individual's 'familial, political, professional, religious, and sexual associations,' is sharply limited." *Scholl*, 776 F. Supp. 3d at 720 (quoting *Carpenter*, 585 U.S. at 311) (additional citation omitted). Common sense dictates that "[k]nowing what portions of an expressway someone passes tells the government far less about 'the "privacies of life,"' than data that 'tracks nearly exactly the movements of [a cellphone's] owner.'" *Id.* (citations omitted, brackets in original). The same is true of Norfolk's system.

To be sure, there may come a time when a system of automatic license-plate readers becomes so pervasive that it outstrips society's evolving reasonable expectations of privacy. *Accord Rinaldi v. Sylvester*, No. 7:24-cv-272, 2025 WL 2682691, at *18 (S.D.N.Y. Sept. 19, 2025) ("[T]he Court does not intend to suggest that the use of LPRs can *never* violate the Fourth Amendment.") (citations omitted). But that day is not here.

- 10 -

That day is not here because of Norfolk's limited system that complies with the guardrails the Commonwealth put into place. Virginia Code § 2.2-5517 limits the use and retention of automatic license-plate reader information to prevent conversion of these photographs on public streets into a dragnet-style investigation that could be a search. *See Jones*, 565 U.S. at 415–16 (2012) (Sotomayor, J., concurring) (recognizing that "oversight from a coordinate branch" could alleviate Fourth Amendment concerns associated with tracking individuals). The law contains myriad guardrails to prevent a system that becomes pervasive or ripe for abuse. The law:

- limits police departments' use of these systems to 1) criminal investigations supported by reasonable suspicion, 2) active investigations into missing people or victims of human trafficking, and 3) receiving alerts for such people, stolen cars, and people with outstanding warrants, Va. Code § 2.2-5517(D); *see also* Va. Code § 2.2-5517(M) (requiring independent reasonable suspicion and license plate confirmation before conducting notification-related stops);

- forbids police departments from selling the data to anybody or sharing the data with other databases, Va. Code § 2.2-5517(F);

- restricts the purposes for which, and the recipients with whom, police departments can share specific data to the following: other law-enforcement agencies for the three purposes laid out in subsection (D); local prosecutors for those same purposes and to comply with discovery; defendants and defense attorneys to comply with discovery; in response to court-issued subpoenas; the vendor for quality control; and the public to alert them to emergencies, Va. Code § 2.2-5517(F)(1);

- requires police departments that use these systems to maintain records, produce reports, create use policies which themselves contain many conditions, and train their officers on those policies, Va. Code § 2.2-5517(G), (H), (I), (K);

- criminalizes unlawful querying or selling of these data, Va. Code § 2.2-5517 (N);

- 12 -

- provides for suppression of evidence gathered in violation of several of the above provisions, Va. Code § 2.2-5517(O);

- forbids vendors, including Norfolk's vendor, Flock, from selling or sharing data collected in the Commonwealth except for legitimate law-enforcement purposes, Va. Code § 2.2-5517(B)(1);

- requires vendors to permanently and irrecoverably delete data after 21 days unless the specific data are being used in an investigation, Va. Code § 2.2-5517(B)(2), (E);

- requires vendors to meet information-security standards, Va. Code § 2.2-5517(B)(5); and

- will, starting July 2026, require state agency approval before police departments can contract with vendors, and will mandate that the contracts meet the requirements in subsection (B), Va. Code § 2.2-5517(C).

In short, the Commonwealth has enacted a thorough and comprehensive set of guardrails designed to protect the public from misuses of these systems and to restrict their uses to legitimate law-enforcement activities. The limited remaining uses do not subvert any

- 13 -

reasonable expectation of privacy, and they prevent the abuse that otherwise might bring other jurisdictions to that day where automatic license-plate readers are used pervasively and inappropriately.

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully Submitted,

COMMONWEALTH OF VIRGINIA

/s/*Daniel J. Honold*

DANIEL J. HONOLD
  *Deputy Solicitor General*

JAY JONES
  *Attorney General*

TILLMAN J. BRECKENRIDGE
  *Solicitor General*

DANIEL J. HONOLD
  *Deputy Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-1252 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

June 18, 2026

*Counsel for Amicus Curiae*

- 14 -

## STATEMENT

The Commonwealth of Virginia files this amicus brief with the consent of all the parties. *See* Fed. R. App. P. 29(a)(2). Additionally, no party's counsel authored this brief, either in whole or in part; no party or a party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure 29(a)(4), (a)(5), 32(a)(7)(B), I certify that this Brief of Amicus Curiae is proportionately spaced and contains 2,384 words excluding parts of the document exempted by Rule 32(f).

/s/*Daniel J. Honold*

DANIEL J. HONOLD
  *Deputy Solicitor General*

- 16 -