No. 26-1227

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LEE SCHMIDT ET AL.,

*Plaintiffs-Appellants,*

v.

CITY OF NORFOLK ET AL.,

*Defendants-Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
CIVIL NO. 2:24CV621

## BRIEF OF THE UNITED STATES AS AMICUS CURIAE IN
## SUPPORT OF DEFENDANTS-APPELLEES

DENNIS C. BARGHAAN, JR.
Assistant United States Attorney
Chief, Civil Division
Department of Justice
United States Attorney's Office
Eastern District of Virginia

STANLEY E. WOODWARD, JR.
Associate Attorney General

MICHAEL WEISBUCH
Senior Counsel
Department of Justice
Office of the Associate Attorney
  General
950 Pennsylvania Ave.,
Washington, D.C. 20530
(202) 322-2450
Michael.Weisbuch@usdoj.gov

*Attorneys for Amicus Curiae the
United States*

# Table of Contents

Table of Contents ..................................................................................i

Table of Authorities..............................................................................ii

Interest of the United States .............................................................. 1

Statement of the Issue ........................................................................5

Summary of Argument..........................................................................6

Argument................................................................................................ 7

    I.     The collection, retention, and use of ALPR data is not a Fourth Amendment search. ................................................ 7

    II.    The Court should not reach Appellants' hyperbolic arguments about future technology...................................... 15

Conclusion .......................................................................................... 18

i

# Table of Authorities

**Cases**

*Ashcroft v. al-Kidd,*
  563 U.S. 731 (2011)...................................................................................16

*Leaders of a Beautiful Struggle v. Baltimore Police Department,*
  2 F.4th 330 (4th Cir. 2021) (en banc) ............................................. 14, 15

*Carpenter v. United States,*
  585 U.S. 296 (2018)................................6, 7, 8, 9, 10, 12, 13, 14, 17, 18

*Dow Chemical Co. v. United States,*
  476 U.S. 227 (1986)..............................................................................9, 16

*FCC v. Consumers' Research,*
  606 U.S. 656 (2025)...................................................................................15

*New York v. Class,*
  475 U.S. 106 (1986)............................................................................7, 8, 11

*Northwest Airlines, Inc. v. Minnesota,*
  322 U.S. 292 (1944)...................................................................................17

*Olabisiomotosho v. City of Houston,*
  185 F.3d 521 (5th Cir. 1999)...................................................................11

*Riley v. California,*
  573 U.S. 373 (2014))................................................................................16

*Rinaldi v. Sylvester,*
  2025 WL 2682691 (S.D.N.Y. Sept. 19, 2025).......................................12

*Scholl v. Illinois State Police,*
  776 F. Supp. 3d 701 (N.D. Ill. 2025).....................................................12

*United States v. Bowers,*
  2021 WL 4775977 (W.D. Pa. Oct. 11, 2021) ................................. 12, 13

*United States v. Cooper,*
  2025 WL 35035 (E.D. La. Jan. 6, 2025)................................................13

*United States v. Ellison,*
    462 F.3d 557 (6th Cir. 2006) .......................................................... 10, 11

*United States v. Jackson,*
    4:24cr1 (E.D. Va.) ............................................................................... 4

*United States v. Jiles,*
    2024 WL 891956 (D. Neb. Feb. 29, 2024) ............................................ 13

*United States v. Jones,*
    565 U.S. 400 (2012) ....................................................... 7, 9, 10, 13, 18

*United States v. Knotts,*
    460 U.S. 276 (1983) .......................................................................... 8, 9

*United States v. Martin,*
    753 F. Supp. 3d 454 (E.D. Va. 2024) .................................................. 13

*United States v. Place,*
    462 U.S. 696 (1983) ...................................................................... 10, 11

*United States v. Porter,*
    170 F.4th 381 (5th Cir. 2026) ............................................................ 11

*United States v. Rubin,*
    556 F. Supp. 3d 1123 (N.D. Cal. 2021) ............................................... 13

*United States v. Sturdivant,*
    786 F. Supp. 3d 1098 (N.D. Ohio 2025) .............................................. 13

*United States v. Wilcox,*
    415 F. App'x 990 (11th Cir. 2011) ....................................................... 11

*United States v. Yang,*
    958 F.3d 851 (9th Cir. 2020) ................................................... 12, 13, 17

