No. 26-1227

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

LEE SCHMIDT; CRYSTAL ARRINGTON,
*Plaintiffs-Appellants*,

v.

CITY OF NORFOLK; MARK TALBOT,
IN HIS OFFICIAL CAPACITY AS NORFOLK CHIEF OF POLICE,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 2:24-CV-00621-MSD-RJK

## BRIEF OF *AMICI CURIAE* STATE OF SOUTH CAROLINA, 15 OTHER STATES, AND THE DISTRICT OF COLUMBIA IN SUPPORT OF DEFENDANTS-APPELLEES

ALAN WILSON
*South Carolina Attorney General*
Thomas T. Hydrick
*Solicitor General*
Joseph D. Spate
*Deputy Solicitor General*
Chandler N. Huskey*
*Solicitor General Fellow*

*Counsel for Amicus Curiae State of South Carolina*

SOUTH CAROLINA OFFICE OF THE
ATTORNEY GENERAL
1000 Assembly St.
Columbia, SC 29201
(803) 734-3765
chandlerhuskey@scag.gov
    *Counsel of Record

(Additional Counsel listed after signature page)

June 18, 2026

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................. ii

INTRODUCTION AND INTEREST OF AMICI ....................................................1

SUMMARY OF ARGUMENT...............................................................................2

ARGUMENT .........................................................................................................4

    I.    The City of Norfolk's use of ALPRs does not violate the Fourth
        Amendment .........................................................................................4

        A.    Drivers lack a reasonable expectation of privacy in their license plates
            and public movements. ...........................................................6

        B.    Plaintiffs-Appellants' reliance on *Carpenter* and *Beautiful Struggle*
            fails..........................................................................................12

    II.    Restricting the use of ALPR tools would greatly endanger communities
        nationwide. ..........................................................................................21

CONCLUSION .....................................................................................................24

ADDITIONAL COUNSEL ...................................................................................26

CERTIFICATE OF COMPLIANCE .....................................................................27

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Boniecki v. Fox*,
  2015 WL 3507936 (D. Mont. June 3, 2015) ......................................................13
*Cardwell v. Lewis*,
  417 U.S. 583 (1974) ..........................................................................................6, 8
*Carpenter v. United States*,
  585 U.S. 296 (2018) ....................................................................... passim
*Chaney v. City of Albany*,
  2019 WL 3857995 (N.D.N.Y. Aug. 16, 2019)........................................................13
*Katz v. United States*,
  389 U.S. 347 (1967) ...........................................................................................8
*Kyllo v. United States*,
  533 U.S. 27 (2001) ........................................................................ 4, 5, 15, 19
*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
  2 F.4th 330 (4th Cir. 2021) ........................................................... passim
*New York v. Class*,
  475 U.S. 106 (1986) ........................................................................................6, 7
*Olabisiomotosho v. City of Houston*,
  185 F.3d 521 (5th Cir. 1999).............................................................................7
*Riley v. California*,
  573 U.S. 373 (2014) .........................................................................................21
*Rinaldi v. Sylvester*,
  2025 WL 2682691 (S.D.N.Y. Sept. 19, 2025)................................................ 13, 17
*Schemel v. City of Marco Island, Fla.*,
  2023 WL 3010344 (M.D. Fla. Feb. 14, 2023)......................................................13
*Schemel v. City of Marco Island, Fla.*,
  2025 WL 2958798 (M.D. Fla. Oct. 17, 2025).......................................................13
*Schmidt v. City of Norfolk*,
  819 F. Supp. 3d 492 (E.D. Va. 2026)................................................ 3, 16, 17, 20
*Scholl v. Ill. State Police*,
  776 F. Supp. 3d 701 (N.D. Ill. 2025)........................................................ passim
*Sidor v. Thornell*,
  2025 WL 3282976 (D. Ariz. Oct. 24, 2025)........................................................13
*United States v. Acosta*,
  2025 WL 2427700 (N.D. Okla. Aug. 22, 2025) ...................................................13
*United States v. Bowers*,
  2021 WL 4775977 (W.D. Pa. Oct. 11, 2021) ......................................................13

*United States v. Brown*,
744 F.3d 474 (7th Cir. 2014)................................................................9

*United States v. Brown*,
2021 WL 4963602 (N.D. Ill. Oct. 26, 2021) .......................................17

*United States v. Brown*,
2025 WL 2444596 (W.D. Okla. Aug. 25, 2025).................................13

*United States v. Chatrie*,
107 F.4th 319 (4th Cir. 2024) .............................................................10

*United States v. Cooper*,
2025 WL 35035 (E.D. La. Jan. 6, 2025) .............................................13

*United States v. Ellison*,
462 F.3d 557 (6th Cir. 2006)................................................................7

*United States v. Floyd*,
2025 WL 3250951 (M.D. Fla. Nov. 21, 2025) ...................................13

*United States v. George*,
971 F.2d 1113 (4th Cir. 1992)..............................................................3

*United States v. Goins*,
2025 WL 1285936 (W.D. Va. May 2, 2025).......................................18

*United States v. Graham*,
2022 WL 4132488 (D.N.J. Sep. 12, 2022)..........................................13

*United States v. Gregory*,
128 F.4th 1228 (11th Cir. 2025)...............................................1, 11, 19

*United States v. Griffin*,
2025 WL 1474679 (S.D. Ind. May 22, 2025).....................................13

*United States v. Hammond*,
996 F.3d 374 (7th Cir. 2021)..............................................................10

*United States v. Jackson*,
2025 WL 1530574 (D. Kan. May 29, 2025) .......................................13

*United States v. James*,
2023 WL 3370421 (W.D. La. Jan. 30, 2023) ......................................13

