## NO. 26-1227

# United States Court of Appeals

*for the*

# Fourth Circuit

———————◆———————

LEE SCHIMIDT and CRYSTAL ARRINGTON,

*Plaintiffs-Appellants,*

– v. –

CITY OF NORFOLK and MARK TALBOT, in his official capacity as the Norfolk Chief of Police,

*Defendants-Appellees.*

———————————

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 2:24-cv-00621-MSD-LRL
The Honorable Mark S. Davis, U.S. District Court Judge

---

**BRIEF OF *AMICI CURIAE* FLORIDA STATE HISPANIC CHAMBER OF COMMERCE, HISPANIC OUTREACH TASKFORCE, AND MULTICULTURAL BUSINESS ALLIANCE IN SUPPORT OF DEFENDANTS-APPELLEES**

---

STEPHEN V. CAREY
PARKER POE ADAMS & BERNSTEIN LLP
301 Fayetteville Street, Suite 1400
Raleigh, North Carolina 27601
(919) 828-0564

*Attorneys for Amici Curiae*
June 18, 2026

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.  26-1227          Caption:  Schmidt v. City of Norfolk

Pursuant to FRAP 26.1 and Local Rule 26.1,

Florida State Hispanic Chamber of Commerce
(name of party/amicus)


who is _____ Amicus _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.   Does party/amicus have any parent corporations?                    ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:




3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      ☐YES ☑NO
     If yes, identify all such owners:


12/01/2019 SCC                          - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)      ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?                    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Stephen V. Carey                         Date:         6/18/2026

Counsel for:  Florida State Hispanic Chamber of C

- 2 -

Print to PDF for Filing

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1227__     Caption: __Schmidt v. City of Norfolk__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Hispanic Outreach Taskforce__
(name of party/amicus)

who is _____ Amicus _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

12/01/2019 SCC     - 1 -

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☐NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
        If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Stephen V. Carey                              Date:        6/18/2026

Counsel for: Hispanic Outreach Taskforce

- 2 -

**Print to PDF for Filing**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)


_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO


2.     Does party/amicus have any parent corporations?     YES     NO
       If yes, identify all parent corporations, including all generations of parent corporations:


3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     YES     NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    YES    NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)        YES    NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    YES    NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?            YES    NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: _____

Counsel for: _____

- 2 -

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS................................................i

TABLE OF AUTHORITIES.................................................................vii

IDENTITY AND INTEREST OF AMICI CURIAE ................................. 1

INTRODUCTION.............................................................................3

ARGUMENT ..................................................................................5

    I.    ALPRs Are A Race-Neutral Technology That Can Reduce Racial Bias and Discrimination In Policing. ......................... 4

    II.    Effective ALPR Placement Is Based On Objective Criteria, Including Crime Data. ....................................................... 8

    III.    ALPRs Provide Public-Safety Benefits To All Communities, Including Minority Communities. ........................................ 12

CONCLUSION ............................................................................. 18

CERTIFICATE OF COMPLIANCE......................................................... 19

CERTIFICATE OF SERVICE.............................................................. 20

## TABLE OF AUTHORITIES

Other Authorities

Arnout van de Rijt et al., *Racial and gender differences in missing children's recovery chances*, PLOS One, (Dec. 31, 2018) .....................14

Black And Missing, *Missing Persons Statistics 2023* .............................14

*California Racial and Identity Profiling Advisory Board,* Press Release, California Racial and Identity Profiling Advisory Board Releases Report on 2024 Police Stop Data (Jan. 30, 2026) .............................6, 7

Center for American Progress, *Delivering Accountability:  A Plan to Stop Crime in Our Communities*, 10 (Jan. 29, 2026) ....................10, 13

Dylan J. Fitzpatrick, et al., *Policing Chronic and Temporary Hot Spots of Violent Crime: A Controlled Field Experiment*, 1 (Nov. 13, 2020) .11

