No. 26-1227

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LEE SCHMIDT; CRYSTAL ARRINGTON,

*Plaintiffs-Appellants,*

v.

CITY OF NORFOLK; MARK TALBOT, in his official capacity as
the Norfolk Chief of Police,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Eastern District of Virginia,
Case No. 2:24-cv-621-MSD-RJK

### APPELLEES' SUPPLEMENTAL RESPONSE BRIEF

The Supreme Court's recent decision in *Chatrie v. United States*, 2026 WL 1855568 (June 29, 2026) ("Op."), strongly underscores the correctness of the district court's conclusion that use of automated license plate readers ("ALPRs") by the Norfolk Police Department ("NPD") complies with the Fourth Amendment. The Supreme Court made clear that photographic "surveillance" "confined to public roads" is not a Fourth Amendment search. Op.14. The Court also made clear that only location information at least as comprehensive as the cell-phone location data at issue in *Carpenter v. United States*, 585 U.S. 296 (2018), implicates the Fourth

1

Amendment—that is, information that allows police to "access all of" a person's "movements," creating a "virtual panopticon with which to scrutinize" "citizens' activities." Op.10, 13. There is no search here for both of those reasons: ALPR data consists of pictures of the exterior of vehicles traveling on public roads, and that spotty and scattered location information does not come anywhere close to the precision and comprehensiveness of cell-phone-associated information. Resp.Br.32-41. Accordingly, even assuming that Plaintiffs had standing to challenge querying of NPD's ALPR database, there is no Fourth Amendment violation in this case.

**1.** *Chatrie* draws a hard line between "public-movements-only technology," such as "surveillance" "confined to public roads," and cell-phone-tracking technology—i.e., the Location History data in *Chatrie* and the cell-site location data in *Carpenter*. Op.14 & n.10. As the Court explained, "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy," because "the car is always in plain view." Op.14. "By contrast, the movements that Location History" or cell-site information "reveals are not limited to public streets," because a "cell phone faithfully follows its owner" "into private residences, doctor's offices, [and] political headquarters"—and Location History even shows the "specific floor" where a person is located inside a building. Op.14.

Accordingly, *Chatrie* does not indicate that "public-movements-only technology," or any technology that creates a less "comprehensive" log of "location" than the cell-site information in *Carpenter*, constitutes a search. Op.14 n.10. Rather, *Chatrie* leaves undisturbed precedent establishing that security cameras, pole cameras, and other technology that photographs the exterior of a car on a public road does not invade any reasonable expectation of privacy. Resp.Br.25-28, 32-35; *see* Resp.Br.30 n.8 (contrasting ALPRs with GPS trackers). That is all that ALPRs do, and this Court need go no further to affirm.

**2.** *Chatrie* also establishes that accessing location information invades a reasonable expectation of privacy only where, as in *Carpenter*, that information provides "near perfect surveillance" of an individual, thus yielding a "comprehensive chronicle" of their "past movements" in a "detailed log." Op.9-11, 14 n.10, 15. ALPR data does no such thing. Resp.Br.32-41.

That is concretely illustrated by the Court's comparison to *Carpenter* in *Chatrie*. Op.11 ("[e]verything *Carpenter* relied on" to find a Fourth Amendment search "applies as well or better to the police's accessing of Google's Location History data"). First, the Court emphasized that Location History data provides an extraordinarily "fine-tuned picture of a person's movements"—even more "detailed" and "encyclopedic" than the data in *Carpenter*. Op.11. Location History data pinpoints a cell-phone user's location exactly, logs location 720 times a day,

and even discloses whether the user has gone into "a doctor's office on the first floor of a multi-story building, or a private apartment on the tenth." Op.11. Also, for most people, Location History data is collected from the moment they get a cell phone, thus "track[ing]" the user's location both continuously and "boundless[ly]." Op.5, 11. ALPR data could not be more different, as the summary-judgment record here establishes. NPD's ALPRs photograph individual cars very rarely, with enormous gaps of time and distance between pictures; ALPRs do not gather data off of public roads; and Plaintiffs' experts could glean virtually nothing about Plaintiffs' movements or activities from months of ALPR data. Resp.Br.36-41.

Second, the Court explained that, like the cell-site information in *Carpenter*, Location History data allows "retrospective[]" reconstruction of all of a person's past movements because a cell phone's owner "has effectively been tailed every moment of every day." Op.11. Accordingly, wherever that person has been, whether in a "public [or] private" place, they have been subject to "tireless and absolute surveillance" for "boundless time." Op.11. Again, the contrast with ALPR data is stark. Photographing a person's car on a public road in a sporadic manner does not amount to tailing that person for most moments of the day, and that technology does not follow him into any private places. Further, under Virginia law, authorities retain ALPR data for only 21 days, Resp.Br.38, not "boundless time." It is thus not surprising that, although Plaintiffs' experts here were given months of

4

complete ALPR data (specially saved from deletion due to this litigation), those experts were utterly unable to reconstruct Plaintiffs' movements. Resp.Br.39-40.

