**No. 26-1227**

In the
# United States Court of Appeals
### for the Fourth Circuit

**LEE SCHMIDT; CRYSTAL ARRINGTON,**

*Plaintiffs–Appellants,*

*v.*

**CITY OF NORFOLK; MARK TALBOT, in his official capacity as Norfolk Chief of Police,**

*Defendants–Appellees.*

**On Appeal from the United States District Court
for the Eastern District of Virginia at Norfolk**

**REPLY BRIEF OF APPELLANTS**

Michael B. Soyfer
Robert Frommer
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320

July 23, 2026

*Counsel for Plaintiffs–Appellants*

TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................... iii

Preliminary Statement ............................................................................. 1

Summary of the Argument ....................................................................... 3

Argument .................................................................................................. 6

    I.   Plaintiffs have standing to challenge Norfolk's surveillance of their movements. ......................................................................................... 6

    II.  Norfolk's Flock Cameras contravene Plaintiffs' reasonable expectation of privacy in their physical movements ........................................... 9

        A.   *Carpenter* Factor 1: Norfolk's Flock Cameras have the capacity to reveal intimate details. ...................................................... 10

        B.   *Carpenter* Factor 2: Norfolk's Flock Cameras are easy, cheap, and efficient compared to traditional surveillance. ..................... 18

        C.   *Carpenter* Factor 3: Norfolk's Flock Cameras enable police to reconstruct people's past movements. ................................... 19

        D.   Norfolk's remaining arguments do not alter the *Carpenter* balance. ................................................................................... 20

    III. Precedent forecloses Norfolk's efforts to reframe the analysis. .................... 22

        A.   *Carpenter*'s multifactor test determines when surveillance contravenes a reasonable expectation of privacy. .................... 23

        B.   The Court should reject Norfolk's argument that a search requires human review. ..................................................................... 26

    IV. Norfolk's Flock Cameras effect an unreasonable search within the original meaning of the Fourth Amendment. ................................... 30

Conclusion ............................................................................................. 30

Certificate of Compliance ..................................................................... 32

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*ACLU v. Clapper*,
  785 F.3d 787 (2d Cir. 2015) ...............................................................................6

*Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*,
  848 F.2d 457 (4th Cir. 1988) ..............................................................................7

*Berger v. New York*,
  388 U.S. 41 (1967)..............................................................................................21

*Carpenter v. United States*,
  585 U.S. 296 (2018)....................................................................................*passim*

*Chatrie v. United States*,
  2026 WL 1855568 (June 29, 2026) ............................................................*passim*

*Commonwealth v. Church*,
  2025 WL 2908089 (Va. Ct. App. Oct. 14, 2025) ..............................................21

*Cooksey v. Futrell*,
  721 F.3d 226 (4th Cir. 2013) ..............................................................................8

*Covenant Media of S.C., LLC v. City of N. Charleston*,
  493 F.3d 421 (4th Cir. 2007) ..............................................................................8

*Kyllo v. United States*,
  533 U.S. 27 (2001)......................................................................................*passim*

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
  456 F. Supp. 3d 699 (D. Md. 2020).....................................................................7

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
  979 F.3d 219 (4th Cir. 2020) ..............................................................................7

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
  2 F.4th 330 (4th Cir. 2021) (en banc) ........................................................*passim*

*Neal v. Fairfax Cnty. Police Dep't*,
  812 S.E.2d 444 (Va. 2018) ................................................................................29

*Nelson v. Adams USA, Inc.*,
    529 U.S. 460 (2000)..................................................................................26

*New York v. Class*,
    475 U.S. 106 (1986)..................................................................................29

*Rakas v. Illinois*,
    439 U.S. 128 (1978)................................................................................8, 21

*United States v. Brignoni-Ponce*,
    422 U.S. 873 (1975)..................................................................................24

*United States v. Chatrie*,
    136 F.4th 100 (4th Cir. 2025) (en banc) ................................................19

*United States v. Cortez*,
    449 U.S. 411 (1981)..................................................................................17

*United States v. Di Re*,
    332 U.S. 581 (1948)..................................................................................20

*United States v. Dunn*,
    480 U.S. 294 (1987)..................................................................................24

*United States v. Giddins*,
    858 F.3d 870 (4th Cir. 2017) ..................................................................30

*United States v. Jones*,
    565 U.S. 400 (2012).............................................................................*passim*

*United States v. Knotts*,
    460 U.S. 276 (1983)..................................................................................29

*United States v. Moore-Bush*,
    36 F.4th 320 (1st Cir. 2022)................................................................23, 28

*United States v. Porter*,
    170 F.4th 381 (5th Cir. 2026) ..................................................................22

*United States v. Robinson*,
    744 F.3d 293 (4th Cir. 2014) ..................................................................30

*United States v. Sturdivant*,
786 F. Supp. 3d 1098 (N.D. Ohio 2025) ..............................................22

*Warth v. Seldin*,
422 U.S. 490 (1975)..............................................................................8

*Wikimedia Found. v. NSA*,
857 F.3d 193 (4th Cir. 2017) ...............................................3, 6, 7, 8

*Wikimedia Found. v. NSA*,
14 F.4th 276 (4th Cir. 2021) ................................................................9

*Yee v. City of Escondido*,
503 U.S. 519 (1992)............................................................................25

## Statutes

Va. Code § 2.2-5517 ..............................................................................21

## Other Authorities

Br. for the United States, *Jones*, 565 U.S. 400 (No. 10-1259), 2011
WL 3561881 (Aug. 11, 2011).............................................................16

Devlin Barrett, *Gun-Show Customers' License Plates Come Under
Scrutiny*, Wall St. J. (Oct. 2, 2016)...................................................13

*Education Campus*, Flock Safety (last visited July 22, 2026),
https://bit.ly/3T49m1P .......................................................................13

*Healthcare*, Flock Safety (last visited July 22, 2026),
https://bit.ly/4aGGUJr........................................................................13

Laura K. Donohue, *Bulk Metadata Collection: Statutory and
Constitutional Considerations*,
37 Harv. J.L. & Pub. Pol'y 757 (2014)........................................27, 28

*Not All License Plate Readers Are Equal*, Flock Safety (Feb. 6, 2026),
https://bit.ly/3SN22HP.......................................................................29

*Places of Worship*, Flock Safety (last visited July 22, 2026),
https://bit.ly/4fkJFmh.........................................................................13

*Virginia State Police Recorded License Plates of Inauguration Attendees: Report*, NBC 4 Washington (Oct. 20, 2013), https://bit.ly/4vOwZu1 ....................................................................................13