*Verdun v. City of San Diego,*
    51 F.4th 1033 (9th Cir. 2022) ...................................................... 15, 16

**Other Authorities**

Angela Bohon, *Franklin Police Dept. use license plate reader technology to solve abduction case* (Dec. 8, 2022) .................................................... 4

*Bureau of Justice Statistics,*
*Federal Law Enforcement Office,* 2023 – *Statistical Tables* ................. 1

U.S. CONST. AMEND. IV ............................................................................. 7

Va. Code § 2.2-5517 ................................................................................... 2

iv

## Interest of the United States

The United States employs nearly 134,000 law enforcement officers nationwide, the vast majority of whom protect public safety and national security through the investigation of criminal acts and prosecution of putative offenders.[1]  While investigating federal offenses, these law enforcement officers frequently partner and share information with State and local law enforcement agencies.

In this case, Appellants challenge the use of a technology that exemplifies how law enforcement agencies can work together to keep Americans safe while respecting constitutional rights.  Over 5,000 communities in 49 states have installed Automatic License Plate Reader (ALPR) cameras to varying degrees.  And, thanks to the cooperation of these State and local partners, ALPR technology has become one of the most crucial investigative tools at the United States' disposal.  Officers across federal agencies regularly extol the benefits of ALPR technology in deterring criminal conduct and aiding investigations so that violent predators are taken off America's streets and out of its communities.

---

[1] *See Bureau of Justice Statistics, Federal Law Enforcement Office, 2023 – Statistical Tables* (published May 19, 2026), *available at* https://bjs.ojp.gov/document/fleo23st.pdf.

1

Although extremely useful, ALPR program data is also limited in various ways. Like toll cameras and red-light safety cameras, ALPR cameras record passing license plates. Time-stamped records are then uploaded to a central repository that can be accessed by law enforcement when there is an investigatory need. The cameras cannot see inside vehicles, physical structures (such as houses, garages, or businesses), or even the curtilage of such places. They do not record pedestrians. And state laws often restrict their use. For example, Virginia requires ALPR "[s]ystem data" to be "purged after 21 days of the date of its capture in such a manner that such data is destroyed and not recoverable by either the vendor or the law enforcement agency" unless the data is part of an "ongoing investigation, prosecution, or civil action." Va. Code § 2.2-5517(E). A law enforcement agency can "download" accessible data, but only for enumerated law enforcement purposes. *Id.* § 2.2-5517(D). To deter misuse, vendors must also maintain "audit trail" data showing how law enforcement officers interact with the ALPR system. *Id.* § 2.25517(A), (B)(3), (D).

Despite such restrictions and the limited nature of the data, ALPR technology has played a crucial role in countless criminal investigations.

2

Indeed, ALPR technology comes at an important time for the United States. Federal law enforcement officers (and the state and local officers with whom they proudly partner) are confronting widespread criminal gang activity, including activity connected with transnational organizations (such as cartels) that prey on American communities. And as a general matter, law enforcement officers frequently confront a wide range of crimes where even basic information about a vehicle's location can provide critical evidence.

Consider one tragic but illustrative case from the Eastern District of Virginia, where this lawsuit originated. In 2023, Ty'osha Mitchell was tortured and ultimately murdered by members of the Almighty Black P Stone Nation gang. Law enforcement officers found Ty'osha's body in a remote area in York County near the Colonial National Historical Park; her body contained eight gunshot wounds to the head, abdomen, back, buttocks, and legs. The officers were ultimately able to identify the body as Ty'osha's. They learned that Ty'osha's boyfriend had called law enforcement in the City of Richmond the prior evening to report that Ty'osha had been taken from their residence by force. When combined with other information, data collected via ALPR technology

3

was critical to identifying the vehicle used in her kidnapping and murder. The result: convictions of five gang members, and sentences totaling 144 years of imprisonment. *See United States v. Jackson*, 4:24cr1 (E.D. Va.). Ty'osha's murderers are off the Commonwealth's streets because of ALPR technology.