*United States v. Jiles*,
2024 WL 891956 (D. Neb. Feb. 29, 2024) ................................... 13, 17

*United States v. Jones*,
565 U.S. 400 (2012) .........................................................................9, 10

*United States v. Knotts*,
460 U.S. 276 (1983) ...................................................................... passim

*United States v. Martin*,
753 F. Supp. 3d 454 (E.D. Va. 2024)...........................11, 13, 18, 19, 21

*United States v. Porter*,
2022 WL 124563 (N.D. Ill. Jan. 13, 2022).........................................13

*United States v. Rubin*,
  556 F. Supp. 3d 1123 (N.D. Cal. 2021) ...............................................................13
*United States v. Salcido-Gonzalez*,
  2024 WL 2305478 (D. Utah May 21, 2024) .......................................................13
*United States v. Slaybaugh*,
  2025 WL 2123781 (M.D. Ala. July 29, 2025).....................................................13
*United States v. Sturdivant*,
  786 F. Supp. 3d 1098 (N.D. Ohio 2025) .............................................5, 11, 13, 19
*United States v. Toombs*,
  671 F. Supp. 3d 1329 (N.D. Ala. 2023).......................................................11, 13
*United States v. Walraven*,
  892 F.2d 972 (10th Cir. 1989).................................................................................7
*United States v. Wilcox*,
  2009 WL 10671540 (N.D. Ga. Dec. 22, 2009) ......................................................7

**Statutes**

S.C. Code Ann.§ 56-3-1240 ......................................................................................7
U.S. Const. amend. IV ..............................................................................................4
Va. Code Ann. § 2.2-5517(B)(2)............................................................................20

**INTRODUCTION AND INTEREST OF AMICI**

The Fourth Amendment stands as great shield against government overreach into the private lives of Americans. But, as to the *public* lives of Americans, the Fourth Amendment leaves room for state and local governments to ensure public safety and bring criminals to justice. In zealous pursuit of that endeavor, law enforcement agencies employ modern technology to "more efficiently conduct their investigations." *United States v. Gregory*, 128 F.4th 1228, 1243 (11th Cir. 2025). One such technology, the automatic license plate reader (ALPR), is among the most valuable, and reliable, crime-fighting tools in law enforcement's arsenal. These devices are used to solve crimes ranging from murder to kidnapping to armed robbery. They help law enforcement apprehend individuals suspected of violent crimes, prevent mass criminal events, such as terrorist attacks, and locate and rescue victims, including children. And, in the age of easy travel, this technology makes it easier to locate and apprehend fugitives who have crossed jurisdictional lines, fleeing justice. In short, ALPRs help keep our communities safe, an outcome of paramount importance for *Amici* States.

Seeking to leverage the benefits of this technology, South Carolina and *Amici* States have rapidly implemented ALPR systems in their mission to protect the public and ensure swift justice. Already, these systems have had a profound impact on community safety and police efficiency nationwide. What once began as a niche

technology for well-funded departments has evolved into a game-changing tool accessible to cities and counties of all sizes.[1] And while not constitutionally required, many of *Amici* States have enacted rules that regulate ALPRs in ways that protect the privacy of citizens without sacrificing the utility of their use.

Plaintiffs-Appellants aim to frustrate the law enforcement efforts of *Amici* States by having this Court classify the use of an ALPR system as a warrantless "search" under the Fourth Amendment. This Court should decline that dangerous invitation and follow the example of numerous courts around the country in upholding the use of these technologies by Defendants-Appellees. Simply put, the Fourth Amendment does not restrict the use of ALPRs in the way Plaintiffs-Appellants say it does. And for South Carolina and *Amici* States, the stakes could not be higher. Stripping our state and local law enforcement of this vital tool would endanger our citizens while emboldening criminals. Few interests are more important to *Amici* States than the prevention of that outcome. This Court should affirm.

## SUMMARY OF ARGUMENT

As the court below stated quite well, the analysis here "must remain tethered to the reality that what a person displays in public is definitionally not private—and the calculus only shifts when police surveillance is so intrusive that it crosses the

---

[1] Billy Grogan, *From Patrol Cars to Poles: How Automated License Plate Readers Became a Crime-Fighting Star*, Police Chief Online (Oct. 15, 2025), https://tinyurl.com/yetywpfa.

line into cataloging the whole, or nearly the whole, of a person's movements." *Schmidt v. City of Norfolk*, 819 F. Supp. 3d 492, 511 (E.D. Va. 2026). As such, the Supreme Court has correctly recognized that a driver on public roads "has no reasonable expectation of privacy in his movements from one place to another." *United States v. Knotts*, 460 U.S. 276, 281 (1983). He cannot expect to hide his license plate or other exterior features of his vehicle. *See United States v. George*, 971 F.2d 1113, 1120 (4th Cir. 1992). And as is on point here, police pole cameras or security cameras that photograph public areas do not violate any reasonable expectation of privacy protected by the Fourth Amendment. *See Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 345 (4th Cir. 2021) (en banc) ("People understand that they may be filmed by security cameras on city streets"). These basic Fourth Amendment principles, considered together, dispose of this case.

And contrary to Plaintiffs-Appellants' assertions, ALPRs do not cross into the realm of ankle-monitor style surveillance capable of cataloguing "the whole of their physical movements." *Carpenter v. United States*, 585 U.S. 296, 310 (2018). Instead, as nearly every court faced with this issue has held, ALPRs merely augment traditional methods without generating an invasive "chronicle of a person's physical presence…every day, every moment, over several years." *Id.* at 315.