Florida State Hispanic Chamber of Commerce, *Exploring the Rise of Hispanic-Owned Businesses in Florida and Their Impact on Local Economy* (July 8, 2025) .................................................................15, 16

George Mason Center for Evidence-Based Crime Policy, *LPR Deployment in the Field* ......................................................................11

Hao Fe, et al., *How bad is crime for business? Evidence from consumer behavior*, J. of Urban Econ. 129, 2 (2022)...........................................16

Letter of Cynthia Adams, President, NAACP Oakland Branch 1051 (2025) ......................................................................................................6

Lily Robin, et al., Urban Institute, *Public Surveillance Cameras and Crime:  The Impact of Different Camera Types on Crimes and Clearances*, 1 (Feb. 2020) ........................................................... 10, 11

Linda A. Seabrook, *Shining a Light on the Crisis of Missing or Murdered Black Women and Girls in the United States*, U.S. Dep't of Justice (Nov. 22, 2025) .......................................................................14

Major Cities Chiefs Association, *Automated License Plate Reader Technology in Law Enforcement: Recommendations And Considerations*, 11 (2023) ...............................................................8, 9

Marco Conner, *Traffic Justice: Achieving Effective and Equitable Traffic Enforcement in the Age of Vision Zero*, 44 Fordham Urb. L.J. 969 (2017) ............................................................................................6

*National Institute of Justice, Racial Profiling and Traffic Stops* (Jan. 9, 2013) ..................................................................................................7

NCMEC, *Roads to Recover: How One of NCMEC's New Technology Partners is Helping Bring Missing Children Home*, (June 18, 2025) .15

Press Release, *The NAACP Oakland Branch calls on the City of Oakland and the Oakland City Council to continue to fund and activate Flock Safety Camera System to Combat Rising Crime* (Oct. 23, 2025) ........................................................................................13

Roberto Arnold, *Don't dismantle what protects our communities*, Our Weekly (May 5, 2026) ................................................................. 11, 12

SoundThinking, *What Chicago Voters Think About Gunshot Detection, and Why We Asked* (June 1, 2026) .....................................................14

W. Xu et al., *The racial composition of road users, traffic citations, and police stops*, 121 Proceedings of the Nat'l Acad. of Sci. of the United States of America 24 (June 3, 2024) .....................................................7

## **IDENTITY AND INTEREST OF AMICI CURIAE**[1]

*Amici curiae* are a group of minority associations and non-profits. For 25 years, the Florida State Hispanic Chamber of Commerce ("FSHCC") has been a leading advocate for the economic empowerment and growth of Hispanic entrepreneurs. Representing over 600,000 Hispanic-owned businesses across Florida, the FSHCC works to elevate and support this vital community. The FSHCC is committed to advancing opportunities for Hispanic business leaders, ensuring their voices are heard, and helping them thrive in an ever-changing marketplace. By championing these initiatives, the FSHCC strives to create an inclusive and prosperous business environment conducive to the long-term success of its members.

The Hispanic Outreach Taskforce ("HOT") is a nonprofit organization whose mission is to improve the quality of life for residents of several California communities through programs that promote education, health, economic development, financial literacy and the

---

[1] No party's counsel authored this brief in whole or in part, and no entity or person, aside from *amici curiae*, their members, or their counsel, contributed any money to fund the preparation or submission of this brief. All parties have consented to this filing.

1

cultural arts. The nonprofit is guided by a Board of Directors composed of local business professionals and community leaders that represent a variety of respected organizations that serve the South East corner of Los Angeles County.

The Multicultural Business Alliance ("MBA") was developed in response to the critical needs of marginalized business communities in California, particularly in low-income cities. The MBA forges equitable business and economic opportunities for minority-owned, women-owned, veteran-owned, and LGBTQ+ businesses through customized programming, resources, and advocacy. The MBA is committed to fostering diversity, equity, and inclusion while providing practical support through technical assistance, advocacy, and community building.