Third, the Court reasoned that Location History data is "private" in nature— more so than the cell-site information in *Carpenter*. Op.12. Cell-phone users consult and rely on Location History data, which makes it a "personal journal of a user's movements" that "resembles other private materials," like "emails" or "calendars," that a "user reasonably views as his own." Op.12. ALPR data does not fall into the same category. Drivers do not use and consult photographs of their vehicles' exteriors on public roads, or reasonably understand such pictures as their "own." To the contrary, such "public-movements-only" information is universally understood as non-private, Op.14 n.10, including because the whole point of license-plate information is public identification, Resp.Br.25-28.

**3.** *Chatrie*'s rejection of an argument that no search occurred when the police accessed "two hours" of Location History data only reinforces the distinctions between that case and this one. Op.14. In rejecting that argument, the Court said that "[w]hat creates th[e] concern" under the Fourth Amendment "is that the government can access all of a cell-phone user's movements, in both public and private places," giving the government "a virtual panopticon with which to scrutinize its citizens' activities"—and that "[t]he sweep of the official invasion is not made less because the government, with the benefit of hindsight, can pinpoint exactly

which few hours of movements it wants to review." Op.13. In other words, although in *Chatrie* the government happened to pick only two hours of data to "obtain[]," the Fourth Amendment problem arose only because the government had at its fingertips a huge quantity of comprehensive and precise location data stretching back "boundless[ly]." Op.11, 13. That is why the Court repeatedly emphasized that Location History data creates an endless well of highly detailed location information, including information from inside private places. *E.g.*, Op.5, 11, 13-14.

Once again, ALPR data is not remotely comparable. An individual's car will at most have been photographed only very rarely, Resp.Br.37-39; ALPR data does not follow anyone inside any private place, and so cannot allow police to "focus . . . precisely" on sites inside which private activity might occur, Op.12; and ALPR data in Virginia is deleted after 21 days. Thus, far from creating a "boundless" "panopticon," NPD's ALPR system is akin to "placing a black sheet of paper" over Norfolk "with 75 . . . holes punched through it" corresponding to spots on public roads, thereby "permitting information gathering" about where cars drive in public "only in a narrow range of static locations," JA38 n.15, and stretching back only a limited time.

Moreover, because *Chatrie* reaffirms preexisting precedent about the constitutionality of "surveillance" by cameras on "public roads," Op.14, and does not disturb the Court's recent endorsement of the constitutionality of "conventional

6

surveillance techniques and tools, such as security cameras," *Carpenter*, 585 U.S. at 315-16, *Chatrie* does not indicate that data providing *any* glimpse into someone's private activities is enough to invade a reasonable expectation of privacy. If such a glimpse were enough, that would mean that police review of security-camera footage from outside a hospital, live observation of a suspect's movements to and from his workplace, and use of the beeper technology in *United States v. Knotts*, 460 U.S. 276 (1983), would violate the Fourth Amendment absent a warrant. *Chatrie* does not purport to work such a sea change. Rather, *Chatrie* acknowledges that, unlike information about the inside of someone's home, Op.13 (discussing heat-imaging of home), as to which there is a reasonable expectation of virtually total privacy, location information encompassing public places is not inherently private. Accordingly, a reasonable expectation of privacy in such information can arise only when the information is extraordinarily comprehensive, Op.11-14—which the ALPR data here is not.

Finally, *Chatrie* makes clear that Plaintiffs are wrong to argue that an ALPR system invades a reasonable expectation of privacy because of what police *might* do with ALPR data if more cameras were deployed or if police were to combine ALPR data with other data streams. Either the Fourth Amendment applies to a particular challenged practice or it does not—"regardless of 'the quality or quantity of

information' the government obtains" from other sources or might theoretically obtain in the future.  Op.13.

## CONCLUSION

The judgment should be affirmed.

Dated: July 7, 2026

Respectfully submitted,

/s/ *Adam D. Melita*
Adam D. Melita
Karla J. Soloria
CITY OF NORFOLK
DEPARTMENT OF LAW
810 Union Street
  Suite 900
Norfolk, VA 23510
(757) 664-4529
adam.melita@norfolk.gov
karla.soloria@norfolk.gov

*Counsel for Defendants-Appellees*

/s/ *Elaine J. Goldenberg*
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Daniel J. Kane
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
  Suite 500 E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com
Elaine.Goldenberg@mto.com
Daniel.Kane@mto.com

Justin P. Raphael
MUNGER, TOLLES & OLSON LLP
560 Mission Street
  27th Floor
San Francisco, CA, 94105
(415) 512-4000
Justin.Raphael@mto.com

*Counsel for Defendant-Appellee*
*City of Norfolk*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing motion complies with the word limit set forth in this Court's Order dated July 2, 2026, because it contains 1,500 words. I further certify that the foregoing motion complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6).

DATED: July 7, 2026

/s/ *Elaine J. Goldenberg*
Elaine J. Goldenberg

*Counsel for Defendant-Appellee*
*City of Norfolk*

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2026, I electronically filed the foregoing motion with the Clerk of the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which sent notification of such filing to all registered CM/ECF users.

DATED:  July 7, 2026

/s/ *Elaine J. Goldenberg*
Elaine J. Goldenberg

*Counsel for Defendant-Appellee*
*City of Norfolk*