## PRELIMINARY STATEMENT

As Plaintiffs explained in their opening brief, the district court erred by holding that surveillance does not become a Fourth Amendment "search" until it captures "the whole, or nearly the whole, of a person's movements." JA36; *see* Pls.Br.24-47. Instead, *Carpenter v. United States* created a multifactor test that uses guideposts rooted in Founding-era expectations of privacy to differentiate dragnet surveillance technologies from traditional police surveillance. 585 U.S. 296 (2018); *see* Pls.Br.24-29. Then, in *Leaders of a Beautiful Struggle v. Baltimore Police Department*, this Court held that even surveillance with substantial gaps can cross the line into revealing intimate patterns and thereby qualify as a Fourth Amendment search. 2 F.4th 330 (4th Cir. 2021) (en banc); *see* Pls.Br.27-28. Properly framed, this case is simple. Applying *Carpenter*'s factors—the capacity to reveal intimate details, make surveillance cheap and easy, and enable reconstruction of past movements—Plaintiffs demonstrated that Norfolk's Flock Cameras contravene traditional expectations of privacy. Pls.Br.24-27.[1]

The Supreme Court's recent decision in *Chatrie v. United States* bolsters those arguments. 2026 WL 1855568 (June 29, 2026). *Chatrie* held that police invaded a reasonable expectation of privacy by obtaining "only two hours" of Location History data from Google. *Id.* at *14, *16. In the process, the Court rejected the notion that

---

[1] This brief uses the same defined terms as Plaintiffs' opening brief.

1

the *quantity* of data was dispositive. *Id.* at \*13 & n.9. It instead looked to "'guideposts' stretching back to the Fourth Amendment's beginnings"—the *Carpenter* factors. *Id.* at \*9. *First*, although two hours of data could not reveal intimate "patterns," "[e]ven short-term monitoring" may reveal visits to sensitive locations. *Id.* at \*12. That the defendant did not visit any such locations was irrelevant because the Court focused on the technology's ultimate capabilities, not just "what it finds." *Id.* at \*14. *Second*, Location History enables police to surveil people "with no real effort" or cost, "at just the 'click of a button.'" *Id.* at \*11 (citation omitted). And *third*, it "allows police officers to reconstruct retrospectively" even if they had no reason to suspect a person when the data were created. *Id.* (cleaned up).

Norfolk's arguments were already weak in light of *Carpenter* and *Beautiful Struggle*. But *Chatrie* renders them untenable. So rather than engage head-on with Plaintiffs' arguments, Norfolk advances a hodgepodge of arguments across two briefs that seek to dodge the merits, confuse the issues, and confine these precedents to their specific facts. It reprises a standing argument even the district court rejected, urges this Court to evaluate the Flock Cameras as though they operated in silos, and otherwise rehashes the district court's quantitative analysis, all while crying forfeiture at every turn. At bottom, Norfolk is simply repackaging arguments *Carpenter*, *Beautiful Struggle*, and *Chatrie* rejected. And it should achieve the same

2

result. ALPRs are "new, but the principle covering [them] is not." *Chatrie*, 2026 WL 1855568, at *18. The Court should vacate the judgment, reverse the denial of Plaintiffs' summary judgment motion, and remand for entry of an injunction.

## SUMMARY OF THE ARGUMENT

**I.** Plaintiffs have standing to challenge the collection and centralized storage of information about them. Norfolk's contrary argument ignores *Wikimedia Foundation v. NSA*, 857 F.3d 193 (4th Cir. 2017), and *Beautiful Struggle*, where this Court held that the plaintiffs had standing even absent evidence that a person would ever see their data.

**II.** On the merits, *Carpenter*'s guideposts overwhelmingly favor Plaintiffs. Norfolk's Flock Cameras have the capacity to reveal intimate details, to make surveillance cheap and easy, and to enable reconstruction of past movements. Yet Norfolk barely addresses the *Carpenter* factors, opting instead to rehash the district court's quantitative analysis.

**A.** There is no dispute of material fact that *Carpenter*'s first factor favors Plaintiffs. Norfolk's Flock Cameras have the capability to enable pattern-based deductions and reveal visits to sensitive locations, as with Crystal's visit to her father. Norfolk's contrary arguments recycle the same broad summary statistics the district court cited, which are immaterial because they do not reflect the Flock Cameras' *ultimate capabilities*. *Chatrie* and *Beautiful Struggle* make clear that this Court

3

should focus on the Flock Cameras' capabilities, not just what they happened to capture about a given person at a given time.

**B.** Norfolk snubs *Carpenter*'s second factor, treating it as a throwaway line. But *Chatrie* forecloses this argument. Cheap and easy surveillance evades the resource constraints that limit abusive police surveillance and therefore contravenes traditional expectations of police surveillance capacity. Because Norfolk ignores this factor, it is undisputed that Norfolk's Flock Cameras enable surveillance that is even cheaper, easier, and more efficient than CSLI or aerial surveillance.

**C.** On *Carpenter*'s third factor, Norfolk argues only that its Flock data do not enable *comprehensive* reconstruction of people's movements. But that blinks the central concern: the "retrospective nature of the data" means "this newfound tracking capacity runs against everyone." And Norfolk does not—and cannot—deny that its Flock Cameras indiscriminately store data about everyone's movements.

**D.** All of *Carpenter*'s factors favor Plaintiffs, and Norfolk's remaining arguments do not alter the balance. If anything, Virginia's ALPR statute validates Plaintiffs' privacy concerns, but it cannot supersede the Fourth Amendment's warrant requirement. Norfolk's bevy of nonbinding cases, meanwhile, is unhelpful because these cases used the quantitative approach *Chatrie* rejected.

**III.** Lacking any defense of the judgment below based on *Carpenter*'s historical guideposts, Norfolk tries to change the framework. It argues that

4

*Carpenter*'s test is a rote quantitative threshold and that, in any event, this Court should evaluate only the capabilities of each individual ALPR because no officer ever "queried" Plaintiffs' data. Both arguments run up against binding precedent.

**A.** Plaintiffs explained in their opening brief that *Carpenter* created a multifactor test based on Founding-era privacy expectations. *Chatrie* forecloses Norfolk's contrary argument. The Supreme Court expressly held that quantity is not dispositive and applied *Carpenter*'s factors to determine whether police access to Location History data is a search.