ALPR technology can also be used to thwart crime in progress and prevent such tragic outcomes. It often aids investigations regarding missing persons and abducted children in particular. In September 2024, an ALPR camera near the Norfolk airport flagged a vehicle license plate connected to a person of interest in a woman's disappearance, which enabled the Norfolk Police Department to stop the suspect vehicle, detain the suspect, and locate the missing woman. JA391. And in December 2022, the Franklin (Virginia) Police Department was able to reunite a child with the child's legal custodian after an abduction by using ALPR technology to track the suspect vehicle.[2]

As many examples from across the country and this circuit make

---

[2] *See* Angela Bohon, *Franklin Police Dept. use license plate reader technology to solve abduction case* (Dec. 8, 2022), *available at* https://www.wtkr.com/news/franklin-police-use-license-plate-reader-technology-to-solve-abduction-case.

clear, ALPR data plays a critically important role in keeping Americans safe, catching criminals, and honoring victims. Appellants nevertheless challenge the City of Norfolk's use of ALPR technology. The district court, in line with the judicial consensus across the country, rejected Appellants' challenge.

The United States has a strong interest in defending the City's practice and the district court's ruling while promoting a proper understanding of the Fourth Amendment. The United States thus submits this brief to offer its perspective on the importance and legality of the collection, retention, and use of ALPR data—and to ensure that municipalities like the City continue to have the choice to employ ALPR to protect their communities.

### Statement of the Issue

Whether the City of Norfolk's collection, retention, and use of ALPR data captured by cameras constitutes a search under the Fourth Amendment.[3]

---

[3] Given that the United States' interest in this appeal is limited to defending the use of ALPR technology generally and on the merits, the United States takes no position on any Article III standing issues.

5

## Summary of Argument

I.  The City's collection and use of ALPR data is clearly not a Fourth Amendment search.  Among other reasons, the City's ALPR cameras capture only limited, public location information.  No one can drive on public roads and reasonably expect their license plate—the entire purpose of which is to identify vehicles to law enforcement officers and other government entities—to remain private.

Appellants' contrary arguments misunderstand the Supreme Court's Fourth Amendment jurisprudence. To be sure, the Supreme Court has held "that individuals have a reasonable expectation of privacy in the whole of their physical movements." *Carpenter v. United States*, 585 U.S. 296, 310 (2018). But Appellants cannot stretch that holding to encompass the City's use of ALPR technology, which does not capture the whole of their physical movements.

II.  Hyperbolic statements about surveillance systems not actually in use today (let alone at issue in this case) are not a basis to invalidate the City's ALPR program.  Courts should address future technological developments when, if ever, they arise.

6

## Argument

### I.    The collection, retention, and use of ALPR data is not a Fourth Amendment search.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   U.S. CONST. AMEND. IV.   A Fourth Amendment search occurs when the government violates "certain expectations of privacy . . . that society is prepared to recognize as reasonable." *Carpenter*, 585 U.S. at 304 (internal quotation marks omitted).[4]   For all the reasons the City explains in its response brief, the City's collection, retention, and use of ALPR data does not violate any reasonable expectation of privacy and is therefore not a search under the Fourth Amendment.

There is a "lesser expectation of privacy in a motor vehicle" to the extent a vehicle "has little capacity for escaping public scrutiny" while it "travels public thoroughfares . . . in plain view."   *New York v. Class*, 475

---

[4] A search under the Fourth Amendment can also result from "trespass upon the areas ('persons, houses, papers, and effects') it enumerates."   *United States v. Jones*, 565 U.S. 400, 406 (2012). Appellants do not (and could not) argue that the use of ALPR technology is a common-law trespass.

U.S. 106, 112–113 (1986). So, as a general matter, there is "no … expectation of privacy" that "extend[s] to visual observation of [an] automobile" when "[v]isual surveillance from public places . . . would have sufficed to reveal all" the same information to the government. *United States v. Knotts*, 460 U.S. 276, 282 (1983). The Supreme Court thus upheld the use of a beeper that enabled law enforcement officers to follow the movements of an entire "automotive journey." *Id.* at 285. That police have "augment[ed] the sensory facilities bestowed upon them at birth with such enhancement as science and technology afforded them in this case" does not render their actions unconstitutional. *See id.* at 287.