This growing judicial consensus has enabled States and localities to strike the proper balance between security and privacy. So far, the results of that democratic

process—state laws authorizing limited use of ALPRs—confirm the technology promotes public safety without transgressing expectations of privacy. Experience has also proven that ALPRs are a vital crime-fighting tool. ALPRs have enabled law enforcement to solve countless crimes, from stolen vehicles to kidnapping to violent and sexual felonies. Recent examples from Virginia illustrate these well-recognized public-safety benefits. Other States, like South Carolina, have taken notice of those benefits and implemented their own ALPR systems. This Court shouldn't erase that progress by expanding the Fourth Amendment past its parameters. Our Constitution allows state and local governments to responsibly harness "innovation" to "protect[] those most vulnerable to the ravages of crime." *Beautiful Struggle*, 2 F.4th at 353 (en banc) (Wilkinson, J., dissenting). This Court should permit *Amici* States to do just that.

## ARGUMENT

**I. The City of Norfolk's use of ALPRs does not violate the Fourth Amendment**

The Fourth Amendment provides that "the right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Thus, the "antecedent question" in a Fourth Amendment case is whether a "search" has even occurred. *Kyllo v. United States*, 533 U.S. 27, 31 (2001). "When the Fourth Amendment was adopted, as now, to 'search' meant '[t]o look over or through for the purpose of finding something; to

explore; to examine by inspection; as, to *search* the house for a book; to *search* the wood for a thief.'" *Id.* at 32 n.1 (citation modified). The Founders primarily sought to preclude searches, such as those supported by "general writs" and "writs of assistance," in which "British officers…rummage[d] through homes…unrestrained." *Carpenter*, 585 U.S. at 303 (citation modified).

Under modern doctrine, a "search" occurs when "the government [has] violate[d] a[n] expectation of privacy that society recognizes as reasonable." *Kyllo*, 533 U.S. at 33. This case, like other recent applications of that test, implicates "a person's expectation of privacy in [their] physical locations and movements." *Carpenter*, 585 U.S. at 306. The reasonableness of that expectation waxes or wanes depending on context. On one end of the spectrum, someone "travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Knotts*, 460 U.S. at 281. On the other end is round-the-clock surveillance that "tracks nearly exactly the movements of its owner…beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Carpenter*, 585 U.S. at 311.

A state or local government's use of ALPR cameras falls on the constitutional side of that line—as almost every court to consider the question has held. A driver lacks a reasonable expectation of privacy in his "car's license plate and exterior appearance." *See, e.g., United States v. Sturdivant*, 786 F. Supp. 3d 1098, 1107 (N.D.

Ohio 2025). And unlike the "near perfect surveillance"—akin to an "ankle monitor"—in *Carpenter*, the use of ALPRs doesn't implicate a driver's privacy interest in "the *whole* of [his] physical movements." 585 U.S. at 310, 312 (emphasis added). Rather than being the first federal court to adopt Plaintiffs-Appellants theory—that the use of ALPRs on public roads violates the Fourth Amendment—the Court should align with the "nearly uniform consensus" on this critical issue. *Scholl v. Ill. State Police*, 776 F. Supp. 3d 701, 720–21 (N.D. Ill. 2025) (collecting cases).

A.   **Drivers lack a reasonable expectation of privacy in their license plates and public movements.**

No Fourth Amendment "search" occurs when law-enforcement officers examine information "voluntarily conveyed" to the public—either with their "naked eyes," or by "augmenting the[ir] sensory faculties…with science and technology." *Knotts*, 460 U.S. at 281–82, 285. Here, that rule applies to both the images ALPRs capture and the location information those images convey to law enforcement.

Start with the images ALPRs capture, which reveal a vehicle's license plate and some exterior features. No driver has a reasonable expectation of privacy in "the physical characteristics of [his] automobile." *New York v. Class*, 475 U.S. 106, 112 (1986). "A car has little capacity for escaping public scrutiny" since "[i]t travels public thoroughfares" where it is necessarily "in plain view." *Id*. at 112–113 (quoting *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974)). Plus, "automobiles…are subject to pervasive and continuing governmental regulation and controls." *Id*. at 113. So,

when an officer moved "papers obscuring the…dashboard" of a car to uncover its vehicle identification number—and discovered a handgun—the Court rejected the defendant's Fourth Amendment claim. *Id.* at 107–08, 113. The Court deemed "unreasonable" any "expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile," and which "plays an important part in the pervasive regulation by the government of the automobile." *Id.* at 113–14.

"'The factors that generally diminish the reasonable expectation of privacy in automobiles are applicable *a fortiori* to' license plates." *Scholl*, 776 F. Supp. 3d at 714 (quoting *Class*, 475 U.S. at 113). "The very purpose of a license plate," like a VIN, "is to provide identifying information to law enforcement officials and others," *United States v. Ellison*, 462 F.3d 557, 561 (6th Cir. 2006), including whether the car is "stolen or otherwise noncompliant with the law," *United States v. Wilcox*, 2009 WL 10671540 (N.D. Ga. Dec. 22, 2009), *adopted*, 2010 WL 11527193 (N.D. Ga. Jan. 27, 2010), *aff'd*, 415 Fed. App'x 990, 992 (11th Cir. 2021). And like VINs, license plates *must* be "in plain view from the exterior of the automobile." *See Class*, 475 U.S. at 114; *see also, e.g.*, S.C. Code Ann. § 56-3-1240 (requiring license plates to be displayed and "open to view" on South Carolina vehicles). As such, there is "no privacy interest…in license plates." *United States v. Walraven*, 892 F.2d 972, 974 (10th Cir. 1989); *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 529 (5th

7

Cir. 1999). And while "the interior of an automobile has [some] Fourth Amendment protection," exterior features—which cannot serve as a "repository of personal effects," *Cardwell*, 417 U.S. at 590–91 —plainly do not.