Because a prosperous business and cultural environment is a safe environment, *Amici* have a strong interest in promoting public safety for its members and reducing crime in its communities. Crime threatens community members' sense of safety, stifles growth, increases the cost of doing business, drives away customers and business, and can lead to business closure and other economic and community harm. *Amici* thus support the use of effective, evidence-based practices to reduce crime and

2

increase safety, including the use of modern law-enforcement technologies.

## **<u>INTRODUCTION</u>**

This case is not about, and never has been about, discrimination. Yet several amicus briefs filed in support of Appellants suggest that Automated License Plate Readers ("ALPRs") facilitate discriminatory policing practices when placed in minority neighborhoods.[2] As minority associations and non-profits that support the use of technologies like ALPRs to promote public safety in their communities, *Amici* provide this brief to correct that suggestion.

Rather than facilitating discrimination and bias, ALPRs provide law enforcement with objective evidence about crime and do so effectively, promoting public safety in all communities. *Amici*, therefore, urge the Court to consider the following points in resolving this appeal:

---

[2] *See Brief of* Amici Curiae *the Innocence Project and the Center on Race, Inequality, and the Law at New York University School of Law in Support of Plaintiffs-Appellants* ("*Innocence Project* Brief") at 21–30; *Brief of* Amicus Curiae *Electronic Privacy Information Center (EPIC) in Support of Plaintiffs-Appellants and Urging Reversal* ("*EPIC* Brief") at 17–22.

First, especially as compared to practices that involve the subjective judgment of individual law-enforcement officers, ALPRs provide objective evidence about crime, without bias. Fixed ALPRs do not choose which plates to photograph based on a driver's appearance. They do not record the driver's race or even identity, but, instead, capture vehicle-related information only. Nor does the record establish that minority drivers are more likely to be stopped following an ALPR alert or that ALPR-based enforcement produces racially disparate stop or arrest rates compared to non-ALPR enforcement. On the contrary, there is significant support for the proposition that use of cameras *reduces* bias and discrimination.

Second, contrary to Appellants' amici's arguments, placing some ALPRs in high crime areas is an objective, logical, and commonly recommended method of ALPR deployment. Proper ALPR placement depends on objective factors, such as crime patterns and traffic flow, and is subject to appropriate controls aimed to avoid negative effect on minority communities. On an objective view, it makes sense to place *some* cameras in areas that show a statistically high level of crime, based on crime-rate data. And to the extent that ALPR placement and use

4

raises policy concerns that call for corrective controls, those matters can be addressed through legislation or local regulation, as is already the case in Virginia.

Third, Appellants' amicus briefs ignore that many in minority communities support the use of ALPRs to increase public safety. *Amici* thus submit this brief to give voice to those community members, including those who maintain businesses in these communities.

In sum, *Amici* ask the Court not to decide this case based on speculation about racially discriminatory impacts (which is not even an issue in the case) but instead recognize that ALPRs provide effective, objective evidence about crime and increase public safety for all.

## **ARGUMENT**

### I.    **ALPRs Are A Race-Neutral Technology That Can Reduce Racial Bias and Discrimination In Policing.**

ALPRs are race neutral. They photograph license plates that pass by, regardless of the driver's race, and do not initiate any direct police interaction. That feature distinguishes fixed ALPRs from officer-initiated stops and supports their use as a race-neutral investigative tool.

Indeed—as the Oakland Branch of the NAACP wrote in a public letter supporting the continued and expanded use of ALPRs in the city of

Oakland, California—ALPRs "are designed to detect only vehicles associated with a crime, removing the subjective judgment that too often leads to disproportionate stops and harmful interactions with Black and Brown residents." Letter of Cynthia Adams, President, NAACP Oakland Branch 1051 (2025).[3] Thus, the letter explains, APLRs are "a clear example of how technology can support safer, fairer policing." *Id.*