**B.** Norfolk does not dispute that, as Plaintiffs argued, the Court must consider the technology's capabilities. But it confuses the issues by urging the Court to consider only the capabilities of each individual ALPR since no officer ever saw Plaintiffs' data. In *Kyllo v. United States*, however, the Supreme Court held that the initial collection is a search even if surveillance data require human "analysis (*i.e.*, the making of inferences)" to reveal intimate details. 533 U.S. 27, 36-37 & n.4 (2001). A contrary holding would create an automation exception enabling police to run dragnet surveillance programs if they use technologies that collect data without human involvement.

**IV.** Norfolk does not try to argue that its high-tech dragnet is consistent with the Fourth Amendment's original understanding. Although the Court need not address this argument, it provides another route to the same result.

## ARGUMENT

### I. Plaintiffs have standing to challenge Norfolk's surveillance of their movements.

No one disputes that the Flock Cameras captured and stored data about Plaintiffs' movements hundreds of times during discovery, and, on that basis, even the district court held that they had Article III standing. Pls.Br.14-16. On appeal, though, Norfolk advances a Rube Goldberg-style standing argument that confuses the issues and ignores on-point precedent. The argument runs like this: Plaintiffs challenge only the collection and centralized storage of information about their movements. But that collection and storage, Norfolk insists, is not a search. Instead, for reasons Norfolk never fully explains, no search could possibly happen until an officer queries the database and reviews Plaintiffs' information in the search results. Since Plaintiffs' information was never queried and since the initial collection was not a search, Norfolk contends that it follows QED that Plaintiffs lack standing.

Binding circuit precedent offers a straightforward path out of this tangle of arguments. This Court rejected the premise that the targets of surveillance suffer no injury absent human review in *Wikimedia*. *See* 857 F.3d at 209-11. Even if an officer never reviews the myriad datapoints Norfolk has collected on Plaintiffs, they "surely have standing to allege injury from the collection, and maintenance in a government database, of records relating to them." *ACLU v. Clapper*, 785 F.3d 787, 801 (2d Cir. 2015) (quoted with approval in *Wikimedia*, 857 F.3d at 210).

6

*Beautiful Struggle* clinches it. 2 F.4th 330 (4th Cir. 2021) (en banc). There, as here, the "Defendants contend[ed] that the Plaintiffs' standing is contingent upon the potential, *future* review of the imagery data." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 456 F. Supp. 3d 699, 708 (D. Md. 2020). But the district court rejoined that the "collection of imagery data associated with the Plaintiffs is a[ sufficient] 'injury-in-fact'" even if "the [police] may never review the 'dots' associated with these Plaintiffs." *Id.* at 708-09. On appeal, the panel affirmed that holding because this Court "in a very similar case" (*Wikimedia*) had rejected the proposition that standing to challenge government surveillance requires "human review." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 979 F.3d 219, 225 (4th Cir. 2020). Although the en banc Court vacated that opinion and did not expressly address standing, it "validated" the panel's standing analysis, *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 848 F.2d 457, 459 (4th Cir. 1988), because it necessarily concluded the plaintiffs had standing when it ruled for them on the merits, *see Beautiful Struggle*, 2 F.4th at 333.

Norfolk distinguishes these cases on the rationale that "data being collected [*was*] *itself private*." Norf.Br.23-24. But whether the data are "private" is a merits issue, not a standing issue.[2] "[S]tanding in no way depends on the merits of the

---

[2] Norfolk accuses Plaintiffs of conflating standing with the merits, Norf.Br.23, but that is what Norfolk is doing. Rather than address the legal theory Plaintiffs asserted—that Norfolk's warrantless collection and storage of data about Plaintiffs

plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *see Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 429 (4th Cir. 2007) (applying this rule on review of summary judgment). Instead, the Court must "assume that on the merits the plaintiffs would be successful in their claims." *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013) (citation omitted). That means the Court must assume that Norfolk's collection of Flock data violates Plaintiffs' reasonable expectation of privacy. The only "question" is whether Plaintiffs are "entitled to have the court decide the merits of" *that* claim, for or against them. *Warth*, 422 U.S. at 498. *Wikimedia* and *Beautiful Struggle* confirm that they are.

Norfolk's perfunctory argument that Plaintiffs also lack Fourth Amendment "standing" because no officer ever queried their data, Norf.Br.21, fails for the same reason. Fourth Amendment "standing . . . is more properly subsumed under substantive Fourth Amendment doctrine." *Rakas v. Illinois*, 439 U.S. 128, 139

---

violate the Fourth Amendment—Norfolk argues they lack standing to challenge something else—the later human review of those data. Although it never clearly explains why, Norfolk's position seems to be that the mere collection of data cannot be a search, so the only thing Plaintiffs *could* challenge is human review of the data. *Compare id.* at 25, *with id.* at 29. Confusingly, though, Norfolk insists human review is also not a search. *See id.* at 29-45. On the merits, Norfolk's effort to partition its surveillance into discrete steps is wrong. *See* Section III(B) below. But that has nothing to do with standing.

8

(1978). In any event, Plaintiffs have Fourth Amendment standing because they are challenging the collection of data about *their own* movements, not someone else's.

Lastly, Norfolk wrongly claims Plaintiffs forfeited these arguments by not making them in their opening brief. The district court held that Plaintiffs had standing to challenge the collection and storage of information about them. JA15, JA17-19. And it expressly rejected Norfolk's effort to "improperly . . . inject the merits of Plaintiffs' claim into the standing analysis." JA18 n.11; *see also* JA34 (declining to address whether to adopt Norfolk's "construct" separating data collection from later human review). Plaintiffs "thus had no reason to" relitigate standing "before [Norfolk] contested it." *Wikimedia Found. v. NSA*, 14 F.4th 276, 290 (4th Cir. 2021) (appellant that prevailed on standing but lost on other grounds was not required to anticipate appellee's standing arguments).

The Court should straightforwardly apply its precedent to hold that Plaintiffs have standing to challenge Norfolk's surveillance of them.

## II.    Norfolk's Flock Cameras contravene Plaintiffs' reasonable expectation of privacy in their physical movements.

*Carpenter*'s factors heavily favor Plaintiffs. Norfolk's Flock Cameras have the capability to reveal intimate patterns and visits to sensitive locations; they are far cheaper and more efficient than traditional police surveillance; and the retrospective quality of the stored data means the surveillance runs against everyone. Pls.Br.24-47. Even with the benefit of a second brief, Norfolk barely addresses these factors

9

and instead largely parrots the district court's analysis. The few counterarguments it offers all fall short. On this record, the *Carpenter* factors overwhelmingly favor Plaintiffs.