Appellants' principal Supreme Court authority, *Carpenter*, was an explicitly "narrow" decision. 585 U.S. at 316. It held that, in certain narrow circumstances, the government performs a Fourth Amendment search when it uses technology (for an extended period of time) that "provides an all-encompassing record of [a person's] whereabouts," including "beyond public thoroughfares," and thus "provides an intimate window into a person's life." *Id.* at 311 (discussing "historical cell-site records" used to "map[] a cell phone's location over the course of 127

days"). Similarly, in *Jones*, a majority agreed that "long[] term GPS monitoring [of a vehicle]" constitutes a search. 565 U.S. at 430 (opinion of Alito, J.); *see id.* at 415 (opinion of Sotomayor, J.).

Such circumstances are not present here—not even close. The collection, retention, and use of ALPR data (which is limited to license plates on public streets) results from precisely the sort of "augmented visual surveillance" of vehicles "on public thoroughfares" that the Supreme Court has confirmed is *not* a search. *Carpenter*, 585 U.S. at 306 (quoting *Knotts*, 460 U.S. at 281). The City's ALPR program results in limited snapshots: It consists of 75 "camera clusters [that] monitor a very small percentage of Norfolk's public roadways." JA10. As the City points out, the average vehicle is photographed once every two days, and even the top 5% of vehicles are photographed no more than once a day. *See* City Br. 7 (citing JA2282). Of course there may be outliers, and law enforcement agents can sometimes draw additional inferences from that limited data. But because ALPR "photographs . . . are not so revealing of intimate details, . . . [t]he mere fact that human vision is enhanced somewhat . . . does not give rise to constitutional problems." *Dow Chemical Co. v. United States*, 476 U.S. 227, 238 (1986).

9

The City's use of ALPR data is thus nothing like the detailed tracking at issue in *Jones* and *Carpenter*. As the district court put it, "the evidence . . . is insufficient to demonstrate that [the City's] current ALPR system captures enough images of Plaintiffs—or other drivers—to reconstruct the whole of their movements." JA35. The City's ALPR cameras do not "follow [a vehicle's] owner beyond public thoroughfares" or "continuously reveal[]" a vehicle's specific location, let alone for a lengthy period of time or at a granular level of detail. *Carpenter*, 585 U.S. at 309, 311.

To the contrary, ALPR collection is almost "*sui generis*" as an "investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed." *United States v. Place*, 462 U.S. 696, 707 (1983) (addressing canine sniff). An ALPR photograph is "much less intrusive than a typical search" because it discloses "only the presence or absence" of a license plate at a particular location. *Id.* The content of that information is far from private or intimate; "[t]he very purpose of a license plate number … is to provide identifying information to law enforcement officials and others." *United States v. Ellison*, 462 F.3d

10

557, 561 (6th Cir. 2006); *accord Olabisiomotosho v. City of Houston*, 185 F.3d 521, 529 (5th Cir. 1999) (license plate numbers are "constantly open to the plain view of passersby"). "[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile." *Class*, 475 U.S. at 114; *accord United States v. Wilcox*, 415 F. App'x 990, 992 (11th Cir. 2011) (there is no "reasonable expectation of privacy in [a] plainly visible license plate"). And because of the limited information they gather, ALPR cameras do not "incidentally "expose . . . items that would [otherwise] remain hidden from public view." *Place*, 462 U.S. at 707. Americans have long been accustomed to toll and red-light cameras capturing their license plates at particular locations (and dreading the bill or ticket in the mail that follows).

Unsurprisingly, then, courts across the country have roundly rejected Appellants' capacious understanding of what constitutes a search. The Fifth Circuit recently held that "the use of an [A]LPR system did not invade any reasonable expectation of privacy and did not constitute a search." *United States v. Porter*, 170 F.4th 381, 386 (5th Cir. 2026). Indeed, "nearly every court" that has addressed the issue

11

"has held that queries of [A]LPR databases do *not* constitute Fourth Amendment searches." *Rinaldi v. Sylvester*, 2025 WL 2682691, at *17 & n.13 (S.D.N.Y. Sept. 19, 2025).[5]   Those courts have recognized, contrary to Appellants' mischaracterization, that ALPR technology simply does not uncover the whole of an individual's movements; it "records a vehicle's location only when it passes" a camera. *Scholl v. Illinois State Police*, 776 F. Supp. 3d 701, 719–20 (N.D. Ill. 2025).   ALPR "technology is more akin to the conventional surveillance methods, such as security cameras, that the *Carpenter* Court was careful not to call into question." *United States v. Bowers*, 2021 WL 4775977, at *3 (W.D. Pa. Oct. 11, 2021).