If drivers lack a reasonable expectation of privacy in the images that ALPRs capture, what about the information that "ALPR data reveals about their movements"? *Scholl*, 776 F. Supp. 3d at 715. Indeed, that is the question at the center of Plaintiffs-Appellants' claim. Once again, precedent provides the answer: "A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements," *Knotts*, 460 U.S. at 281, because "[w]hat a person knowingly exposes to the public…is not a subject of Fourth Amendment protection," *Katz v. United States*, 389 U.S. 347, 351 (1967).

When a driver chooses to travel on "public streets," he has "voluntarily conveyed…the fact that he was travelling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property." *Knotts*, 460 U.S. at 281–82. The facts of *Knotts* illustrate this principle in action. There, officers used a radio-transmitter device (a "beeper") to track the location of a suspect's car. *Id.* at 277. Officers followed the beeper's signal as Knotts navigated by public roads to his cabin, which contained a drug lab. *Id.* at 278–79. The Court held that no Fourth Amendment

"search" occurred because the location of the suspect's vehicle and cabin could have been discovered through "visual surveillance from public places." *Id.* at 282.

And while the Supreme Court has found Fourth Amendment "searches" elsewhere, their rationale in *Knotts* remains steadfast. Contrary to Plaintiffs-Appellant's wishes, *United States v. Jones* does not change that. *Jones* held that the government's installation of a GPS tracker on a suspect's vehicle was a Fourth Amendment "search." 565 U.S. 400, 404 (2012). But the Court did not suggest that Jones had a reasonable expectation of privacy in his public movements—it relied on a distinct line precedent holding that a "search" occurs when the government "engage[s] in physical intrusion of a constitutionally protected area." *Id.* at 407. In *Jones*, "by attaching the [tracker] to the [suspect's vehicle,]" officers did "*more* than conduct a visual inspection"; they "encroached on a protected area." *Id.* at 410 (emphasis in original). That doctrine, grounded in physical trespass, has no application to ALPRs.

To be sure, as Plaintiffs-Appellants emphasize, "five Justices suggested in concurring opinions" that long-term, continuous GPS monitoring of a person's location might constitute a search. *United States v. Brown*, 744 F.3d 474, 476 (7th Cir. 2014). But "*Jones* did not reach that conclusion." *Id.* at 478. And for many of the reasons discussed herein, the use of ALPRs does not replicate the "precise, comprehensive record" of an individual's whereabouts—and thus, his "familial, political, professional, religious, and sexual associations"—discussed in the separate *Jones*

opinions. 565 U.S. at 415 (Sotomayor, J., concurring); *see also id.* at 430 (Alito, J., concurring in the judgment) ("In this case, for four weeks, law enforcement agents tracked every movement [Jones] made[.]").

Courts continue to apply *Knotts*. In *United States v. Hammond*, police tracked a suspect's movements on public roads using "real-time" cell-site location information. 996 F.3d 374, 389–90 (7th Cir. 2021). Officers received "pings" from AT&T alerting them to Hammond's location every fifteen minutes for several hours. *Id.* at 381. Hammond travelled on "public, interstate highways and into parking lots within the public's view." *Id.* at 389. But by using this technology to track "Hammond's location in public," rather than "to peer into the intricacies of his private life," the court held, police had not effectuated a search. *Id.* This Court has reached similar conclusions. *See Beautiful Struggle,* 2 F.4th at 341 (recognizing the line between "short-term tracking of public movements" and "prolonged tracking that can reveal intimate details."); *United States v. Chatrie*, 107 F.4th 319, 330–31 (4th Cir. 2024) (finding that cell phone location history obtained through geofence technology was not a search, and was "far less revealing than that obtained in *Jones*, *Carpenter*, or *Beautiful Struggle* and more like the short-term public movements in *Knotts*.").

Like the beeper in *Knotts*, ALPRs can be used to track a driver's public movements more effectively than police "rel[ying] solely on their naked eyes." 460 U.S. at 285. But "the Fourth Amendment does not punish law enforcement for using

technology to more efficiently conduct their investigations." *Gregory*, 128 F.4th at 1243 (citation modified). ALPRs "merely augment the same sensory faculties that have always been used by" police. *United States v. Martin*, 753 F. Supp. 3d 454, 476 (E.D. Va. 2024). That "does not allow officers to access any previously unobtainable information; it simply allows them to access information more quickly." *Sturdivant*, 786 F. Supp. 3d at 1108. Simply put, "there is no indication" that the information ALPRs collect "would not [be] visible to the naked eye." *Knotts*, 460 U.S. at 285; *United States v. Toombs*, 671 F. Supp. 3d 1329, 1340–41 (N.D. Ala. 2023) (ALPRs and the beeper in *Knotts* "result in information that could have been obtained from simple surveillance"). When police "could have stationed agents round-the-clock to observe" traffic, the fact "that they instead used a camera…does not make the surveillance unconstitutional." *Gregory*, 128 F.4th at 1243 (citation modified). ALPRs enhance police efficiency in much the same way as pole and security cameras— "conventional surveillance technique[s]"—that state and local governments have used "for decades." *Id.* at 1242. That such cameras operate automatically and "non-stop" does not make their use a Fourth Amendment search. *See id.* at 1241. Unsurprisingly, "no federal circuit court has found a Fourth Amendment search based on long-term use of pole cameras on public property." *Id.* at 1244.