There is ample support for the proposition that cameras reduce bias. *See* Marco Conner, *Traffic Justice:    Achieving Effective and Equitable Traffic Enforcement in the Age of Vision Zero*, 44 Fordham Urb. L.J. 969, 998 (2017) (observing that "automated enforcement technology is an indispensable tool to prevent the racial disparities and potentially lethal use of force that are inherent risks of traffic stops by police officers" and may be "operated in ways that eliminate any possibility of racialized bias or targeting").    Myriad studies show that minorities are disproportionately subject to officer-initiated traffic stops. *See, e.g.*, Press Release, California Racial and Identity Profiling Advisory Board,

---

[3] Available at https://cdn.prod.website-files.com/6821cc9ecc966b7f252b 372e/68fa563fad6e6088dc3554af_Oakland%20NAACP%20Letter%20of %20Support%207.3.25.docx.pdf (last visited June 18, 2026).

California Racial and Identity Profiling Advisory Board Releases Report on 2024 Police Stop Data (Jan. 30, 2026)[4] (reporting that "individuals perceived to be Black were stopped 128% more often than expected, and individuals perceived to be Pacific Islander were stopped 58% more often than expected"); National Institute of Justice, Racial Profiling and Traffic Stops (Jan. 9, 2013)[5] ("Research has verified that people of color are more often stopped than whites.").

But studies also show that use of automated enforcement technologies like cameras can reduce that bias. Take, for example, a study focused on automated speed-enforcement cameras in Chicago. *See* W. Xu et al., *The racial composition of road users, traffic citations, and police stops*, 121 Proceedings of the Nat'l Acad. of Sci. of the United States of America 24 (June 3, 2024).[6] The study found that the cameras generated citations at rates roughly proportional to the racial

---

[4] Available at https://oag.ca.gov/news/press-releases/california-racial-and-identity-profiling-advisory-board-releases-report-2024(last visited June 18, 2026).

[5] Available at https://nij.ojp.gov/topics/articles/racial-profiling-and-traffic-stops (last visited June 18. 2026).

[6] Available at https://www.pnas.org/doi/10.1073/pnas.2402547121 (last visited June 18. 2026).

composition of the roads on which the cameras were located. *Id.* Police officers, on the other hand, stopped a higher proportion of Black drivers in an area regardless of the racial composition of the roadway. *Id.*

Like other cameras, fixed ALPRs do not use race, perceived race, or driver appearance as an input, and they are incapable of deciding to take a picture of a license plate based on what a driver looks like. Thus, to the extent the Court considers racial bias at all, *Amici* urge the Court to consider how ALPRs can *reduce* bias and discrimination, rather than promote it.

## II. Effective ALPR Placement Is Based On Objective Criteria, Including Crime Data.

Additionally, the most effective deployment of fixed ALPRs is based on objective criteria, including crime data. That is, the most common deployment patterns for ALPR cameras focus on either high-traffic areas to generate a high volume of data; high-crime areas to generate data that is likely to be used; or specific places of interest, such as a mall targeted by organized retail theft. *See* Major Cities Chiefs Association, *Automated License Plate Reader Technology in Law Enforcement: Recommendations*

*And Considerations*, at 11 (2023).[7]  On their face, these are objective, race-neutral factors.

Amici in support of Appellants, however, argue that data suggest that camera placement in high crime areas is not race-neutral because, according to a preprint of a statistical analysis of cameras in the Hampton Road region, including the City of Norfolk, majority-Black neighborhoods are more likely to have an ALPR and because, they say, cameras are disproportionately found in historically redlined areas. *Innocence Project* Brief at 21–22; *see also EPIC* Brief at 19–20 (arguing that predictive policing is flawed because it is "built atop historic police enforcement patterns riddled with systemic discrimination").

But even amici concede that these issues are "not unique to Norfolk or to [ALPRs]," but arise from "broader" policing trends.  *Id.* at 23.  Thus, these points are not really an argument against ALPRs but appear to go to broader issues having nothing to do with APLRs and their placement.

---

[7] Available at https://majorcitieschiefs.com/wp-content/uploads/2023/02/MCCA-Automated-License-Plate-Reader-Technology-in-Law-Enforcement.pdf (last visited June 18, 2026).