### A.    *Carpenter* Factor 1: Norfolk's Flock Cameras have the capacity to reveal intimate details.

*Carpenter*'s first factor weighs in Plaintiffs' favor because the Flock Cameras have the capacity to reveal intimate details. Pls.Br.30-41. Rather than directly engage with Plaintiffs' arguments, Norfolk largely ignores these capabilities and underscores the same diluted summary statistics the district court cited. Norf.Br.29-43, 51. Beyond that, it insists this case is distinguishable from *Carpenter*, *Beautiful Struggle*, and *Chatrie* because the Flock Cameras do not follow people into private spaces. *Id.* at 51-52. And it faults Plaintiffs' experts for not showing that the Flock Cameras could reveal every conceivable detail of Plaintiffs' private lives. *Id.* at 52. But, as explained below, *Chatrie* bolstered Plaintiffs' arguments that the Flock Cameras can reveal intimate details, and Norfolk's contrary arguments are immaterial or foreclosed.

Specifically, *Chatrie* clarified that surveillance of movements can reveal two types of "private matters": (i) "[r]epeated patterns" and (ii) visits to sensitive locations. *See* 2026 WL 1855568, at *12. The summary judgment record shows that the Flock Cameras can reveal both types of intimate details.

10

Starting with the first type, undisputed evidence shows Norfolk's Flock Cameras are capable of revealing patterns. Dr. Higdon-Topaz's simulation analysis showed that they can log data about virtually every car trip. *See* Pls.Br.17-18, 32. Indeed, it is almost certain that Norfolk's Flock Cameras would capture a large share of people's habitual routes according to his calculations. *See id.* at 18-19, 32 & n.10.[3] Real-world data bear that out: in less than a month, Norfolk's Flock Cameras aggregated tens of millions of datapoints memorializing where people were driving. *See id.* at 9-10. Plaintiffs alone were each tracked hundreds of times in just a few months. *See id.* at 14-16. Using those data, Plaintiffs' expert Dr. Wheeler demonstrated how an officer could identify patterns ranging from anodyne trips to the supermarket to visits to a relative. *See id.* at 19-20, 33-34.

*Beautiful Struggle* already held that long-term surveillance of people's public movements can "reveal intimate details through habits and patterns." 2 F.4th at 341; *accord Chatrie*, 2026 WL 1855568, at *12. Because "the source of the underlying location data is entirely irrelevant," *Beautiful Struggle*, 2 F.4th at 343-44, Plaintiffs were not required to reestablish the proposition that patterns can reveal intimate

---

[3] Norfolk faults Plaintiffs for not addressing "comprehensiveness" as a separate factor. Norf.Br.47-48, 51. But the key precedents addressed comprehensiveness to explain how the surveillance could reveal intimate details. *See, e.g.*, *Chatrie*, 2026 WL 1855568, at *11. And Norfolk's critique is immaterial anyway because Higdon-Topaz demonstrated that Norfolk's Flock Cameras can generate comprehensive data on people's driving patterns. *See* Pls.Br.17-19, 32.

11

details. Norfolk's only response is to urge the Court to abandon *Beautiful Struggle*'s core rationale because it might render stakeouts unconstitutional. *See* Norf.Br.43. But that ignores the other *Carpenter* factors, which protect "conventional surveillance techniques" like stakeouts. *See* 585 U.S. at 316. Just because those techniques "can sometimes reveal intimate information like the" Flock Cameras "do[], that does not mean" NPD's "citywide prolonged surveillance campaign must be permissible as well." *Beautiful Struggle*, 2 F.4th at 346.

Moving to the next category of intimate details, Plaintiffs showed that Norfolk's Flock Cameras can reveal visits to sensitive locations. *Chatrie* held "'[e]ven short-term monitoring' of a person's physical movements" can effect a Fourth Amendment search by revealing such trips. 2026 WL 1855568, at *12, *14. And police armed with ALPRs can reveal trips to all the sensitive places *Chatrie* flagged. *See id.* at *12. Wheeler demonstrated how an NPD officer could deduce when Crystal visited her father (at his "private residence," *id.* at *14) and *even how long she stayed* (just over an hour), JA2258-2259. He also explained how officers could identify Jehovah's Witnesses who routinely attend services or attendees at a school sports game. *Compare* JA2240-2241, JA2588, JA2591, *with Chatrie*, 2026 WL 1855568, at *14 n.10 (geofence "included a nearby church" and "showed individuals' trips to . . . a school"). Separately, Higdon-Topaz's slack-time analysis showed how police could use "gaps" between ALPR captures to identify the

12

locations a person could have visited. *See* JA2189-2191; Pls.Br.19. Across the country, officers have used ALPRs to track attendees at "protest march[es],"[4] "gun show[s],"[5] and "political rall[ies]."[6] *Cf. Chatrie*, 2026 WL 1855568, at *11-12. Unlike a device that moves with a target, like an ankle monitor or GPS, ALPRs "enable[] police officers to focus on precisely those sites—to see, in a given time block, who shows up." *Id.* at *12.[7]

Accordingly, undisputed evidence demonstrates that Norfolk's Flock Cameras can reveal intimate patterns and visits to sensitive locations. Norfolk's scattershot counterarguments across its two briefs either repackage contentions this Court and the Supreme Court have rejected or rehash the district court's analysis. The Court should reject all of these arguments.

***First***, Norfolk claims *Chatrie* drew a "hard line" between "public-movements-only technology" like ALPRs and "cell-phone-tracking technology." Norf.Suppl.Br.2; *see* Norf.Br.33, 37. Not so. After all, the "insight[]" that "[e]ven

---

[4] *See, e.g.*, JA1962-1963, JA1967-1969; EFF/ACLU.Br.22.

[5] Devlin Barrett, *Gun-Show Customers' License Plates Come Under Scrutiny*, Wall St. J. (Oct. 2, 2016), https://bit.ly/4y3OfwI.

[6] *Virginia State Police Recorded License Plates of Inauguration Attendees: Report*, NBC 4 Washington (Oct. 20, 2013), https://bit.ly/4vOwZu1.

[7] Flock markets its ALPRs to churches, healthcare facilities, and schools, which can choose to share their ALPR data directly with the police. *See, e.g.*, *Healthcare*, Flock Safety (last visited July 22, 2026), https://bit.ly/4aGGUJr; *Places of Worship*, Flock Safety (last visited July 22, 2026), https://bit.ly/4fkJFmh; *Education Campus*, Flock Safety (last visited July 22, 2026), https://bit.ly/3T49m1P.

short-term monitoring" can track people to sensitive locations came from *Jones*, where all "the movements occurred in public." *Chatrie*, 2026 WL 1855568, at \*10, \*12. *Chatrie* also did not disturb *Beautiful Struggle*'s holding that multi-day public surveillance can reveal intimate details through pattern-based deductions. Rather, it held that the ability to track a person to sensitive locations is *another* way to "reveal" intimate details, not the only way. *See id.* at \*12.