Courts have not only upheld the use of ALPR technology; many have found that the use of such technology is not even close to a Fourth Amendment search.   As a concurring Ninth Circuit opinion stated, the argument that ALPR databases provide "the same degree of information" at issue in *Carpenter* "falls apart under the barest of scrutiny."   *United*

---

[5] The phrase "nearly every" is arguably not strong enough—although some courts (like the court below) have let challenges to ALPR systems get past the motion-to-dismiss stage, no federal court has held that such a system violates a reasonable expectation of privacy.

*States v. Yang*, 958 F.3d 851, 862 (9th Cir. 2020) (Bea, J., concurring). ALPR information is not "remotely comparable to the 'detailed, encyclopedic' information at issue in *Carpenter*." *United States v. Rubin*, 556 F. Supp. 3d 1123, 1130 (N.D. Cal. 2021) (Breyer, J.).[6] "Even in the aggregate, the ALPR cameras['] capability to capture multiple shots of a single vehicle and/or store historical data does not approach the near-constant surveillance of cell-phone users' public and private moves that so concerned the Court in *Carpenter*." *Bowers*, 2021 WL 4775977, at *3.

Because the data being aggregated is far less detailed than the data at issue in *Jones* and *Carpenter*, the aggregated results are also far less detailed. In *Carpenter*, suspects had "effectively been tailed every moment of every day for five years." 585 U.S. at 312; *see also Yang*, 958

---

[6] *See also, e.g.*, *United States v. Martin*, 753 F. Supp. 3d 454, 471 (E.D. Va. 2024) ("meaningfully different from the facts in . . . *Carpenter*"); *United States v. Sturdivant*, 786 F. Supp. 3d 1098, 1113 (N.D. Ohio 2025) ("does not present a privacy threat analogous to the one in *Carpenter*"); *United States v. Cooper*, 2025 WL 35035, at *6–7 (E.D. La. Jan. 6, 2025) ("do not support a reasonable expectation of privacy . . . within the reasoning of *Carpenter*"); *United States v. Jiles*, 2024 WL 891956, at *19 (D. Neb. Feb. 29, 2024) ("substantially limited relative to a GPS monitor, as in *Jones*, or cell-site location information, as in *Carpenter*). The City's response brief includes (at 35 n.9) a more comprehensive list of cases.

13

F.3d at 863 (Bea, J., concurring) (contrasting "the nearly 13,000 unique data points—more than 100 per day—that the search of cell phone records in *Carpenter* revealed). Such "tireless and absolute surveillance" is simply not at issue here. *Carpenter*, 585 U.S. at 312.

Of the dozens of federal decisions addressing the issue, Appellants have not identified a single holding that the use of ALPR technology constitutes a search. Appellants are left to emphasize *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021) (en banc). But that decision is inapposite. The Fourth Circuit addressed aerial cameras that provided "twelve hours of coverage of around 90% of the city each day, weather permitting." *Id.* at 334. Whether or not such technology "invades the reasonable expectation of privacy that individuals have in the whole of their movements," *id.* at 341; *but see id.* at 353 (Wilkinson, J., dissenting) ("[D]ecades of Supreme Court precedent mak[es] clear that limited aerial surveillance like that in this case does not violate a reasonable expectation of privacy[.]"), the sort of ALPR program at issue here plainly does not. As this Court recognized, "[p]eople understand that they may be filmed by security cameras on city streets," and cameras that are "fixed in place

14

. . . generally only capture individual trips." *Id.* at 345. Accordingly, *Leaders of a Beautiful Struggle* confirms there is no Fourth Amendment violation here.

Finally, the Court can easily reject Appellants' contention that the collection, retention, and use of ALPR data violates the Fourth Amendment when considered "in combination with other information" that law enforcement agencies lawfully obtain. Appellants' Br. 36. The Supreme Court has brushed aside such "combination theor[ies]—that a constitutional non-violation plus a constitutional non-violation may equal a constitutional violation." *FCC v. Consumers' Research*, 606 U.S. 656, 696 (2025).