Under longstanding Supreme Court precedent, a driver lacks a reasonable expectation of privacy in his license plate, the exterior of his car, or his public

movements on public roadways. As such, the City's use of ALPRs on such roadways did not amount to a Fourth Amendment "search."

**B.      Plaintiffs-Appellants' reliance on *Carpenter* and *Beautiful Struggle* fails.**

Plaintiffs-Appellants, faced with this wall of adverse precedent, don't challenge the isolated use of ALPRs for capturing license plate numbers and corresponding data. Instead, their issue is with the City of Norfolk's aggregated use of ALPRs city-wide, which they characterize as "pervasive, indiscriminate surveillance." Appellant's Br. 2. This aggregated surveillance, they argue, is just like cell-site information in *Carpenter* and the mass aerial surveillance data in *Beautiful Struggle.* That comparison is wrong.

Even apart from the shortcomings of that comparison, Plaintiffs-Appellants' reliance on *Carpenter* runs into an early roadblock. Specifically, *Carpenter*'s scope is decidedly "narrow." 585 U.S. at 316. The *Carpenter* Court couldn't have been clearer on this point, explaining that its decision did not "call into question conventional surveillance techniques and tools, such as security cameras," or otherwise prejudge "matters not before" the Justices. *Id.* This Court should heed that warning and reject Plaintiffs-Appellants' superficial conflation of conventional ALPRs with *Carpenter*'s continuous, "near perfect surveillance," *id.* at 312.

Even setting this threshold issue aside, Plaintiffs-Appellants' reliance on *Carpenter* cannot withstand scrutiny. The City's use of ALPRs does not begin to

resemble the "unique" circumstances of *Carpenter*, in which the government invaded an individual's "reasonable expectation of privacy in the whole of his physical movements." *See* 585 U.S. at 313 (emphasis added). Indeed, all 26 federal courts (including the court below) faced with this issue have rejected Plaintiffs-Appellants' *Carpenter* analogy.[2] This Court should join them.

Specifically, *Carpenter* involved cell-site location information, or CSLI, automatically generated each time a user's mobile device "connects to a cell site." 585 U.S. at 301. Especially in urban areas with numerous cell sites, these "time-stamped

---

[2] *Scholl*, 776 F. Supp. 3d at 721; *United States v. Floyd*, 2025 WL 3250951 (M.D. Fla. Nov. 21, 2025); *Sidor v. Thornell*, 2025 WL 3282976 (D. Ariz. Oct. 24, 2025), *adopted*, 2025 WL 3281746 (D. Ariz. Nov. 25, 2025); *Schemel v. City of Marco Island, Fla.*, 2025 WL 2958798 (M.D. Fla. Oct. 17, 2025), *Rinaldi v. Sylvester*, 2025 WL 2682691 (S.D.N.Y. Sept. 19, 2025); *United States v. Brown*, 2025 WL 2444596 (W.D. Okla. Aug. 25, 2025); *United States v. Acosta*, 2025 WL 2427700 (N.D. Okla. Aug. 22, 2025); *United States v. Slaybaugh*, 2025 WL 2123781, at *1 (M.D. Ala. July 29, 2025); *Sturdivant*, 786 F. Supp. 3d at 1108; *United States v. Jackson*, 2025 WL 1530574 (D. Kan. May 29, 2025); *United States v. Griffin*, 2025 WL 1474679, at *9 (S.D. Ind. May 22, 2025); *Martin*, 753 F. Supp. 3d 454; *United States v. Porter*, 2022 WL 124563 (N.D. Ill. Jan. 13, 2022); *Toombs*, 671 F. Supp. 3d at 1334; *Schemel v. City of Marco Island, Fla.*, 2023 WL 3010344, at *4 (M.D. Fla. Feb. 14, 2023); *United States v. Rubin*, 556 F. Supp. 3d 1123, 1130 (N.D. Cal. 2021); *Boniecki v. Fox*, 2015 WL 3507936, at *1 (D. Mont. June 3, 2015); *United States v. Salcido-Gonzalez*, 2024 WL 2305478, at *12 (D. Utah May 21, 2024); *United States v. Cooper*, 2025 WL 35035, at *7 (E.D. La. Jan. 6, 2025); *United States v. Bowers*, 2021 WL 4775977, at *3 (W.D. Pa. Oct. 11, 2021); *Chaney v. City of Albany*, 2019 WL 3857995, at *8 (N.D.N.Y. Aug. 16, 2019); *United States v. Jiles*, 2024 WL 891956, at *15-19 (D. Neb. Feb. 29, 2024); *United States v. James*, 2023 WL 3370421 (W.D. La. Jan. 30, 2023); *United States v. Graham*, 2022 WL 4132488, at *5 (D.N.J. Sep. 12, 2022), *aff'd*, No. 23-3197, 2025 WL 342190 (3d Cir. Jan. 30, 2025).

record[s]" of a phone's location have become very precise. *Id*. In Timothy Carpenter's case, federal authorities acquired CSLI that revealed "12,898 location points cataloguing Carpenter's movements—an average of 101 data points per day." *Id.* at 302. This "detailed, encyclopedic, and effortlessly compiled" location data created an "an all-encompassing record" of Carpenter's whereabouts. *Id.* at 309, 311. In short, the government used historical CSLI to obtain an "intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." *Id.* at 311 (citation modified). That precise, continuous surveillance "contravenes" reasonable expectations of privacy. *Id.*

The Court took care to distinguish *Knotts*. It explained that "individuals regularly leave their vehicles," whereas "they compulsively carry their cell phones with them…beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id.* Thus, historical CSLI, unlike tracking a car as it travels public roads, enables "near[ly] perfect surveillance, as if" the government "had attached an ankle monitor to the phone's user." *Id*. at 312.