In any event, Appellants' amici's argument ignores that the record here shows that cameras are placed in logical, objective locations— "mostly busy intersections, roads in commercial areas, and freeway ramps." Appellees' Br. at 6. To be sure, the placement includes areas where there are "high rates of violent crime, a large number of high-priority calls requiring immediate police presence, or numerous cars crossing into or out of Norfolk." *Id.* at 7. But this deployment makes sense. As others have observed, "[c]rime is not evenly spread throughout cities," but is instead "highly concentrated in specific places in certain neighborhoods." Center for American Progress, *Delivering Accountability: A Plan to Stop Crime in Our Communities*, 10 (Jan. 29, 2026) ("CAP Report").[8] Crime can be "effectively" prevented "by focusing on these persistent and dangerous 'hot spots.'" *Id.* ("Hot spots policing is a widespread proactive policing strategy that shows consistent evidence of reducing crime."); *see also* Lily Robin, et al., Urban Institute, *Public Surveillance Cameras and Crime: The Impact of Different Camera*

---

[8] Available at https://www.americanprogress.org/wp-content/uploads/sites/2/2026/01/CAP-CrimeReduction-report.pdf (last visited June 18, 2026).

10

*Types on Crimes and Clearances*, 1 (Feb. 2020) ("Research suggests police departments can maximize cameras' effectiveness by strategically placing them where they are most likely to capture criminal activity or generate evidence….")[9]. This applies to ALPR deployment. *See, e.g.*, George Mason Center for Evidence-Based Crime Policy, *LPR Deployment in the Field*[10] (recommending that "LPRs should be placed where they can potentially have the most impact for crime prevention and detection, in those specific places, or 'hot spots' of crime, auto-theft and traffic-related concerns"). Still more, at least one study of hot spots policing programs "confirm[ed] that certain undesirable outcomes (over-policing arrests of racial minorities) did not occur in the study period." Dylan J. Fitzpatrick, et al., *Policing Chronic and Temporary Hot Spots of Violent Crime: A Controlled Field Experiment*, 1 (Nov. 13, 2020).[11]

---

[9] Available at https://www.urban.org/sites/default/files/publication/101649/public_surveillance_cameras_and_crime.pdf (last visited June 18, 2026).

[10] Available at https://cebcp.org/lpr/lpr-deployment-in-the-field/ (last visited June 18, 2026).

[11] Available at https://arxiv.org/pdf/2011.06019 (last visiting June 18, 2026).

11

And to the extent that Appellants' amici raise policy concerns about the potential misuse of ALPRs, those matters are best addressed through legislation and regulation, not litigation. *See* Roberto Arnold, *Don't dismantle what protects our communities*, Our Weekly (May 5, 2026)[12] (editorial by *Amicus* MBA's Founder and Chairman explaining that concerns about the responsible use of ALPRs should be addressed by local government regulation, not wholesale prohibition). This case provides a perfect example. The Virigina legislature "enacted a statute imposing some of the Nation's most restrictive conditions on use of ALPR data." Appellees' Br. at 8. These restrictions—which, among other things, limit the time that data may be retained, how and by whom it may be accessed, and require audit procedures (*id.* at 8–9)—can be used protect against the abuse of ALPRs to disproportionately harm minorities and minority communities.

Accordingly, the Court should consider the ample support for the proposition that ALPRs are most effectively distributed based on objective factors, including in high crime locations.

---

[12] Available at https://www.ourweekly.com/2026/05/05/dont-dismantle-what-protects-our-communities/ (last visited June 18, 2026).