***Second***, like the district court, Norfolk dismisses Higdon-Topaz's analysis because he used mathematical modeling to quantify the Flock Cameras' capabilities. *Compare* Norf.Br.40, *with* JA42. In its supplemental brief, Norfolk insists—without a quote or even a pincite—that "*Chatrie* makes clear" that a technology's potential capabilities are irrelevant. *See* Norf.Suppl.Br.7. But *Chatrie* did just the opposite. The Court focused solely on what police *might* do with Location History, rejecting the government's argument that it should ignore these capabilities "because Chatrie did not go" to any sensitive locations. 2026 WL 1855568, at \*12, \*14. Higdon-Topaz's simulation is the same type of analysis *Chatrie* and prior cases used to assess capabilities[8]—he just added mathematical rigor. *See* JA544-45 ("Simulation is a standard and widely utilized scientific practice for evaluating what a system *could*

---

[8] *Cf., e.g.*, *Chatrie*, 2026 WL 1855568, at \*13-14 (noting hypothetical locations that Location History could place someone, even though defendant was not tracked to those locations); *Beautiful Struggle*, 2 F.4th at 343 (hypothetical of tracking a person from a crime scene to their home and following them over multiple days); *Kyllo*, 533 U.S. at 38 (hypothetical lady of the house taking her daily bath).

14

do under realistic conditions . . . ."). Norfolk has not identified any faulty assumptions or mathematical errors; its only grievance is that he mathematically assessed the Flock Cameras' true potential, rather than simply what they happened to capture at a given time.

Norfolk's only affirmative evidence of its Flock Cameras' capabilities below and on appeal is its labor economist's broad summary statistics. *Compare* Norf.Br.37-39, *and* Norf.Suppl.Br.3-8, *with* JA36-39. But those statistics are immaterial to assessing the Flock Cameras' ultimate *capabilities*, which is the dispositive question. *See* Pls.Br.30-31. After all, *Beautiful Struggle* did not demand "perfect tracking of all individuals . . . across all the time . . . cover[ed]." 2 F.4th at 342. That is, it did not consider all the times people could not be tracked over multiple days, like when they made a one-time visit to see the Baltimore aquarium. Instead, it focused on theoretical scenarios where the aircraft could enable multi-day tracking. *See* 2 F.4th at 343 & n.9; *see also* PolicingProject.Br.4-9 (*Beautiful Struggle* considered the ultimate capabilities of the surveillance, not just record evidence of how it had been deployed). Norfolk's statistics are immaterial because the outcome hinges on its surveillance system's ultimate potential, not what information it happened to collect at a given time.

***Third***, Norfolk's emphasis on "gaps" in its Flock data, Norf.Br.13, 16, 39, likewise ignores *Beautiful Struggle*, as Plaintiffs explained in their opening brief, *see*

15

Pls.Br.35-40. Like the district court, Norfolk overlooks that the Flock Cameras track people only while they are *driving*. Yet driving is how "most people do most of their moving," *Beautiful Struggle*, 2 F.4th at 343, in Norfolk, *see* Pls.Br.37-38. So the gaps are immaterial for the same reason they were in *Beautiful Struggle*: they largely reflect stretches of time when people are not moving much. *See* 2 F.4th at 343; *cf. United States v. Jones*, 565 U.S. 400, 417 n.* (2012) (Sotomayor, J., concurring) (tracking a "bugged container" in a car that "was stationary for much of the Government's surveillance" was less invasive).[9] Put differently, the absence of a signal is its own information, which can even be used to deduce where someone was between captures, as Higdon-Topaz's slack-time analysis demonstrated. *See* JA2189-2191; *see also* Pls.Br.36, 38. And in any event, Norfolk inflates the gaps by calculating the time and distance between captures *for the entire day*, as if people spend all day in their cars. *See* Pls.Br.37-38 & n.13.

 ***Fourth***, Norfolk's criticisms of Wheeler miss the point of his analyses and fly in the face of binding precedent. It first faults him for only identifying a few patterns and intimate details in its Flock data. But the point of his analysis was to demonstrate *how* an officer could make deductions, not to identify *every* intimate detail a resourceful officer might find among all the data on Plaintiffs' movements. *See*

---

 [9] The GPS in *Jones* reflected this same intuition because it shut off when the car stopped. *See* Br. for the United States, *Jones*, 565 U.S. 400 (No. 10-1259), 2011 WL 3561881, at *4 (Aug. 11, 2011).

Pls.Br.33-34. Regardless, no party has ever been required to provide a laundry list of every intimate detail a surveillance technology uncovered about them in order to prevail—not Timothy Carpenter, not Okello Chatrie, not the plaintiffs in *Beautiful Struggle*. Such a requirement would make no sense given that the analysis turns on a surveillance technology's capabilities, not "what it finds" about a given person. *See Chatrie*, 2026 WL 1855568, at *13-14.

Next, Norfolk complains that Wheeler had some background information about Plaintiffs.[10] Yet *Beautiful Struggle* rejected the argument that police must be able to make deductions without "context" for surveillance to be a search. *See* 2 F.4th at 344; *accord Carpenter*, 585 U.S. at 312 ("[T]he Government could, *in combination with other information*, deduce a detailed log of Carpenter's movements . . . ." (emphasis added)). If anything, Wheeler had far less context than an NPD officer would. *See Beautiful Struggle*, 2 F.4th at 344; *see also* PolicingProject.Br.11-15 (the integration of police information systems and technologies was what made the AIR Program truly invasive). And his concession that his conclusions were not "hard certainties" was both entirely appropriate and immaterial. *Compare United States v. Cortez*, 449 U.S. 411, 418 (1981) (the "process" by which "a trained officer draws inferences and makes deductions" from

---

[10] Plaintiffs provided the addresses of Schmidt's supermarket and Crystal's father in responses to an interrogatory from Norfolk asking for their most frequently visited locations. *See* JA2424; JA2444-2445.

"data" "does not deal with hard certainties, but with probabilities"), *with* JA2500 (Wheeler: "Essentially pretty much all the work I do . . . as a crime analyst, it's, like, probabilistic. It's never a hundred percent certain."). In dismissing those "inferences" as "speculation purely," *cf.* JA537-538 (Norfolk's CSLI expert), Norfolk is repackaging arguments *Carpenter* and *Beautiful Struggle* rejected, *see Beautiful Struggle*, 2 F.4th at 344-45.