## II. The Court should not reach Appellants' hyperbolic arguments about future technology.

Much of Appellants' rhetoric, such as characterizing the City's modest ALPR program as "mass surveillance," Appellants' Br. 1, appears rooted in fears about future technology. And Appellants' "apparent contention" that ALPR programs "exhibit the same characteristics as general warrants and writs is obviously inaccurate." *Cf. Verdun v. City of San Diego*, 51 F.4th 1033, 1046 (9th Cir. 2022) (cleaned up) (rejecting a challenger's attempt to argue "through hyperbole" that tire chalking

15

violates the Fourth Amendment); *see* Appellants' Br. 3. "The general warrants of the colonial era 'allowed royal officials to search and seize whatever and whomever they pleased while investigating crimes or affronts to the crown,' with officers 'rummag[ing] through homes in an unrestrained search for evidence of criminal activity.'" *Verdun*, 51 F.4th at 1046–1047 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), then *Riley v. California*, 573 U.S. 373, 403 (2014)). The use of cameras to collect license plate location information on public roads "is of course not that." *Id.*

Amici in support of Appellants takes the same approach in purporting to challenge granular "networks of continuous surveillance." *E.g.*, Cato Amicus Br. 10 (formatting modified). The City's ALPR program does not provide continuous surveillance. It provides, at most, snapshots that can sometimes support inferences of varying strength about vehicle locations. Appellants' and amici's concerns are not presented in this case.

"Fourth Amendment cases must be decided on the facts of each case, not by extravagant generalizations." *Dow Chemical Co.*, 476 U.S. at 238 n.5. Of course, the Supreme Court has instructed courts to "take

account of more sophisticated systems that are already in use or in development." *Carpenter*, 585 U.S. at 313. But at the same time, the Supreme Court cautioned that "when considering new innovations," courts should "tread carefully … to ensure that we do not 'embarrass the future.'" *Id.* at 316 (quoting *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 300 (1944)). In other words, the Supreme Court would consider technological "capability" at the time the Court issued its decision. *Id.* at 313. But the Court would not "express a view on matters not before [it]," including "manifold situations that may be presented by . . . new technology" that might later emerge (or not). *Id.* at 316 & n.4.

Here, it would be imprudent to hypothesize about future developments involving ALPR or similar programs. Whether "technology advances as [Appellants] believe it will" is no basis for a decision, particularly when there is not "even one case where the 'whole of [one's] physical movements' was implicated in an ALPR database search." *Yang*, 958 F.3d at 864 (Bea, J., concurring) (quoting *Carpenter*, 585 U.S. at 310). Opining on such future technology without concrete information or full briefing is more likely to sow confusion than promote

17

clarity. How ALPR or similar technology might work in the future—both in terms of the data collected and the privacy safeguards involved—is unpredictable. It is enough to acknowledge, as *Carpenter* and *Jones* confirm, that courts are more than capable of addressing whether and how the Fourth Amendment applies to new technology when such technology is actually in use.

## Conclusion

The United States urges that this Court affirm the judgment of the district court.

18

Respectfully submitted,

DENNIS C. BARGHAAN, JR.
Assistant United States Attorney
Chief, Civil Division
Department of Justice
United States Attorney's Office
Eastern District of Virginia

STANLEY E. WOODWARD, JR.
Associate Attorney General


*s/ Michael Weisbuch*

MICHAEL WEISBUCH
Senior Counsel
Department of Justice
Office of the Associate Attorney
    General
950 Pennsylvania Ave.,
Washington, D.C. 20530
(202) 322-2450
Michael.Weisbuch@usdoj.gov

*Attorneys for Amicus Curiae the
United States*

19

# Certificate of Compliance with Type-Volume Limit

Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. *See* Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing *en banc* may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains ___3469___ words.

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using

**Microsoft Word 365** in **Century Schoolbook 14 Point**.

*/s/Michael Weisbuch, Senior Counsel, Office of the Associate Attorney General*
*for United States of America, Amicus Curiae*
Dated: June 18, 2026

## Certificate of Service

I certify that on June 18, 2026, I electronically filed the foregoing brief with the Clerk of the Court by using the CM/ECF system, which will send notification of filing to all counsel of record.

s/ *Michael Weisbuch*
MICHAEL WEISBUCH
Senior Counsel