At the end of its opinion, *Carpenter* reiterated that its judgment turned on "the unique nature of cell phone location information," that its ruling was "a narrow one," and that it did not "call into question conventional surveillance techniques and tools,

such as security cameras"—or any other "matters not before" the Court. *Id.* at 315–16. It even held out the possibility that police could "obtain an individual's historical CSLI," without a warrant, for a "limited period." *Id.* at 310 n.3.

*Carpenter*—with its caveats and disclaimers—thus reiterates a basic Fourth Amendment principle: Whether a "search" has occurred often turns on whether the government has obtained a "distinct category" of previously "unknowable" private information. *Id.* at 312, 314. A "detailed chronicle of a person's physical presence compiled every day, every moment, over several years" qualifies. *Id.* at 315. In this way, *Carpenter* resembles *Kyllo*, which held that thermal imaging of a home necessarily exposed an area "held safe from prying government eyes." 533 U.S. at 37. *Kyllo* focused on the "otherwise-imperceptibility" of private facts exposed by the government. *Id.* at 38 n.5. And in *Carpenter*, the Court applied the same principle to "the whole of [a person's] physical movements," a tapestry of information—much of it private—previously imperceptible to the state. *See* 585 U.S. at 310.

Confirming its narrow scope, this Court has extended *Carpenter* to just one technology: aerial surveillance covering "90% of the city" of Baltimore. *Leaders of a Beautiful Struggle*, 2 F.4th at 334. There, this Court, en banc, reasoned that because this surveillance "transcend[ed] mere augmentation of ordinary police capabilities" and allowed "police to deduce from the whole of individuals' movements," it gave the government a qualitatively different set of information about a person's private

life. *See id.* at 345–46. And, notably, five judges of this Court disagreed, explaining that Baltimore's program was consistent with *Knotts* and arguing that the majority "overread[] Carpenter," "extending it beyond recognition to bar all warrantless tracking of public movements." *Id.* at 361 (Wilkinson, J., dissenting).

But, unlike the cell-site technology in *Carpenter* or the aerial surveillance data in *Beautiful Struggle*, ALPRs do not record "the whole of a person's physical movements," or produce a "detailed chronicle of a person's physical presence compiled every day, every moment, over several years." 585 U.S. at 310, 315. While the technology in *Carpenter* recorded a person's position "several times a minute" and followed him off roads into "private residences and…other potentially revealing locales," *id.* at 300, 311, ALPRs "record[] a vehicle's location only when it passes one of a limited…number of" devices, which are usually "installed near the roadside of an expressway" or mounted on a patrol vehicle. *Scholl*, 776 F. Supp. 3d at 720.

Plaintiffs-Appellants characterize this fragmented ALPR network in Norfolk as an unblinking eye. But an "unblinking" eye is not necessarily an "all-seeing" eye. Indeed, the lower court found that there are many gaps in the "sight" of that "unblinking eye." *See Schmidt*, 819 F. Supp. 3d at 512 ("Defendants' ALPR system has many thousands more blind spots than it has 'unblinking eyes.'"). This hardly paints the same picture as a program that "tracks every movement of every person outside in Baltimore." *Beautiful Struggle*, 2 F.4th at 341 (citation modified). Rather than

16

"run[ning] against everyone" who owned a cell phone in the United States like the CSLI in *Carpenter*, 585 U.S. at 312, a locality's ALRP network runs against only those drivers who happen to travel a particular route on a public road.

By collecting "discrete data points with considerable stretches of obscurity in between," ALPRs "thus provide[] no more information than what could have been obtained through police surveillance," *Rinaldi*, 2025 WL 2682691, at \*18 (cleaned up). These obvious technological distinctions mean that the location information recorded by ALPRs—while incredibly useful for solving crimes—would be of "sharply limited" "utility" for anyone hoping to glean "an individual's familial, political, professional, religious, and sexual associations." *Scholl*, 776 F. Supp. 3d at 720 (citation modified); *accord Jiles*, 2024 WL 891956, at \*19 ("[T]he ALPR database only reveals when, where, and in which direction a certain vehicle was driving."). Compared to CSLI, data indicating "what portions of an expressway someone passes tells the government far less about the privacies of life." *Scholl,* 776 F. Supp. 3d at 720 (citation modified); *accord United States v. Brown*, 2021 WL 4963602, at \*3 (N.D. Ill. Oct. 26, 2021).

And as the court below noted, this is true even when ALPR data can entirely reconstruct "one route" a person uses. *Schmidt*, 819 F. Supp. 3d. at 514. *Carpenter* and *Beautiful Struggle* don't suggest otherwise. Critically, the concern in those cases wasn't the reconstruction of one or even two routes, but instead the reconstruction

of *all* routes, i.e., "the whole of" an individual's movements. Even if the aggregated use of ALPRs can inform law enforcement as to an individual's habitual travel to certain destinations, it does not come anywhere near the intimate knowledge revealed by the technologies used in *Carpenter* and *Beautiful Struggle. See United States v. Goins*, 2025 WL 1285936, at *4 (W.D. Va. May 2, 2025) ("[T]he two fixed cameras…only captured one aspect of the Defendant's life…but it did not come close to creating a comprehensive record of his whereabouts or who he associated with when he was off-site.").

For example, ALPRs cannot "deduce whether [someone] is a weekly church goer, a heavy drinker, a regular at the gym, an unfaithful husband, an outpatient receiving medical treatment, an associate of particular individuals or political groups." *Beautiful Struggle*, 2 F.4th at 342 n.8 (emphasis added) (citation modified). Rather than creating a "comprehensive chronicle" of a "person's past movements," 585 U.S. at 300, ALPRs capture something much more "sporadic" in nature. *Goins*, 2025 WL 1285936, at *4. They are simply not the de facto "ankle monitor" that *Carpenter* disallowed.