## III. ALPRs Provide Public-Safety Benefits To All Communities, Including Minority Communities.

ALPRs positively affect minority communities because they promote public safety, protect potential victims, and encourage economic development. Tools like ALPRs empower law-enforcement investigators to "identify crime patterns, connect related incidents, and generate strong cases against those driving violence." CAP Report at 13. Properly employed, these tools can not only "lead to arrests for violent crimes," but "may be used to more efficiently address quality-of-life priorities, such as illegal dumping of trash and construction debris, and the recovery of stolen cars." *Id.* Thus, in the words of the Oakland Branch of the NAACP, "[s]upporting and fully utilizing these tools is a practical, effective step toward reducing crime and safeguarding [minority] families, local businesses, and public spaces." Press Release, *The NAACP Oakland Branch calls on the City of Oakland and the Oakland City Council to continue to fund and activate Flock Safety Camera System to Combat Rising Crime* (Oct. 23, 2025)[13].

---

[13] Available at https://cdn.prod.website-files.com/6821cc9ecc966b7f252b 372e/68fa563fdb0cb0b72134df6d_OAKLAND%20NAACP%20Flock%20 Safety%20Camera%20System%20_10_23_25.pdf (last visited June 18, 2026).

13

And minority communities tend to support technologies like ALPRs. For example, a recent survey of Chicago voters showed that communities impacted by gun violence overwhelmingly supported the use of gunshot detection technology. SoundThinking, *What Chicago Voters Think About Gunshot Detection, and Why We Asked* (June 1, 2026).[14] The survey also showed that minority groups backed the technology—specifically, 80% of Black voters and 78% of Latino voters surveyed backed the technology. *Id.*

The benefits are not limited to crime and crime prevention. For example, ALPRs can help locate missing persons—a problem that disproportionately affects minorities.[15] The National Center for Missing

---

[14] Available at https://www.soundthinking.com/blog/what-chicago-voters-think-about-gunshot-detection-and-why-we-asked/ (last visited June 18, 2026).

[15] *See, e.g.*, Black And Missing, *Missing Persons Statistics 2023* ("40 percent of missing persons are persons of color, yet African-Americans make up only 13 percent of the population."), available at https://www.blackandmissinginc.com/statistics/ (last visited June 18, 2026); Linda A. Seabrook, *Shining a Light on the Crisis of Missing or Murdered Black Women and Girls in the United States*, U.S. Dep't of Justice (Nov. 22, 2025) (similar), available at https://www.ojp.gov/archive/safe-communities/inside-perspectives/shining-light-on-the-crisis-of-missing-or-murdered-black-women-and-girls-in-the-united-states (last visited June 18, 2025). This phenomenon is underreported—indeed, national statistics do not even separately track how many Hispanic children go

14

& Exploited Children ("NCMEC") has integrated Flock Safety's ALPRs with AMBER Alert searches for missing children—so when a camera detects a license plate associated with an AMBER Alert, it instantly notifies law enforcement. NCMEC, *Roads to Recover: How One of NCMEC's New Technology Partners is Helping Bring Missing Children Home*, (June 18, 2025).[16]  According to the NCMEC, "[w]hat once took hours of canvassing can now happen in seconds," and this integration has contributed to the safe return of over a thousand missing persons, including children.

All these benefits are of particular importance to *Amici*.  Take, for example, the FSHCC and its members.  According to a U.S. Small Business Administration report, Hispanic-owned businesses grew by

---

missing every year.  *See* Arnout van de Rijt et al., *Racial and gender differences in missing children's recovery chances*, PLOS One, (Dec. 31, 2018) ("One important limitation of the present study is that the police records it draws on do not systematically indicate the Hispanic ethnicity of missing children.  As a result, White and Hispanic children were mixed into a single race category, even though many of the mechanisms predicting an African-American disadvantage also predict a Hispanic disadvantage."), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC6312271/#pone.0207742.ref067 (last visited June 18, 2026).

[16] Available at https://www.missingkids.org/blog/2025/roads-to-recovery-how-one-of-ncmecs-partners-is-helping-bring-missing-children-home (last visited June 18, 2026).