Like the district court, Norfolk ignores the ultimate potential of its Flock Cameras. There is no genuine dispute of material fact that they have the capability to reveal intimate details, whether through pattern-based deductions or by revealing visits to sensitive locations. *Carpenter*'s first factor therefore favors Plaintiffs.

### B.    *Carpenter* Factor 2: Norfolk's Flock Cameras are easy, cheap, and efficient compared to traditional surveillance.

Plaintiffs explained that Norfolk's Flock Cameras achieve mass surveillance at far lower cost and with far greater efficiency than even CSLI or aerial surveillance. *See* Pls.Br.42-44. Yet Norfolk snubs *Carpenter*'s second factor, treating it as a throwaway line. Norf.Br.49-50.

Once again in *Chatrie*, though, the Court assessed the low cost, ease, and efficiency of Location History as part of its historically oriented analysis. *See* 2026 WL 1855568, at *10. "Prior to the digital age," police surveillance "for any extended period of time was difficult and costly and therefore rarely undertaken." *Id.* (citation omitted). "[L]ow-cost surveillance technologies could" therefore "lead to more

18

surveillance and less accountability." *United States v. Chatrie*, 136 F.4th 100, 124 (4th Cir. 2025) (en banc) (Wynn, J., concurring). Norfolk can discard this factor only because it misreads *Carpenter* to require a quantitative assessment, rather than a qualitative one rooted in history. *See* Section III(A) below.

As a result, Norfolk does not even try to dispute what Plaintiffs argued: reconstructing past movements with the Flock Cameras is far easier, cheaper, and more efficient than doing so using CSLI or aerial surveillance imagery. So it is undisputed that *Carpenter*'s second factor favors Plaintiffs.

### C.     *Carpenter* **Factor 3: Norfolk's Flock Cameras enable police to reconstruct people's past movements.**

There is no dispute that Norfolk's indiscriminate retention of Flock data enables police to recreate past movements. *Compare* Pls.Br.45, *with* Norf.Br.52-53. Norfolk's sole counterargument is that its Flock data do not allow police to "meaningfully" "reconstruct[] the *whole* of anyone's movements." Norf.Br.52 (emphasis added); Norf.Suppl.Br.4-5.

That misapprehends why *Carpenter* emphasized the "retrospective quality of" CSLI data. 585 U.S. at 312. "Critically," that retrospective quality meant "this newfound tracking capacity runs against everyone," even those not under suspicion when their locations were logged. *Id.*; *accord Chatrie*, 2026 WL 1855568, at *11. Compiling an indiscriminate surveillance database is "like a 21st century general search, enabling the police to collect all movements, both innocent and suspected,

without any burden to 'articulate an adequate reason to search for specific items related to specific crimes.'" *Beautiful Struggle*, 2 F.4th at 348 (citation omitted). It creates the type of "too permeating police surveillance" the Fourth Amendment was "designed" to prevent. *United States v. Di Re*, 332 U.S. 581, 595 (1948).

Norfolk does not meaningfully dispute any of this. For all its efforts to liken its Flock Cameras to traditional surveillance of cars on public roads, it ignores the key distinction *Carpenter* drew: "Unlike with the GPS device in *Jones*, police need not even know in advance whether they want to follow a particular individual, or when." *Carpenter*, 585 U.S. at 312. Every driver in Norfolk is treated as a potential suspect, and their movements are stored in a massive and widely accessible government database, just in case the information proves useful later. *See* Pls.Br.9-10. And unlike traditional targeted surveillance, Norfolk's surveillance program has no end date. Drivers' movements will continue to be tracked and stored in 21-day increments for as long as Norfolk decides to maintain its contract with Flock.

All of *Carpenter*'s factors favor Plaintiffs.

**D.      Norfolk's remaining arguments do not alter the *Carpenter* balance.**

Norfolk sees *Carpenter* as a quantitative test, rather than a qualitative one framed around "the Fourth Amendment's beginnings." *Chatrie*, 2026 WL 1855568, at *9. Unsurprisingly, then, it offers no historical defense of its high-tech dragnet in response to Plaintiffs' arguments. Because there is none. *See* Pls.Br.45-47. Norfolk

20

instead falls back on a recent Virginia statute and nonbinding cases that rejected challenges to particular ALPR systems. Norf.Br.34-36, 43-45. Neither tilts the balance back in Norfolk's favor.

If anything, the Virginia statute supports Plaintiffs. The General Assembly's decisions to impose Fourth Amendment-like standards ("reasonable suspicion") and limit data retention, Va. Code § 2.2-5517(D)(i), (E), provide objective evidence that ALPRs invade privacy, *cf. Rakas*, 439 U.S. at 143 n.12. But the question of reasonableness is ultimately for this Court, not the General Assembly, and the Supreme Court has never allowed legislation to authorize a search without a warrant or its functional equivalent. *Compare, e.g., Carpenter*, 585 U.S. at 316-17 (statutorily authorized court order based on less than individualized probable cause was "not a permissible mechanism"), *with id.* at 338 (Kennedy, J., dissenting) (arguing the Court should "defer to legislative judgments" when it assesses "reasonableness"); *see Berger v. New York*, 388 U.S. 41, 54-60 (1967) (statute authorizing "eavesdrop orders" did not satisfy particularity requirement).

The nonbinding cases rejecting challenges to ALPRs also do not help Norfolk. All were decided on sparse motion-to-suppress records or dismissed on the pleadings. These cases, moreover, rested their holdings on the number of cameras or datapoints rather than assessing the general capabilities of the underlying ALPR systems. *See, e.g., Commonwealth v. Church*, 2025 WL 2908089, at *3 (Va. Ct. App.

21

Oct. 14, 2025) (reversing suppression because the record contained only "three [ALPR] images that were taken during approximately seven minutes"); *accord United States v. Porter*, 170 F.4th 381, 384, 387 (5th Cir. 2026); *United States v. Sturdivant*, 786 F. Supp. 3d 1098, 1114 (N.D. Ohio 2025). *Chatrie* forecloses that approach. *See* 2026 WL 1855568, at *13. This Court should decline Norfolk's invitation to blindly follow these other courts and ignore "the lessons of history." *Carpenter*, 585 U.S. at 320 (citation omitted).

*      *      *

ALPRs may be "new, but the principle covering [them] is not." *Chatrie*, 2026 WL 1855568, at *18. And that principle—embodied in the *Carpenter* factors—points to only one result here. The Court should hold that there is no genuine dispute of material fact that Norfolk's operation of the Flock Cameras is an unlawful warrantless search.