Instead, what they can do is merely "augment[]…warrantless capabilities the police had even before the technology." *Beautiful Struggle*, 2 F.4th at 340; *accord Martin*, 753 F. Supp. 3d at 476. Indeed, vehicle-based monitoring of public roads, often aided by cameras, is elementary policework. True, ALPRs allow police to

protect our communities "more efficiently" by using automatic cameras rather than "station[ing] agents round-the-clock." *Gregory*, 128 F.4th at 1243 (citation modified). But that *quantitative* leap in law-enforcement capacity is a far cry from the *qualitative* transformation in *Carpenter* and *Beautiful Struggle*, which provided access to a "previously unobtainable" portrait of an individual's every move. *Sturdivant*, 786 F. Supp. 3d at 1108.

Moreover, there is nothing unusual or unexpected about the City's use of ALPRs. *Cf. Kyllo*, 533 U.S. at 33–34 ("society" must broadly view a privacy expectation "as reasonable"). "Every day, individuals drive past surveillance cameras, including tollbooth cameras, private security cameras, CCTV cameras, ALPRs, traffic light cameras, [and] poll cameras." *Martin*, 753 F. Supp. 3d at 475. Thus, now more than ever, American drivers share the intuition of *Knotts*: we largely "expect the public surveillance of our vehicle as we travel on public roads." *Id.* And while there may be a world where a far "more extensive network of ALPRs might" implicate the Fourth amendment, *Scholl*, 776 F. Supp. 3d at 721, this case does not reflect one. Indeed, courts have upheld the use of as many as 344 ALPRs in a single county, *id*. at 707, far more than the 176 utilized by the City of Norfolk.

ALPRs also differ when it comes to data retention. In *Carpenter*, the government's ability to retroactively access CSLI was "subject only to the retention policies of the wireless carriers," 585 U.S. at 312, but ALPR data retention is often subject

to statutory limits *and* providers' policies.[3] For example, Virginia's ALPR law restricts use of ALPR systems to only those systems with the capability to purge data 21 days after its initial capture. Va. Code Ann. § 2.2-5517(B)(2). It then requires law enforcement agencies to purge that data after 21 days, *id.* at § 2.2-5517(E), and create an internal auditing procedure that occurs at least once every 30 days. *Id.* at § 2.2-5517(H)(6). Such a statutorily limited time frame hardly creates the "all-encompassing record" produced by 127 days of cell-site data, as in *Carpenter*. 585 U.S. at 311. And even the number of location datapoints collected and retained per day is significantly less than *Carpenter*. There, the CSLI records showed an average of 101 location points per day, 585 U.S. at 302, while the ALPR system in Norfolk captured Plaintiffs-Appellants' vehicles a mere 2 to 3 times per day. *Schmidt*, 819 F. Supp. 3d at 500. The difference could not be clearer. And to heed *Carpenter*'s "narrow" scope, 585 U.S. at 316, courts must account for the "dramatically reduced scope of ALPR surveillance, relative to" CSLI, *Scholl*, 776 F. Supp. 3d at 720.

Finally, ruling for the City of Norfolk here wouldn't require this Court to split from its holding in *Beautiful Struggle*. According to a majority of the en banc Court, Baltimore's aerial surveillance tracked individuals' movements "[w]hether they

---

[3] As an example of a provider policy, Flock Safety, the system provider used by numerous counties in South Carolina, has a policy of permanently deleting stored data after 30 days on a rolling basis. Chloe Appleby, *'For the Most Part, We Can Track You All Over the Country.' Beaufort Co. Adds License Plate Cameras*, THE ISLAND PACKET (Feb. 14, 2026), https://tinyurl.com/5xrxd7rr.

drove or walked," "followed them to each new garage entered or door knocked on," and "only ceased once night fell—typically when individuals were already back at home for the night." *Martin*, 753 F. Supp. 3d at 471; *Beautiful Struggle*, 2 F.4th at 343 ("[L]aw enforcement could…track a person's movements from a crime scene to, eventually, a residential location where the person remains," then "track [their] movements from that residence"). An ALPR network's "individual snapshots of [a driver's] brief location at specific times" and "in strategically chosen locations" doesn't "rise to the level of persistent, unceasing public surveillance" used in Baltimore—or, for that matter, by federal law enforcement against Mr. Carpenter. *Martin*, 753 F. Supp. 3d at 458, 473.

## II. Restricting the use of ALPR tools would greatly endanger communities nationwide.

As it considers whether a locality's use of ALPRs on public roads violates the Fourth Amendment, this Court cannot ignore the real-world consequences of Plaintiffs-Appellants' position. Indeed, all courts must exercise care in wielding "the blunt instrument of the Fourth Amendment," lest they constitutionalize questions properly left to the democratic process. *Riley v. California*, 573 U.S. 373, 408 (2014) (Alito, J., concurring). The Fourth and Tenth Amendments leave room for "democratic experimentation and innovation…to make headway in protecting those most vulnerable to the ravages of crime." *Beautiful Struggle*, 2 F.4th at 353 (Wilkinson, J., dissenting). Here, the people of Virginia, and also *Amici* States have chosen to embrace

the use of ALPRs—subject to important limits—as an indispensable element of effective law enforcement.