46% in Florida between 2007 and 2012. *See* FSHCC, *Exploring the Rise of Hispanic-Owned Businesses in Florida and Their Impact on Local Economy* (July 8, 2025).[17]  These businesses range from restaurants and retail to professional services and technology startups. *Id.* And these businesses play a significant role in supporting their local communities by contributing to job growth, providing unique products and services, and investing back into Hispanic neighborhoods. *Id.*

Crime harms all of this. It increases the cost of doing business, and it alters the behavior of consumers, workers, and owners based on fear for their safety. One recent study of crime's impact on consumer behavior in Chicago, for example, concluded that "the effects of property crimes and street crimes on consumer visits in the following month are negative, meaningful and strongly significant." Hao Fe, et al., *How bad is crime for business? Evidence from consumer behavior*, J. of Urban Econ. 129, 2 (2022).[18]  According to the study, "[o]ne additional property crime

---

[17] Available at https://fshcc.com/exploring-the-rise-of-hispanic-owned-businesses-in-florida-and-their-impact-on-local-economy/ (last visited June 18, 2026).

[18] Available at https://www.sciencedirect.com/science/article/pii/S0094119022000250 (last visited June 18, 2026).

incident near a venue results in 1.13 fewer visits to that venue in the following month, which is a 12% reduction in consumer visits with one standard deviation increase in property crime." *Id.* And "[o]ne additional crime in streets near a venue results in about three fewer visits to that venue in the following month, a 10% reduction in consumer visits with one standard deviation increase in street crime." *Id.* These findings support "the argument that the perception of crime and the risk of victimization scare off consumers, potentially making businesses less profitable." *Id.*

For these reasons, *Amici* support effective policing practices like ALPRs that reduce the risk of crime and help bring justice to its victims. Cameras can both deter criminals and provide critical evidence to solve crimes like after-hours robberies. As Norfolk Assistant Chief Michele Maria Naughton testified in her deposition in this case, "being able to capture the license plate" gives "officers the ability to prevent crimes." *Schmidt v. City of Norfolk*, Case No. 2:24-cv-00621, DE 114-3 at 78:17–20. For example, in Norfolk, stolen vehicles were being used in connection with violent crimes, and capturing the license plate of stolen vehicles and alerting officers that those vehicles were in a certain area

17

"has the ability to deter crime." *Id.* at 78:20–79:11. Deterring and preventing crimes saves lives, protects the profitability and security of small businesses, and allows communities to thrive.

*Amici* thus offer this brief to combat the one-sided view presented by Appellants' amici and make the Court aware that many in minority communities support and welcome ALPRs as important tools for promoting public safety, protecting families and businesses, and providing safer spaces for all.

## CONCLUSION

For the reasons set forth above, *Amici* urge this Court to affirm the district court's judgment.

This the 18th day of June, 2026.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Stephen V. Carey
Stephen V. Carey

PARKER POE ADAMS & BERNSTEIN LLP
301 Fayetteville Street, Suite 1400
Raleigh, North Carolina  27601
Telephone:  (919) 828-0564
Facsimile:  (919) 834-4564
Email:  stevecarey@parkerpoe.com

*Attorneys for Amici Curiae*

</div>

18

## CERTIFICATE OF COMPLIANCE

I, Stephen V. Carey, hereby certify that:

1.    I am an attorney representing the Amici Curiae.

2.    This brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-pt. type and Century Schoolbook. Using the word count feature of the software used to prepare the brief, I have determined that the text of the brief (excluding the cover page, disclosure statements, table of contents, table of authorities, request for oral argument, signature block, and certificates of counsel) contains 3,181 words.

/s/ Stephen V. Carey
Stephen V. Carey

June 18, 2026.

19

## CERTIFICATE OF SERVICE

I, Stephen V. Carey, counsel for the Florida State Hispanic Chamber of Commerce and a member of the Bar of this Court, certify that, on June 18, 2026, the foregoing document was filed with the Court's CM/ECF system which will send notification of such filing to all counsel of record.

This the 18th day of June, 2026.

/s/  Stephen V. Carey
Stephen V. Carey

*Attorney for Amici Curiae*

20