## III.    Precedent forecloses Norfolk's efforts to reframe the analysis.

*Carpenter*'s multifactor analysis governs this case and requires the Court to evaluate the Flock Cameras' ultimate capabilities, not just what they happened to capture about Plaintiffs. Lacking any defense of the judgment below based on the *Carpenter* factors, Norfolk instead tries to confuse the issues by reframing the analysis, but the Court can easily reject those efforts. *Chatrie* foreclosed Norfolk's argument that *Carpenter* set a quantitative threshold that requires a surveillance

22

technology to capture the literal "whole" of people's movements to qualify as a search. Meanwhile, Norfolk's claim that no search occurs until a human reviews its Flock data is foreclosed by *Kyllo*, where the Supreme Court held that the collection of surveillance data is a search even if it requires human analysis to reveal intimate details.

**A.     *Carpenter*'s multifactor test determines when surveillance contravenes a reasonable expectation of privacy.**

As Plaintiffs have explained, *Carpenter* laid down qualitative "guideposts" to compare modern surveillance technologies to traditional expectations of privacy from police surveillance. *See* Pls.Br.2, 26-30; *see also* Section II above. Norfolk, however, still insists that *Carpenter*'s test is a quantitative threshold and only "near-comprehensive data" tantamount to the "whole of individuals' movements" will do. Norf.Br.30-32, 46-47; *see* Norf.Suppl.Br.3-4. That is wrong.

Norfolk's fundamental error is collapsing two inquiries into one. The relevant portion of *Carpenter*'s analysis proceeded in two steps. *See United States v. Moore-Bush*, 36 F.4th 320, 340-41 (1st Cir. 2022) (en banc) (Barron, C.J., concurring). First, synthesizing the *Jones* concurrences, the Court held people "have a reasonable expectation of privacy in the whole of their physical movements." *See Carpenter*, 585 U.S. at 307, 310. Second, the Court concluded that "[a]llowing government access to cell-site records *contravenes* that expectation." *Id.* at 311 (emphasis added).

Contravention was the more difficult question because CSLI was "less precise than GPS information," placing a person only "within a wedge-shaped sector ranging from one-eighth to four square miles" at "call origination" and "termination." *Id.* at 302, 312. In other words, CSLI does not directly capture the "whole" of people's movements, just *periodic* data about their *general* location. So the Court consulted "some basic guideposts" rooted in "Founding-era understandings." *Id.* at 305, 310. That yielded the critical factors that distinguished CSLI from conventional police surveillance: the ability to open "an intimate window into a person's life," the low cost and ease, and "the retrospective quality of the data" that meant "this newfound tracking capacity runs against everyone." *Id.* at 311-12.

*Chatrie* confirmed as much. *Carpenter*'s test "is less the result of any fixed set of rules than of 'guideposts' stretching back to the Fourth Amendment's beginnings." *Chatrie*, 2026 WL 1855568, at *9. Those are the "guideposts" Plaintiffs have argued should decide the outcome of this case. *Compare id.* at *9-10, *with* Pls.Br.26-27, *and* Section II above. And the ones *Chatrie* applied to hold a search had occurred. *See* 2026 WL 1855568, at *11-12 ("Everything *Carpenter* relied on . . . applies as well or better to . . . Location History.").[11]

---

[11] Contrary to Norfolk, Norf.Br.46, the Supreme Court has never eschewed multifactor Fourth Amendment tests altogether, *see, e.g.*, *United States v. Dunn*, 480 U.S. 294, 301 (1987); *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975).

Norfolk ignores most of *Chatrie*'s reasoning and focuses solely on the quantity of data. *See* Norf.Suppl.Br.3-5. But *Chatrie* put to rest the notion that *Carpenter* created a quantitative test. The Supreme Court has "never understood Fourth Amendment protections as kicking in only once an intrusion 'goes too far.'" *Chatrie*, 2026 WL 1855568, at *13 (citation omitted). Holding otherwise would "create a host of line-drawing questions" that would devolve into the same unanswerable question the district court asked. *Compare Chatrie*, 2026 WL 1855568, at *13 n.9 ("At what point, exactly, would a non-search become a search?"), *with* JA6 ("when?" surveillance becomes "too intrusive" "is elusive" and subject to "serious doubt"). And for all its complaints about administrability, Norf.Br.36, 54, Norfolk cannot put a number to its proposed test. That "gives away its argument." *Chatrie*, 2026 WL 1855568, at *14.

To avoid having this Court apply the *Carpenter* factors, Norfolk insists Plaintiffs forfeited any argument that *Carpenter* created a multifactor test. Norf.Br.45-46. Not so. Parties must preserve claims, not arguments. *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992). Besides, Plaintiffs emphasized each *Carpenter* factor in their briefs below. *See, e.g.*, Dist.Ct. DE 179-1 at PageID#4439 (*Carpenter* considered how CSLI opened an "intimate window into a person's life," made "long-term tracking possible with just the click of a button at practically no expense," and had "a retrospective quality" that "runs against everyone"

25

(cleaned up)). And the district court referenced the factors, though it failed to apply them. *See* JA26-27 & n.13. Plaintiffs did not use the magic words "*Carpenter* factors," but preservation "does not demand the incantation of particular words." *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 469 (2000). The district court was "on notice as to the substance of" Plaintiffs' claims and arguments. *See id.* Norfolk's forfeiture argument fails on every level.

*Chatrie* confirmed that *Carpenter* created a multifactor test rooted in history to distinguish dragnet surveillance technologies from traditional police surveillance. That is the test the Court should apply, not the nonexistent quantitative threshold that the district court applied and that Norfolk defends on appeal.

**B.    The Court should reject Norfolk's argument that a search requires human review.**

Norfolk makes one other attempt to shift the framing. It concedes, as Plaintiffs argued, that *Carpenter* and *Beautiful Struggle* require the Court to consider the ultimate capabilities of the Flock Cameras. *Compare* Pls.Br.30-31, *with* Norf.Br.29. But for reasons it never fully explains, it insists the Court must evaluate only the capabilities of each individual ALPR because no officer ever "queried" Plaintiffs' data. *See* Norf.Br.24, 29.