The people got it right. ALPRs are among the most important crime-fighting tools within the arsenals of state and local police. Law enforcement agencies use ALPRs for a wide range of tasks, from "helping identify or apprehend potential suspects" and "locating missing or kidnapped individuals" to "facilitating crime scene analysis."[4] For example, ALPR data often provides "leads in a series of [unsolved] crimes," because it reveals whether "a common license plate number" was "in the area at the time the crimes [were] committed."[5] Not only do ALPRs help solve crimes after they occur, but "in some cases, knowing that the area employs [A]LPRs may be enough to deter potential offenders."[6] Recognizing as much, every police department "serving over 1 million residents" currently uses ALPR technology.[7]

ALPRs have proven extremely valuable to Virginia law enforcement already, as well as to law enforcement in South Carolina and *Amici* States. For example, the Fairfax County Police Department reported that over the course of two years, it had

---

[4] K. Finklea, *Law Enforcement and Technology: Use of Automated License Plate Readers* 1, CONG. RSCH. SERV. (2024).

[5] T. Martinez, *Innovative Uses of Automated License Plate Readers to Enhance Criminal Investigations* 2, NAT'L POLICE FOUND. (June 2019), https://tinyurl.com/3trymfms.

[6] *License Plate Reader (LPR) Systems: Use Cases* 9, INT'L ASS'N OF CHIEFS OF POLICE (2024), https://tinyurl.com/4b36ymkp.

[7] Finklea, *supra* note 2, at 1.

used ALPRs to locate 30 missing persons, recover 200 stolen vehicles, recover 43 guns, and make 1,556 arrest charges, which included 1,026 felonies.[8] In South Carolina, these cameras have been described as a "force multiplier," especially for smaller departments that don't have the funding to hire more officers.[9] They've also been described as "instrumental" in "multiple shooting cases, murders and break-ins" and in "finding stolen vehicles, runaways and people in distress."[10] And in an age where interstate travel is easy, ALPRs are essential to ensuring criminals cannot evade justice by crossing jurisdictional lines. Thanks to these tools, suspects of homicides and other violent crimes that flee to neighboring states can be located within a few days[11], and sometimes even a few hours.[12]

ALPRs play a critical role in protecting our communities and bringing offenders to swift justice. But make no mistake, justice is not the only concern of *Amici* States. Ensuring the privacy of our citizens and preventing government overreach is another. Thankfully, citizens and their elected representatives can use the democratic

---

[8] John Gonzalez, *Fairfax Co. Police Find Success With License Plate Readers, Aiding In More Than 800 Cases*, ABC NEWS (Nov. 14, 2024), https://tinyurl.com/ycy35rxx.

[9] Mary Green, *Bill Would Impose Guardrails on SC's License Plate-Reading Cameras*, WCSC NEWS (Apr. 17, 2025), https://tinyurl.com/25dkn7dy.

[10] Appleby, *supra* note 3.

[11] Zach Rainey, *Suspect in Shooting at South Carolina House of Worship Caught in Florida,* WYFF NEWS (Jan. 27, 2026), https://tinyurl.com/tuvm6vx8.

[12] DJ Beal, *South Carolina Homicide Suspect Captured in Monroe*, WCCB NEWS (Apr. 13, 2026), https://tinyurl.com/3r42jut5.

process to guard against that potential overreach. In many cases, they already have. As of September 2025, 23 States, including Virginia, have enacted statutes or rules to regulate the use of ALPRs.[13] And more States may decide to follow suit. But Plaintiffs-Appellants, having their way, would see that democratic process collapse overnight in Virginia, opening the door to similar results in South Carolina and elsewhere. Make no mistake: If courts strip law enforcement of this valuable crime-fighting tool, our streets will be more dangerous, our investigations less effective, our criminals emboldened, and our people less safe. Nothing in the Constitution requires that chilling result.

## CONCLUSION

For the reasons set out above, this Court should affirm.

[Signature on following page]

---

[13] LEGIS. ANALYSIS AND PUB. POL'Y ASS'N, *Automatic License Plate Recognition Systems: Summary of State Laws* 4 (September 2025).

June 18, 2026

Respectfully submitted,

s/ Chandler N. Huskey
ALAN WILSON
*South Carolina Attorney General*
Thomas T. Hydrick
*Solicitor General*
Joseph D. Spate
*Deputy Solicitor General*
Chandler N. Huskey*
*Solicitor General Fellow*
SOUTH CAROLINA OFFICE OF THE
ATTORNEY GENERAL
1000 Assembly St.
Columbia, SC 29201
(803) 734-3765
chandlerhuskey@scag.gov
   *Counsel of Record

*Counsel for Amicus Curiae State of
South Carolina*

(Additional Counsel Listed on Following Page)

# ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General of Alabama

CORI MILLS
Acting Attorney General of Alaska

TIM GRIFFIN
Attorney General of Arkansas

BRIAN L. SCHWALB
Attorney General for the
District of Columbia

KATHLEEN JENNINGS
Attorney General of Delaware

CHRISTOPHER M. CARR
Attorney General of Georgia

KWAME RAOUL
Attorney General of Illinois

THEODORE E. ROKITA
Attorney General of Indiana

KRIS KOBACH
Attorney General of Kansas

LIZ MURRILL
Attorney General of Louisiana

CATHERINE HANAWAY
Attorney General of Missouri

MICHAEL T. HILGERS
Attorney General of Nebraska

DAVID SUNDAY
Attorney General of Pennsylvania

MARTY JACKLEY
Attorney General of South Dakota

JONATHAN SKRMETTI
Attorney General of Tennessee

DEREK BROWN
Attorney General of Utah

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(G), this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,919 words. This brief complies with the typeface and typeset requirements of Federal Rule of Appellate Procedure 29(a)(4) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


June 18, 2026                                          s/ Chandler N. Huskey
                                                       Chandler N. Huskey