The Supreme Court rejected the myopic view that a search requires human review in *Kyllo*, 533 U.S. 27. The dissent in *Kyllo* contended that police use of a thermal imager was not a search because the crude images revealed nothing until an

officer reviewed them and "inferred" interior details. *See id.* at 44, 52 (Stevens, J., dissenting). But the majority rejected the "novel proposition that inference insulates a search." *Id.* at 36. The "unlawful thermal-imaging *measurement*" was a search even though the data required human "analysis (*i.e.*, the making of inferences)" "before anything inside the house could be known." *Id.* at 36-37 & n.4 (emphasis added). Likewise, *Beautiful Struggle* held the AIR Program was a search because the captured images "enable[d] deductions," not because a human made those deductions after scouring millions of images for the plaintiffs' blurred dots. 2 F.4th at 342, 345, 348. And in *Chatrie*, the Supreme Court focused not on what information the police "actually accessed," but what was in the "all-encompassing database" they "can access." 2026 WL 1855568, at *13.

The upshot is that there is no "'automation exception' to the Fourth Amendment" that shields surveillance programs that collect data without direct human involvement. Laura K. Donohue, *Bulk Metadata Collection: Statutory and Constitutional Considerations*, 37 Harv. J.L. & Pub. Pol'y 757, 895 (2014). Otherwise, police could set up myriad dragnet surveillance programs without judicial oversight. They could require every home-security camera to save footage to a government database and they could download CSLI in bulk every day, so long as they secured a warrant before a person reviewed the data. *See id.* at 895-96. That turns the Fourth Amendment on its head. The collection of information is a privacy

27

intrusion independent of human review. *See id.* Even if no one ever sees the information, "[a]wareness that the government may be watching chills associational and expressive freedoms," and thereby "alter[s] the relationship between citizen and government in a way that is inimical to democratic society." *Jones*, 565 U.S. at 416 (Sotomayor, J., concurring) (citation omitted).

This case is not about 175 cameras operating in silos; it is about an integrated citywide surveillance system that aggregates tens of millions of datapoints on people's movements in a centralized government database. *See* Pls.Br.6, 8-10 & n.3. Framing the case in this way—based on how Norfolk's Flock Camera system actually operates—disposes of Norfolk's argument that its Flock Cameras are "conventional" "security cameras." *See* Norf.Br.28, 33 (quoting *Carpenter*, 585 U.S. at 316). In context, "the Court is most naturally understood to have been referring to the familiar 'tactic[]'" of police seeking "footage from third parties['] . . . security cameras." *Moore-Bush*, 36 F.4th at 352 (Barron, C.J., concurring) (first alteration in original). But Norfolk's Flock Cameras, which use AI and night vision to create a "Vehicle Fingerprint" for every passing car and upload the data to the cloud, JA7-8, are a far cry from "conventional" "security cameras," *cf. Moore-Bush*, 36 F.4th at 344 (*Carpenter* created a "conventional-discrete/unconventional-aggregative dichotomy"). Indeed, Flock itself distinguishes "[t]raditional LPR systems" from its ALPRs, which "leverag[e] AI, network intelligence, and purpose-built hardware" to

enable "broader vehicle identification."[12] Norfolk's high-tech dragnet is anything but conventional.

This Court should not ignore the forest for the trees simply because no officer ever pulled up Plaintiffs' data on a single computer screen. "The issue in this case is not the police's allegedly unlawful [querying], but their allegedly unlawful" use of advanced surveillance technology to track people's movements. *Cf. Kyllo*, 533 U.S. at 37 n.4. Norfolk is therefore wrong to rely on pre-information-age cases, *see* Norf.Br.25-29, allowing police to examine vehicle identification numbers during a lawful stop, *New York v. Class*, 475 U.S. 106, 113-14 (1986),[13] or tail suspects on a single route in real time using crude beepers, *United States v. Knotts*, 460 U.S. 276, 278-79, 285 (1983); *see Chatrie*, 2026 WL 1855568, at *13 (*Knotts* "cabined [its holding] to that rudimentary technology," which did not "allow[] remote monitoring").[14] The Supreme Court and this Court clarified "three decades later" the principles by which to evaluate "more sophisticated surveillance" technologies that

---

[12] *Not All License Plate Readers Are Equal*, Flock Safety (Feb. 6, 2026), https://bit.ly/3SN22HP.

[13] Norfolk's reliance on *Class* is also a strawman. Plaintiffs' grievance is not that the cameras can see license plates, but that Norfolk is using them as an identifier to create a searchable record of Plaintiffs' movements. *Cf. Neal v. Fairfax Cnty. Police Dep't*, 812 S.E.2d 444, 449 (Va. 2018) (a "license plate number . . . is an agency-issued number that identifies the owner of the vehicle").

[14] Even farther afield are the cases Norfolk cites, Norf.Br.27-28 & n.7, about discrete surveillance of known suspects using non-networked pole cameras, *see Beautiful Struggle*, 2 F.4th at 345 (distinguishing this line of cases).

enable retrospective mass surveillance, like the Flock Cameras. *See Chatrie*, 2026 WL 1855568, at *13. It is those principles that govern this case.

## IV. Norfolk's Flock Cameras effect an unreasonable search within the original meaning of the Fourth Amendment.

Like Norfolk's other cries of forfeiture, its claim that Plaintiffs "affirmatively waived" their alternative argument is a false alarm. Norf.Br.53. Norfolk faults Plaintiffs for raising the argument while acknowledging that it was foreclosed. *Id.* But that is the *opposite* of waiver—it is textbook preservation. *See, e.g.*, *United States v. Giddins*, 858 F.3d 870, 878 n.5 (4th Cir. 2017). The waiver case Norfolk cites is far afield. It involved a criminal defendant who affirmatively withdrew an evidentiary objection, not a party preserving a foreclosed argument. *See United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014).

At this stage, the parties' disputes are largely academic. Plaintiffs' proposed ordinary meaning test offers a more straightforward way to resolve Fourth Amendment questions. But returning to the Fourth Amendment's original meaning will require Supreme Court intervention, and the outcome of this case is clear under current law.

### CONCLUSION

The Court should vacate the judgment, reverse the denial of Plaintiffs' summary judgment motion, and remand for entry of an injunction consistent with this Court's opinion.

Dated: July 23, 2026

Respectfully submitted,

*/s/ Michael B. Soyfer*
Michael B. Soyfer
Robert Frommer
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
msoyfer@ij.org
rfrommer@ij.org

*Counsel for Plaintiffs–Appellants*

31

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit in the Court's July 2, 2026

Order, DE 57, because, excluding the parts of the document exempted by Fed. R.

App. P. 32(f), it contains 7,109 words. This brief complies with the type-style

requirements because it was prepared using Microsoft Word 365 in 14-point Times

New Roman, a proportionally spaced typeface.


Dated: July 23, 2026

*/s/ Michael B. Soyfer*
Michael B. Soyfer
*Counsel for Plaintiffs–Appellants*
